Case No. 23-12469

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

CITY OF ATLANTA,
Appellant- Defendant,

v.

LISA BAKER, ET AL.,
Appellees-Plaintiffs.

---

Appeal from the United States District Court
for the Northern District of Georgia

## APPELLANT CITY OF ATLANTA'S OPENING BRIEF

Robert L. Ashe III
Jane D. "Danny" Vincent
Matthew R. Sellers
BONDURANT MIXSON & ELMORE LLP
1201 W Peachtree St NW Ste 3900
Atlanta, GA 30309

*Attorneys for the City of Atlanta*

Case No. 23-12469
City of Atlanta v. Baker

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, the following trial judges, attorneys, persons, associations of persons, firms, partnerships, and corporations are known or believed to have an actual or potential interest in the outcome of this case or appeal:

- Ashe III, Robert L. (Counsel for Appellant)

- Baker, Lisa (Appellee-Plaintiff)

- Bondurant, Mixson & Elmore, LLP (Law Firm Counsel for Appellant)

- City of Atlanta (Appellant-Defendant)

- Cohen, Mark H. (United States District Judge – Northern District of Georgia)

- Defend Atlanta Forest (Interested Association of Persons)

- Dougherty, Jacqueline (Appellee-Plaintiff)

- Filipovits, Jeff (Counsel for Appellees)

- Law Offices of Gerry Weber, LLC (Law Firm Counsel for Appellees)

- Jones, Keyanna (Appellee-Plaintiff)

- Patel, Alkesh B. (Counsel for Former Defendant and Trial Court Amicus State of Georgia)

- Sellers, Matthew R. (Counsel for Appellant)

Case No. 23-12469
City of Atlanta v. Baker

- Smith, Wingo (Counsel for Appellees)

- Spears, Brian (Counsel for Appellees)

- Spears & Filipovits, LLC (Law Firm Counsel for Appellees)

- State of Georgia (Former Defendant and Amicus)

- Stop Cop City Coalition (Interested Association of Persons)

- Vincent, Jane D. (Counsel for Appellant)

- Weber, Gerald (Counsel for Appellees)

- Weltner, Amelia (Appellee-Plaintiff)

- Winkles, Logan. B. (Counsel for Former Defendant and Trial Court Amicus State of Georgia)

The City of Atlanta is a municipality created by the State of Georgia and thus has no parent corporations or publicly traded corporations to disclose.

## STATEMENT REGARDING ORAL ARGUMENT

In the interest of time, Appellant the City of Atlanta ("City") does not request oral argument. This appeal presents the question whether the City may, consistent with the First Amendment, follow Georgia law in requiring that its residents verify that signatures on a citizen-initiative petition were collected within the City limits. The signature verification process will soon be underway, and the City needs a ruling on the injunction as soon as possible.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF CONTENTS.......................................................................................... ii

TABLE OF CITATIONS ....................................................................................... iv

STATEMENT OF JURISDICTION.................................................................... viii

STATEMENT OF THE ISSUES............................................................................1

STATEMENT OF THE CASE................................................................................2

    I.     Statement of the Facts ...............................................................2

    II.    Proceedings in the District Court ..............................................6

    III.   Standard Of Review ...................................................................9

SUMMARY OF THE ARGUMENT ....................................................................10

ARGUMENT AND CITATIONS OF AUTHORITY ...........................................12

    I.     The district court violated the *Purcell* principle by issuing an injunction in the middle of the petition process. ..................................12

    II.    The district court erred in finding a substantial likelihood of success on the merits based on its application of strict scrutiny to the residency verification requirement.............................................15

        A.    The City residency verification requirement does not impose a severe burden on Petitioners, so strict scrutiny does not apply. ...........................................................17

        B.    The City residency verification requirement is a reasonable regulation on the petition process............................21

C.     The out-of-circuit cases on which the district court relied are the wrong framework for analyzing the City's residency verification requirement. ...........................................22

III.   The Petitioners failed to show irreparable harm caused by the residency requirement. .......................................................27

A.     The Petitioners have not suffered irreparable harm because Georgia Supreme Court precedent prohibits their proposed referendum. ................................................28

B.     The referendum is invalid because it seeks to impair a contract. ....................................................................32

C.     State law still imposes a residency requirement that the City must follow.........................................................34

IV.    The injunction does not serve the balance of equities or the public interest. ......................................................................35

V.     The district court erred in the broad remedy it granted, which effectively rewrote the City petition ordinance.................37

A.     The residency requirement is not severable from the petition ordinance because state law requires it. .....................37

B.     The district court had no authority to extend the time limit for collecting signatures. ...................................40

CONCLUSION ....................................................................................42

CERTIFICATE OF COMPLIANCE....................................................44

CERTIFICATE OF SERVICE ..............................................................45

## TABLE OF CITATIONS

**Cases:**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018)...................................................................35

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983)......................................................................16

*Arizonans for Fair Elections v. Hobbs*,
    454 F. Supp. 3d 910 (D. Ariz. 2020)............................................15

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018)...................................................................35

*Biddulph v. Mortham*,
    89 F.3d 1491 (11th Cir. 1996) ................................................16, 29

*Buckley v. Am. Const. Law Found.*,
    525 U.S. 182 (1999)..............................................16, 17, 19, 20

*Burdick v. Takushi*,
    504 U.S. 428 (1992).........................................................15, 16, 21

*Camden County v. Sweatt*,
    883 S.E.2d 827 (Ga. 2023).......................................................30, 40

*City Council of Augusta v. Mangelly*,
    254 S.E.2d 315 (Ga. 1979)............................................................39

*City of Atlanta v. Hudgins*,
    19 S.E.2d 508 (Ga. 1942)..............................................................31

*Cowen v. Sec'y of State*,
    22 F.4th 1227 (11th Cir. 2022) .....................................................21

*DaimlerChrysler Corp. v. Ferrante*,
    637 S.E.2d 659 (Ga. 2006)............................................................37

iv

*Fair Maps Nevada v. Cegavske*,
    463 F. Supp. 3d 1123 (D. Nev. 2020) ...........................................15

*Gonzalez v. Gov. of Ga.*,
    978 F.3d 1266 (11th Cir. 2020) ....................................................30

*H.G. Brown Family Ltd. P'ship v. City of Villa Rica*,
    607 S.E.2d 883 (Ga. 2005)....................................................38, 39

*Holt Civic Club v. City of Tuscaloosa*,
    439 U.S. 60 (1978) ........................................................................21

*Initiative & Referendum Inst. v. Jaeger*,
    241 F3d 614 (8th Cir. 2001)........................................................17

*Initiative & Referendum Inst. v. Sec'y of State*,
    No. CIV. 98-104, 1999 WL 33117172
    (D. Me. April 23, 1999) ................................................................21

*John Doe No. 1 v. Reed*,
    561 U.S. 186, 197 (2010)..............................................................15

*Jonesboro Area Athletic Ass'n v. Dickson*,
    181 S.E.2d 852 (Ga. 1971)......................................................32, 33

*Keener v. Convergys Corp.*,
    342 F.3d 1264 (11th Cir. 2003) ....................................................41

*Kemp v. City of Claxton*,
    496 S.E.2d 712 (Ga. 1998)..............................................2, 11, 28

*Krislov v. Rednour*,
    226 F.3d 851 (7th Cir. 2000) ........................................................24

*League of Women Voters v. Fla. Sec'y of State*,
    32 F.4th 1363 (11th Cir. 2022) .............................................8, 10, 12

*Leavitt v. Jane L.*,
    518 U.S. 137 (1996)......................................................................37

*Lerman v. Bd. of Elections*,
　　232 F3d 135 (2d Cir. 2000)................................................................24

*Libertarian Party of Va. v. Judd*,
　　718 F.3d 308 (4th Cir. 2013)..............................................................24

*Little v. Reclaim Idaho*,
　　140 S. Ct. 2616 (2020).......................................................................23

*Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*,
　　881 F.3d 1323 (Fed. Cir. 2018)..........................................................28

*New Ga. Project v. Raffensperger*,
　　976 F.3d 1278 (11th Cir. 2020)..................................................... 35-36

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*,
　　50 F.4th 1126 (11th Cir. 2022)............................................................9

*Pierce v. Jacobsen*,
　　44 F.4th 853 (9th Cir. 2022)......................................22, 24, 25, 26

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
　　140 S. Ct. 1205 (2020)..............................................................35, 42

*Swain v. Junior*,
　　961 F.3d 1276 (11th Cir. 2020)....................................................27, 35

*VoteAmerica v. Raffensberger*,
　　609 F. Supp. 3d 1341 (N.D. Ga. 2022)..............................................35

*We the People PAC v. Bellows*,
　　40 F.4th 1 (1st Cir. 2022)...................................................................22

*Wilmoth v. Sec'y of State*,
　　731 F. App'x 97 (3d Cir. 2018).........................................................24

*Yes On Term Limits, Inc. v. Savage*,
　　550 F.3d 1023 (10th Cir 2008).........................................................22

**<u>Statutes</u>:**

U.S. Const. art. I ................................................................................ 32, 33

Ga. Const. art. 3 ..................................................................................31

28 U.S.C. § 1331 ................................................................................ viii

O.C.G.A. § 1-1-3 ............................................................................39, 40

O.C.G.A. § 36-35-3 .....................................................................*passim*

## STATEMENT OF JURISDICTION

The district court had federal question jurisdiction over the First Amendment claims in this case.  *See* 28 U.S.C. § 1331.  The district court entered a preliminary injunction on July 27, 2023. The City timely filed a notice of appeal the next day, on July 28, 2023. *See* Fed. R. App. P. 4(a)(1). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1), which provides for "jurisdiction of appeals from [i]nterlocutory orders of the district courts … granting, continuing, modifying, refusing or dissolving injunctions."

## STATEMENT OF THE ISSUES

This appeal concerns a disruptive preliminary injunction of a City of Atlanta ("City") ordinance providing for citizen petitions and initiatives. Mirroring state law, the City ordinance requires a City resident to attest that petition signatures were collected within the City limits. This brief will refer to the City ordinance at issue as the "petition ordinance" and the specific requirement as the "residency verification requirement." The district court held that the residency verification requirement violates the First Amendment. It entered a preliminary injunction more than halfway through the 60-day statutory period for signature collection that (1) enjoined the residency verification requirement and (2) extended the signature collection period another 60 days. The City must soon begin signature verification under the district court's injunction rather than its own ordinance and state law.

The issues on appeal are:

1. Whether the district court violated the *Purcell* principle by issuing a preliminary injunction in the middle of a petition signature collection process;

2. Whether the district court erred by applying strict scrutiny to the City's ordinance and determining that the Appellees have a substantial likelihood of success on the merits;

3. Whether the district court erred in finding irreparable harm despite the fact that the City ordinance is not the cause of the Appellees' alleged injury;

4. Whether the district court erred in finding that the equities and public interest favor Appellees; and

5. Whether the district erred in severing the residency verification requirement and in extending the signature collection period.

## STATEMENT OF THE CASE

The City is in the process of building a new Public Safety Training Center ("Safety Training Center") to meet the needs of its police and fire departments. Opponents of the Safety Training Center have organized a signature drive in an effort to require the City to hold a referendum to repeal a 2021 City ordinance authorizing then-Atlanta Mayor Keisha Lance Bottoms to enter into a lease of land for the Safety Training Center to the Atlanta Police Foundation. Under Georgia Supreme Court precedent, the City has no power to hold a referendum to repeal such an ordinance. *See Kemp v. City of Claxton*, 496 S.E.2d 712, 715–16 (Ga. 1998). Nonetheless, Appellees Lisa Baker, Jacqueline Dougherty, Keyanna Jones, and Amelia Weltner (collectively, "Petitioners") sued to enjoin the residency verification requirement and moved for a preliminary injunction in the middle of the signature collection effort.

The district court erred in granting the requested injunction. Not only did the injunction disrupt a process that was already underway, but the district court erred in finding that the Petitioners showed irreparable harm and a likelihood of success on the merits. This Court should reverse.

## I.   Statement of the Facts

The City needs new, modern training facilities for its police and fire departments. To meet that need, the City has entered agreements to develop 85 acres

of a 300-plus acre City-owned property in DeKalb County, Georgia into a Public Safety Training Center. The City Council passed an ordinance in September 2021 that "authoriz[ed] the mayor or her designee, on behalf of the city of Atlanta, to execute a ground lease agreement with the Atlanta Police Foundation for approximately 85 acres for improvements related to public safety training facilities and to preserve approximately 265 acres for greenspace" ("ground lease ordinance").[1] Mayor Keisha Lance Bottoms exercised this authority and executed a ground lease agreement in October 2021. In 2023, the City Council appropriated $30 million for construction of the Safety Training Center.[2] Work at the site is ongoing.

After the appropriation, and more than a year and a half after the ground lease ordinance passed and the lease was executed, opponents of the Safety Training Center sought to initiate a petition to hold a referendum to repeal the ordinance authorizing the ground lease.[3] The City's petition and referendum process is derived exclusively from the Georgia Home Rule Act, O.C.G.A. § 36-35-3. Relevant to this appeal, the Home Rule Act requires a "resident of the municipality affected by the petition" to attest that petition "signatures were collected inside the boundaries of the affected municipality." O.C.G.A. § 36-35-3(b)(2)(C). The Home Rule Act gives

---

[1] *See* Doc. 21-3; Atlanta Ordinance 20-O-0367.

[2] *See* Doc. 21-2.

[3] Doc. 1 ¶ 17; Doc. 1-3.

petition sponsors 60 days to collect the requisite number of signatures.[4] Notably, the Georgia Supreme Court has held that this process "is intended to be available only when the proposed amendment is intended to affect a city charter," not "to petition for a referendum on all ordinances and resolutions." *Kemp*, 496 S.E.2d at 715–16. The City adopted an ordinance that mirrors the Home Rule Act.[5] In keeping with the Home Rule Act, the City ordinance also contains the residency verification requirement, which requires a City resident to attest that petition "signatures were collected inside the boundaries of the city."[6]

The Center's opponents submitted a draft petition to the municipal clerk on June 7, 2023,[7] because the clerk must "approve all petitions as to form,"[8] On June 14, Wingo Smith, who served as counsel for Appellees in the trial court and represents them in this Court, contacted the clerk to advocate approval of the petitions.[9] The clerk rejected the original draft petition on June 14 because it did not include a place for a resident to swear "that the signatures were collected inside the boundaries of the City of Atlanta."[10]

---

[4] *Id.*

[5]  *See* Doc. 1-1 (certified copy of Atl. City Code § 66-37).

[6] *Id.*

[7] S*ee* Doc. 1-2 at 3.

[8] *See* Doc. 1-1 ¶ 41; see also O.C.G.A. § 36-35-3(b)(2)(C).

[9] *See* Doc. 24-2.

[10] Doc. 24-3 at 2.

The same day, June 14, Mr. Smith submitted a revised draft petition on behalf of the petition sponsors.[11] The revised draft included a signature block for a circulator to "swear[]" that he or she is "a registered elector in the City of Atlanta" and "collected these signatures for this Petition within the City of Atlanta."[12] The clerk rejected the revised petition on June 20 because it: (1) misstated the legal authority for the petition and referendum process; (2) did not state all requirements for petition signatories; and (3) did not include a field for date of birth, to assist with signature verification.[13] Mr. Smith submitted a third draft petition later on June 20 addressing the deficiencies the clerk had identified on June 20.[14] The clerk approved that petition as to form on June 21 and issued official petitions the next day.[15]

The clerk's issuance of official petitions kicked off the 60-day period for signature collection.[16] The petition sponsors thus had until August 21, 2023 to submit the petition. Under state law, the City has no authority to accept a petition "if more than 60 days have elapsed since the date the sponsor of the petition first obtained copies of the petition from the clerk." O.C.G.A. § 36-35-3(b)(2)(C).

The Appellees Lisa Baker, Jacqueline Dougherty, Keyanna Jones, and Amelia

---

[11] Doc. 24-4.

[12] Doc. 24-4 at 5.

[13] Doc. 24-1 at 4.

[14] Doc. 24-1 at 2–3.

[15] Doc. 24-1 at 2–3; Doc. 1 ¶ 48.

[16] *See* Doc. 1-1; O.C.G.A. § 36-35-3(b)(2)(C).

Weltner are DeKalb County residents who do not live in the City.[17] They oppose the Safety Training Center and want to circulate the petition and collect signatures.[18] They sued to challenge the residency verification requirement.

## II.    Proceedings in the District Court

On July 6, 2023, a quarter of the way through the 60-day signature collection period, the Petitioners filed an action under 42 U.S.C. § 1983 against the City and the State of Georgia (the "State") seeking, among other things, a declaration and injunction (1) prohibiting enforcement of the residency verification requirement and (2) restarting the 60-day signature collection clock.[19] The Petitioners filed a motion for a preliminary injunction with the complaint seeking the same relief.[20] The City waived service on July 7, 2023,[21] and the Petitioners served the State on July 10, 2023.[22]

Per the district court order expediting briefing,[23] the City filed a response on July 14.[24]  The State also filed a response (and then an amended response) asserting

---

[17] Doc. 1 ¶¶ 18–36.
[18] *Id.*
[19] *See generally* Doc. 1.
[20] *See* Doc. 2.
[21] Doc. 8.
[22] Doc. 9.
[23] Doc. 6.
[24] Doc. 15.

sovereign immunity.[25] Faced with that winning argument, the Petitioners dropped the State as a party.[26] After Petitioners filed a reply,[27] the City filed a sur-reply to address certain new arguments the Petitioners raised,[28] and the State filed an amicus brief as a non-party.[29]

The district court granted the Petitioners' preliminary injunction motion and gave Petitioners all the relief they asked for on July 27—with more than half the 60-day signature collection period gone.[30] The district court applied strict scrutiny to the residency verification requirement and found that the requirement was not narrowly tailored to further a compelling state interest.[31] As to irreparable harm, the district court held that "the inability of nonresidents to gather signatures for the proposed referendum impacts their core political speech by making it more difficult to obtain the required number of signatures to place the initiative on the ballot."[32] But the district court declined to address other aspects of state law that will prevent the initiative from going on the ballot, calling those arguments "not ripe."[33]

---

[25] Doc. 16, Doc.19.

[26] Doc. 22; Doc. 23.

[27] Doc. 21.

[28] Doc. 24.

[29] Doc. 25.

[30] Doc. 26.

[31] Doc. 26 at 9–17.

[32] *Id.* at 24.

[33] *Id.* at 23–24.

The district court then held that the equities and public interest favored the Petitioners.[34] It rejected the *Purcell* principle, which holds that "federal district courts ordinarily should not enjoin state election laws in the period close to an election," *League of Women Voters v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (11th Cir. 2022) (quotation omitted), based on its view that "there is no election that is close at hand."[35] (quotation omitted). The district court gave no weight to the disruption to the signature verification process the City must undertake.[36] Finally, the district court held that it could sever the residency verification requirement from the petition ordinance based on a general severability ordinance in the City code.[37]

The district court granted the Petitioners all the relief they sought. The preliminary injunction: (1) orders the City to issue new copies of the petition without the residency verification requirement; (2) restarts the 60-day clock for signature collection; and (3) requires the City to count signatures that were collected prior to the injunction.[38] In effect, the district court gave the Petitioners a 95-day period to collect signatures in lieu of the 60-day period allowed by state and local law.

The City timely appealed the district court's order the day after the district

---

[34] *Id.* at 25–26.

[35] Doc. 26 at 26

[36] *See id.*

[37] Doc. 26 at 27–30.

[38] Doc. 26 at 30–32.

court entered it.[39] The City also moved to stay the preliminary injunction, as a prerequisite to seeking a stay in this Court under Federal Rule of Appellate Procedure 8.[40] The district court denied that motion on August 14.[41] The City filed an emergency stay motion with this Court contemporaneously with this brief. The City has also moved to expedite this appeal given the impending deadlines to verify signatures.

## III.    Standard Of Review

This Court "review[s] a district court's grant of a preliminary injunction for abuse of discretion." *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, 50 F.4th 1126, 1134 (11th Cir. 2022) (quotation omitted). Under that standard, the Court "review[s] the preliminary injunction's underlying legal conclusions *de novo* and its findings of fact for clear error." *Id.* (quotation omitted). To obtain a preliminary injunction, the Petitioners bore the burden to "prove that" (1) "it has a substantial likelihood of success on the merits," (2) "that it will suffer irreparable injury unless the injunction issues," (3) "that the injury that threatens it outweighs whatever damage the proposed injunction may cause the opposing party," and (4) "that the injunction would not be adverse to the public interest." *Id.* at 1135.  In

---

[39] Doc. 28.

[40] Doc. 29.

[41] Doc. 34.

addition, under the *Purcell* principle, "federal district courts ordinarily should not enjoin state election laws in the period close to an election." *League of Women Voters*, 32 F.4th at 1371 (quotation omitted).

## SUMMARY OF THE ARGUMENT

The Petitioners failed to carry their burden of showing entitlement to a preliminary injunction.

At the outset, the preliminary injunction violated the *Purcell* principle, which holds that federal courts ordinarily should not enjoin state election laws in the period close to an election. The injunction—issued 35 days into a 60-day signature collection period—requires the City to count and validate signatures collected out of compliance with the petition ordinance and state law and to give the Petitioners significant additional time to submit signatures. The City's validation must happen on a short, 50-day deadline. The district court's injunction does not say what the City should do if it cannot contact a non-resident petition circulator about the signatures he or she collected, or how long the City gets to verify signatures if the referendum proponents submit additional signatures after the original August 21 deadline. The injunction is also based on the erroneous assumption that the City may lawfully ignore contrary provisions in state law. The district court thus wrongly assumed that its injunction would not disrupt the process. The *Purcell* principle also preludes Petitioners from establishing that the equities or public interest is in their favor.

Beyond that, the district court erroneously applied strict scrutiny to the residency verification requirement. The district court read the requirement as a ban on petition circulation by non-residents, which it simply is not. Properly read, the petition ordinance merely requires City residents to attest that signatures were collected inside the City limits—an attestation a resident can make without ever soliciting passersby to sign the petition, or speaking to anyone at all. The residency verification requirement, in other words, poses no limitation on who can collect signatures or on what they can say about the petition. That is a reasonable regulation of the petition process, not a burden on political speech, and it is justified by the City's interests in restricting its political process to residents and combatting fraud.

Moreover, the Petitioners have not shown irreparable harm because there are at least three other reasons they cannot put the referendum on the ballot. First, the Georgia Supreme Court in *Kemp v. City of Claxton*, 496 S.E.2d 712, has held that municipal petition-initiated referenda are available only to amend the municipal charter, not to repeal municipal ordinances—in other words, state law and the City's ordinance do not permit this type of petition. Second, the Petitioners seek to repeal an ordinance that authorized a contract's execution in 2021. The constitutional prohibitions on the impairment of contracts and against *ex post facto* nullification preclude the City from escaping its obligations by repealing the ordinance. And third, the Petitioners failed to obtain an injunction against the Georgia law that

contains the exact same residency requirement as the petition ordinance. The City has no power to deviate from state law.

Finally, assuming the district court correctly enjoined the petition ordinance, it erred in the remedy it granted. The petition ordinance derives from and must comply with state law. The district court severed what it erroneously viewed as the unconstitutional part of the petition ordinance and then extended the timeline substantially, but that resulted in an ordinance that does not comply with state law on multiple fronts: the petition language and the collection deadline are out of compliance. The district court was wrong to find that the City would have enacted a non-compliant ordinance that it had no power to enact. The district court should instead have enjoined the entire petition ordinance.

This Court should therefore reverse the grant of a preliminary injunction.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I.  The district court violated the *Purcell* principle by issuing an injunction in the middle of the petition process.

Under what is known as the *Purcell* principle, "federal district courts ordinarily should not enjoin state election laws in the period close to an election." *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1371 (quotation omitted). The district court cast the *Purcell* principle aside and entered an injunction that effectively rewrote the petition ordinance in the middle of signature collection, with a matter of months until the potential November election. The

consequence is that the City must soon begin signature verification without a final decision on whether some signatures are valid and with limited ability to confirm the identity of nonresident petition circulators. If the Petitioners obtain the requisite number of signatures, the City may even have to plan to call a special election without knowing how many signatures should count.

This result illustrates the need for the *Purcell* principle. Under the current state of affairs, there are two different petitions circulating, one that requires an attestation by a City resident that the signatures were collected within the City, and one that does not. The deadline to submit signed petitions is August 21 under state law, *see* O.C.G.A. § 36-35-3(b)(2)(C), or September 25 under the district court's order.[42] Under one version of the petition, the person attesting as to where the signatures were collected must also attest that he or she is a City resident. Under the district court's version, that person must only provide an address. If the attestor provides an address outside the City limits or even outside the State, there is little the City Council can do to verify the identity of the attestor—let alone subpoena them to provide sworn testimony. *See* Atl. City Code § 2-103 (providing for punishment under the City code for refusal to obey a subpoena issued by the Council); Atl. City Code § 62-35 (giving the City court jurisdiction to punish code violations).

All this leaves the City in a bind. The City Council has only 50 days to

---

[42] *See* Doc. 26 at 30–31.

determine the validity of the petition. Atl. City Code § 66-37(a). But does that 50 days run from August 21, the date state law and City's ordinance establishes as the deadline, or may the circulators continue to submit additional signatures? If so, does the City's 50-day verification period restart with each additional submission? The district court's order does not say. What's more, the order requires the City Council to incur the expense of counting and verifying signatures that will be invalid if this Court vacates the injunction or if the district court declines to give permanent relief.[43] In other words, the process may change yet again if this Court or the district court take further action. On top of all that, to safeguard the integrity of the process, the City must come up with some way to confirm the identity of nonresident attestors without subpoena power to compel nonresidents to appear. The City and the petitioners alike need a clear, non-contingent process for verifying petition signatures, but the district court's order leaves a question mark about how the City should proceed. *Purcell* is designed to prevent this late-stage uncertainty—and the litigation that will surely follow.

The district court's order does not discuss any of these issues. Instead, the district court rejected the application of *Purcell* based on the mistaken view that no election will be scheduled unless and until the signatures are collected and

---

[43] Doc. 26 at 30–31.

validated.[44] But the narrow focus on an election gives short shrift to the City's "undoubtedly important" interest in "preserving the integrity of the electoral process" through signature verification. *John Doe No. 1 v. Reed*, 561 U.S. 186, 197 (2010). That interest "is not limited to combating fraud," but "extends to efforts to ferret out invalid signatures caused not by fraud but by simple mistake, such as duplicate signatures or signatures of individuals who are not registered to vote." *Id.* at 198. The petitioners seek access to the ballot, after all, and so the City must ensure that signatures are valid. Recognizing as much, federal courts around the country have applied *Purcell* to decline to make late-breaking changes to petition signature laws. *See, e.g.*, *Arizonans for Fair Elections v. Hobbs*, 454 F. Supp. 3d 910, 930 (D. Ariz. 2020); *Fair Maps Nevada v. Cegavske*, 463 F. Supp. 3d 1123, 1148 (D. Nev. 2020) (declining to require new signature system for petition process "[e]ven though there are some five months until the election"). This Court should do the same.

## II.    The district court erred in finding a substantial likelihood of success on the merits based on its application of strict scrutiny to the residency verification requirement.

The Supreme Court has said time and again that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quotation omitted). Moreover, "States allowing ballot

---

[44] Doc. 26 at 26.

initiatives have considerable leeway to protect the integrity and reliability of the initiative process." *Buckley v. Am. Const. Law Found.*, 525 U.S. 182, 191 (1999). "Most restrictions a state might impose on its initiative process would not implicate First Amendment concerns." *Biddulph v. Mortham*, 89 F.3d 1491, 1500 (11th Cir. 1996).

Against this backdrop, the district court erred in applying strict scrutiny to the City's residency verification requirement. Any regulation of an election or initiative process "inevitably affects" First Amendment rights, *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983), and so the Supreme Court has directed courts to use a balancing test to determine the level of scrutiny to apply. In *Burdick*, the Supreme Court said:

> A court considering a challenge to a state election law must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

504 U.S. at 434 (quotation omitted). Under this test, when First Amendment "rights are subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Id.* (quotation omitted). "But when a state election law provision imposes only reasonable, nondiscriminatory

restrictions," then "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (quotation omitted).

Properly viewed, the City's residency verification requirement imposes a reasonable restriction on participation in its political process that does not affect core political speech. This Court should reverse the district court's contrary conclusion.

### A. The City residency verification requirement does not impose a severe burden on Petitioners, so strict scrutiny does not apply.

"No litmus-paper test will separate valid ballot-access provisions from invalid interactive speech restrictions because there is no substitute for the hard judgments that must be made." *Initiative & Referendum Inst. v. Jaeger*, 241 F3d 614, 616 (8th Cir. 2001) (quoting *Buckley*, 525 U.S. at 192). The Court must instead look to the specific facts of the case.

The City petition ordinance, and the Home Rule Act it mirrors, impose two requirements on signature collection: (1) the person signing the petition must be a qualified voter in the City's municipal elections and (2) the signature must be collected within the city limits. *See* O.C.G.A. § 36-35-3(b)(2)(C).[45] The City Council must verify that signers are qualified municipal voters, and the law gives it 50 days to do so after submission of the signed petitions.[46] But the City Council has no way to verify where any signatures were collected, and so the law assigns this verification

---

[45] Doc. 1-1 (certified copy of Atl. City Code § 66-37).

[46] *See id*.

to a City resident.[47] Specifically, a City resident must attest that "the signatures were collected inside the boundaries of the city."[48]

This requirement does not affect one-on-one communication between petition circulators and potential signatories. The Petitioners here may do all they claim to want to do: circulate the referendum petition, collect signatures, and advocate for the ordinance's repeal.[49] Nothing in the petition ordinance or the Home Rule Act stands in their way. All a resident must do is attest that the signature was collected inside the City. A resident may do that without interacting with a potential signatory at all.

To put it in context, consider some of the signature collection drives the referendum proponents have organized—like one at a tailgate for an Atlanta United soccer game.[50] A City resident attending that signature drive could make the required attestation without advocating repeal, soliciting signatures, or even speaking to any potential signatories. The resident must simply be able to swear that the signatures were collected inside the City limits.

---

[47] *See id.*

[48] Doc. 1-1 at 2.

[49] Doc. 1 ¶¶ 21–23, 28, 32, 36.

[50]  *See* Bill Torpy, *Training center referendum will be an answer one way or noather*, Atlanta Journal Constitution (July 19, 2023), available at https://www.ajc.com/opinion/columnists/opinion-training-center-referendum-will-be-an-answer-one-way-or-another/NINJ74ED6JFSRHVCD5H5NH2L2Q/.

Because the residency verification requirement does not involve, let alone restrict, "interactive communication," it is not "core political speech" as defined in the Supreme Court's two leading citizen initiative precedents: *Meyer v. Grant* and *Buckley v. American Constitutional Law Foundation*. In *Meyer*, the Supreme Court considered a Colorado law that made it a felony to pay petition circulators. 486 U.S. 414, 416 (1988). The Supreme Court held that petition circulators "will in almost every case" have to explain "the nature of the proposal and why its advocates support it." *Id.* at 421. The ban on paying circulators thus "limit[ed] the number of voices who will convey" the message and made it "less likely" the proponents would "garner the number of signatures necessary to place the matter on the ballot." *Id.* at 422–23. Here, by contrast, nothing prevents the Petitioners from explaining "the nature of the proposal and why its advocates support it." *Id.* at 421.

In *Buckley*, a divided Supreme Court revisited Colorado's petition process and held that three regulations on petition circulators violated the First Amendment: (1) a requirement that circulators be registered Colorado voters; (2) a requirement that circulators wear a name tag; and (3) a requirement that proponents of the initiative report the names and address of all paid circulators. 525 U.S. at 186. Each regulation, the Court said, "cuts down the number of message carriers in the ballot-access arena." *Id.* at 197. Here again, the Supreme Court's premise in striking down each

regulation was that they all either reduced the number of speakers or discouraged political speech. *See id.* at 197, 200, 204.

Unlike the restrictions in *Meyer* or *Buckley*, the petition ordinance does not regulate the moment "an initiative petition circulator approaches a person and asks that person to sign the petition," which is undoubtedly an "interactive communication concerning political change." *Id.* at 206 (O'Connor, J., concurring in the judgment in part and dissenting in part). Again, anyone, the Petitioners included, may solicit a signature. The residency verification requirement simply requires a resident—who may or may not have even interacted with the signatory— to swear the signature was collected in the City limits. That does not necessarily require any communication at all with the signatory.

The district court reached a contrary conclusion through a misunderstanding of the reach of the City residency verification requirement. It said, in conclusory fashion, that the "residency requirement clearly limits the number of persons who can promote the petition's message."[51] Its conclusion seems to stem from its erroneous view that the petition ordinance "restricts referendum petition signature gatherers to the City's residents." *Id.* at 17. That is a drastic misreading of the petition ordinance's actual requirement. This Court may and should correct the district court's legal error in interpreting the petition ordinance on *de novo* review.

---

[51] Doc. 26 at 12.

**B.    The City residency verification requirement is a reasonable regulation on the petition process.**

On the correct interpretation of the residency verification requirement as a "reasonable" regulation of the electoral process, "the [City's] important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (quotation omitted); *see also Cowen v. Sec'y of State*, 22 F.4th 1227, 1233–34 (11th Cir. 2022). The City's interest in "maintaining the orderly administration of elections, and in avoiding confusion, deception, and even frustration of the democratic process at the general election" suffice. *Cowen*, 22 F.4th at 1234. "No proof of actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies is required." *Id.* (quotation omitted).

The City's interest in "legitimately restrict[ing] the right to participate in its political processes to those who reside within its borders" also suffices. *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68–69 (1978). The district court distinguished *Holt* as a Fourteenth Amendment case,[52] but that interest is no less valid in a First Amendment challenge. *See, e.g.*, *Initiative & Referendum Inst. v. Sec'y of State*, No. CIV. 98-104, 1999 WL 33117172, at *15 (D. Me. April 23, 1999) ("Because petition circulators play a vital role in the process of self-government, the state reasonably may require that such circulators be residents of Maine."). After all,

---

[52] Doc. 26 at 14–15.

the Georgia Supreme Court has recognized that the petition and referendum process "is a delegation of the General Assembly's legislative power to the municipalities." *Kemp*, 496 S.E.2d at 715.

And, of course, the City's interest in preventing fraud suffices. The City can more readily subpoena City residents to confirm that signatures were collected within the City limits—and more easily prosecute City residents in City courts for defiance of such a subpoena. *See* Atl. City Code § 2-103 (providing for punishment under the City code for refusal to obey a subpoena issued by the Council); Atl. City Code § 62-35 (giving the City court jurisdiction to punish code violations). That too is a reasonable interest served by the residency verification requirement. These important regulatory interests all support the constitutionality of the residency verification requirement.

### C. The out-of-circuit cases on which the district court relied are the wrong framework for analyzing the City's residency verification requirement.

The district court relied on out-of-circuit precedent for its conclusion that the City residency requirement imposes a severe burden.[53] The Petitioners likewise characterized those cases as a "wall of authority" that strict scrutiny applies to the

---

[53] Doc. 26 at 11, 15–17 (citing *Pierce v. Jacobsen*, 44 F.4th 853 (9th Cir. 2022); *We the People PAC v. Bellows*, 40 F.4th 1 (1st Cir. 2022); and *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir 2008)).

residency verification requirement.[54] With these points, the district court and Petitioners essentially argue for an impermissible "bright line" rule that residency requirements are invalid. But Petitioners disregard more recent signals from the Supreme Court and material differences in the residency verification requirement at issue that make those cases inapplicable.

For starters, the legal consensus is not so solid as the Petitioners have it. In a recent decision staying a district court's late-breaking injunction against Idaho's initiative process, four justices of the Supreme Court concurred to express skepticism about the framework that other circuits apply. Chief Justice Roberts, for himself and three other justices, wrote that "the Circuits diverge in fundamental respects when presented with challenges to" citizen initiative laws. *Little v. Reclaim Idaho*, 140 S. Ct. 2616, 2616 (2020) (Mem.) (Roberts, C.J., concurring in the grant of stay). Those justices recognized that citizen initiative laws are "not about the right to vote, but about how items are placed on the ballot in the first place." *Id.* at 2617. In that case, a district court ordered a state to "allow the initiative sponsor additional time to gather digital signatures through an online process of solicitation and submission." *Id.* at 2616. An online process would surely reach more people and increase the chances of obtaining enough signatures to put the initiative on the ballot—which is the First Amendment harm the district court identified here. But

---

[54] Doc. 2-1 at 6.

the Chief Justice said that "reasonable, nondiscretionary restrictions" on the process "are almost certainly justified by the important regulatory interests in combatting fraud and ensuring that ballots are not cluttered with initiatives that have not demonstrated sufficient grassroots support." *Id.* at 2717.

What's more, the district court's out-of-circuit precedent dealt with materially different residency restrictions than the one at issue here. The Montana law at issue in *Pierce* required signature gatherers to be Montana residents, 44 F.4th at 858, as the Maine law at issue in *Bellows* required circulators to be Maine residents, 40 F.4th at 14, and the Oklahoma law at issue in *Savage* required circulators to be Oklahoma residents, 550 F.3d at 1025–26. Cases about candidate nomination petitions, which the district court footnoted, similarly dealt with state laws mandating that the petition circulator be a resident.[55] By contrast, the City ordinance requires only that a resident attest that the signatures "were collected" within the City limits.[56] On its face, it does

---

[55] *See Wilmoth v. Sec'y of State*, 731 F. App'x 97, 103 (3d Cir. 2018) (New Jersey law "makes clear that one's *residency* is the sine qua non for determining whether he or she may lawfully circulate nomination petitions in New Jersey."); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 311 (4th Cir. 2013) (Under Virginia law, "signatures on nominating petitions must be witnessed by … 'a person who is a resident of the Commonwealth.'"); *Lerman v. Bd. of Elections*, 232 F3d 135, 139 (2d Cir. 2000) ("New York law requires that designating petition signatures be witnessed by … a resident of the political subdivision in which the office or position is to be voted for."); *Krislov v. Rednour*, 226 F.3d 851, 856 (7th Cir. 2000) (Illinois law requires "that the circulator must be registered to vote in the same political subdivision for which the candidate is seeking office.").

[56] Doc. 1-1.

not in any way restrict who may circulate the petitions and solicit signatures. That makes a material difference to the burden on Petitioners' rights, as noted above. The Petitioners are not and have never been categorically excluded from the petition process, as were the circulators in *Pierce*, *Bellow*, and *Savage*. *See, e.g.*, *Savage*, 550 F.3d at 1029 ("[S]trict scrutiny is the correct legal standard under which to analyze Oklahoma's *ban* on non-resident circulators." (emphasis added)). That makes these cases inapposite.

On top of that, all these circuit cases agree (as they must) that combatting fraud is a compelling interest. *See Pierce*, 44 F.4th at 862–63; *Bellows*, 40 F.4th at 19; *Savage*, 550 F.3d at 1028. And each case held that governments may at minimum require nonresident petition circulators to submit to legal process before collecting signatures. Accordingly, *Bellows* affirmed a preliminary injunction that required non-resident petition circulators to "submit to the jurisdiction of the State of Maine for any investigation and/or prosecution of alleged violations of Maine's election code." 40 F.4th at 7. *Pierce* explained that the Ninth Circuit has "determined that requiring petition circulators to consent to the state's jurisdiction was a more narrowly tailored means of" preventing fraud. 44 F.4th at 862. *Savage* likewise held that Oklahoma could require nonresidents to "enter into agreements with the state … wherein the circulators provide their relevant contact information and agree to return in the event of a protest." 550 F.3d at 1030. Other cases, including those in

context of candidate nominations, have reached similar holdings. *See Pierce*, 44 F.4th at 863 n.6 (collecting cases).

The district court did not acknowledge this feature of the cases on which it relied.[57] Instead, it entered an injunction enjoining enforcement of the residency verification requirement without any backstop like the ones approved in *Bellows*, *Pierce*, and *Savage*.[58] That leaves the City with limited ability to compel residents of other states to return in the event of fraud discovered during signature verification. The Petitioners brushed aside this concern with the claim that they are "fully subject to subpoena power" as residents of the State.[59] But that is no answer because the injunction goes beyond requiring the City to allow non-resident *Georgians* to attest that signatures were collected in the City. Rather, the injunction requires the City to allow *any* non-resident to make that attestation.

The district court should not have relied on this out-of-circuit precedent given material differences between the residency requirements at issue in those cases and the one here. This Court should reverse the district court's erroneous holding that the City's residency verification requirement imposes a severe burden.

---

[57] *See* Doc. 26 at 15–17.

[58] Doc. 26 at 30–32.

[59] Doc. 2-1 at 10–11.

### III.    The Petitioners failed to show irreparable harm caused by the residency requirement.

The district court defined the alleged First Amendment harm as the residency requirement "making it more difficult to obtain the required number of signatures to place the initiative on the ballot."[60] But the district court failed to see that the residency requirement is not the reason the Petitioners cannot place the initiative on the ballot. Rather, binding Georgia Supreme Court precedent holds that the Petitioners cannot use the referendum process to repeal the ordinance. *See Kemp*, 496 S.E.2d at 712. Further, repealing the ordinance would impair the lease agreement between the City and the Atlanta Police Foundation, and do so retroactively, in violation of the Georgia and federal constitutions. And, finally, the district court did not enjoin a state law containing an identical residency requirement and 60-day time limit on signature collection, meaning the City's petition process (as rewritten by the district court) is out of compliance with state law. In other words, even with the residency requirement enjoined, the *Kemp* case, the prohibition on the impairment of contracts, and state law all stand in the way of Petitioners' placing their initiative on the ballot.

The district court could grant preliminary relief only if the Petitioners "will suffer irreparable injury unless the injunction issues." *Swain v. Junior*, 961 F.3d

---

[60] Doc. 26 at 24.

1276, 1292 (11th Cir. 2020) (quotation omitted). "This requirement ensures that an injunction is only entered against a defendant on account of a harm resulting from the defendant's wrongful conduct, not some other reason." *Macom Tech. Sols. Holdings, Inc. v. Infineon Techs. AG*, 881 F.3d 1323, 1330 (Fed. Cir. 2018). These independent bars to the referendum defeat the argument that the residency requirement causes irreparable harm, as discussed further below.

### A.   The Petitioners have not suffered irreparable harm because Georgia Supreme Court precedent prohibits their proposed referendum.

The Georgia General Assembly enacted requirements for municipal petitions and referenda in the Municipal Home Rule Act, O.C.G.A. § 36-35-3. The Georgia Supreme Court's precedent in *Kemp v. City of Claxton* holds that this statute "applies only to amendments to municipal charters." 496 S.E.2d at 716. The *Kemp* court "reject[ed]" the "argument that the electorate can directly exercise such general legislative power" by "petition for a referendum on all ordinances and resolutions." *Id. Kemp* concerned a proposed referendum to repeal a municipal resolution closing two railroad crossings. *Id.* at 714. The Supreme Court held that the municipal clerk had no obligation even to issue the petition because it was unauthorized by state law. *Id.* at 716.

State law, as interpreted by *Kemp*, precludes Petitioners' proposed referendum as well. The Petitioners do not challenge *Kemp*—nor could they, as states have

"generally broad power … to institute procedures governing their own initiative processes." *Biddulph v. Mortham*, 89 F.3d 1491, 1500 (11th Cir. 1996). Because *Kemp* renders the referendum invalid independent of the residency requirement, the district court's injunction against the residency requirement has no effect on the Petitioners' ability to put a referendum on the ballot. The injunction thus does nothing to remedy Petitioners' alleged harm. That should have led the district court to deny the motion.

Indeed, this Court has affirmed the denial of an injunction to put a citizen initiative on a ballot when state law otherwise barred it. In *Gibson v. Firestone*, this Court declined to require the Florida Secretary of State to put an initiative on a ballot after the Florida Supreme Court determined the initiative violated a single-subject requirement in the state constitution. 741 F.2d 1268, 1271–73 (11th Cir. 1984). *Gibson* explained: "Clearly, [initiative proponents] can claim no constitutionally-protected right to place issues before the Florida electorate; any opportunity to do so must be subject to compliance with state constitutional requirements." *Id.* at 1273. The Court thus held that an injunction would not remedy the alleged harm. Like the Florida constitutional requirement in *Gibson*, the injunction here does not remedy the alleged harm because Georgia, "having created such a procedure, retains the authority to interpret its scope and availability." *Id.*

To be sure, the Georgia Supreme Court recently reached a different outcome

with respect to petitions and referenda to amend county ordinances in *Camden County v. Sweatt*, 883 S.E.2d 827 (Ga. 2023). But *Camden County* expressly held that county referendums are authorized by "a completely separate legal provision," so "*Kemp* does not control." *Id.* at 838–39. The Court further declined to overrule *Kemp*. *Id.* This Court is "bound by the decisions of the Supreme Court of Georgia on questions of Georgia law." *Gonzalez v. Gov. of Ga.*, 978 F.3d 1266, 1271 (11th Cir. 2020). The Court must therefore accept that *Kemp* bars the petition at issue. From there, it follows that *Kemp*, not the residency requirement, is the cause of any "difficult[y] … plac[ing] the initiative on the ballot."[61]

The district court accepted that *Kemp* is binding.[62] But it nonetheless declined to consider *Kemp* based on its view that "the issue of the validity of the proposed referendum is not currently before this Court."[63] Though true, that misses the point. Under *Kemp*, Petitioners cannot place their initiative on the ballot irrespective of the district court's injunction against the residency requirement. And that means Petitioners cannot establish that their harm flows from the residency requirement, as required to obtain preliminary relief.

The Petitioners, for their part, took a different tack below and argued that the

---

[61] Doc. 26 at 24.

[62] Doc. 26 at 23.

[63] *Id.* at 23–24.

statute at issue in *Kemp*, O.C.G.A. § 36-35-3, does not apply to this petition and referendum. They say instead that Section 2-501 of the City charter authorizes it.[64] Section 2-501 reads:

> The council shall by ordinance prescribe procedures to govern the initiation, adoption, and repeal of ordinances by the electorate, and the council shall authorize an initiative or referendum election on petition of at least 15 percent of the registered voters qualified to vote in the preceding general municipal election.[65]

The Petitioners are wrong to interpret this provision as authorizing referenda beyond those allowed by O.C.G.A. § 36-35-3. The Georgia Constitution requires "uniform operation" of general state laws, and it forbids "local or special law[s] … for which provision has been made by an existing general law." Ga. Const. art. 3, § 6, ¶ IV(a). The Municipal Home Rule Act authorizes only one, specific referendum process. Any deviation from its express terms would conflict with the general law and thus be invalid. *See, e.g., City of Atlanta v. Hudgins*, 19 S.E.2d 508, 511 (Ga. 1942) ("Territorial uniformity is definitely required, and the subject matter of an existing general law is put beyond the reach of special laws.").

Neither the General Assembly nor the City could constitutionally create an Atlanta-specific petition and referendum process that diverges from the one codified in O.C.G.A. § 36-35-3. And, of course, that is not what they did. Section 2-501

---

[64] Doc. 21 at 12.
[65] Doc. 21-1.

authorizes the City to adopt *procedures* for a petition and referendum—it is not a freestanding authorization for a petition and referendum. Under the authority in Section 2-501, the City council passed an ordinance that tracks O.C.G.A. § 36-35-3, as it must, to be a valid exercise of the State's delegated legislative authority. The City cannot deviate from O.C.G.A. § 36-35-3 and so must follow *Kemp*'s binding interpretation of that statute, too.

### B.    The referendum is invalid because it seeks to impair a contract.

The Petitioners failed to establish irreparable harm for another reason, too. The referendum seeks to repeal an 2021 ordinance authorizing the Mayor to enter a lease agreement.[66] Mayor Bottoms signed that lease in 2021, and it is in effect. The City cannot treat repealing the ordinance as invalidating the lease lest it violate the constitutional prohibition on the impairment of contracts. *See* U.S. Const. art. I, § 10, cl. 1; Ga. Const. art. I, § I, ¶ X; *Jonesboro Area Athletic Ass'n v. Dickson*, 181 S.E.2d 852 (Ga. 1971) (city bound by lease and cannot unilaterally cancel it by resolution). Indeed, the implication that repealing an ordinance authorizing an act that already occurred makes that act void or unlawful runs squarely into constitutional prohibitions against *ex post facto* legislation.

---

[66] *See* Doc. 21-3.

Neither the district court order nor the Petitioners disputed that the referendum would unconstitutionally impair a contract.[67] The district court discounted this impediment to the Petitioners' goals for the same erroneous reason as it discounted *Kemp*—its belief that the impairment issue is unripe.[68] Again, the district court missed the point that the Petitioners cannot show irreparable harm from the residency requirement when other, unchallenged constitutional provisions bar the referendum.

The Petitioners responded that the referendum would be effective because the ordinance they propose to repeal "stipulate[s] important terms of the contract … and authorized future performance by the mayor in carrying out or completing the lease contract."[69] That argument runs headlong into the U.S. and Georgia Constitutions. *See* U.S. Const. art. I, § 10, cl. 1; Ga. Const. art. I, § I, ¶ X. Whether or not contract terms are memorialized in an ordinance, a "municipal corporation … cannot abrogate any contract which it has the right to make under its charter." *Jonesboro Area Athletic Ass'n*, 181 S.E.2d at 857 (quotation omitted). The sheer fact that some terms were contained in an ordinance does not excuse the City from performing under the lease agreement, and repeal will do nothing to change that.

---

[67] *See* Doc. 26 at 24; Doc. 21 at 12–13.

[68] Doc. 26 at 24.

[69] Doc. 21 at 13.

### C.    State law still imposes a residency requirement that the City must follow.

The district court enjoined *only* the City's petition ordinance.[70] The preliminary injunction left intact the Home Rule Act, O.C.G.A. § 36-35-3, the statute that authorizes Georgia municipalities to change their charters by petition and referendum. *See Kemp*, 496 S.E.2d at 715–16. The Home Rule Act contains the same residency requirement as the City ordinance: petitions must include a place for a City resident to swear that petition "signatures were collected inside the boundaries of the affected municipality." O.C.G.A. § 36-35-3(b)(2)(C).

The City has no authority to deviate from this state law. "Municipal corporations are creations of the state, possessing only those powers that have been granted to them, and allocations of power from the state are strictly construed." *Kemp*, 496 S.E.2d at 715. Petitioners affirmatively dropped the State from the case— and thus cut loose the only party that could provide relief from the Home Rule Act. The Petitioners' failure to obtain an injunction against a proper party from the Home Rule Act means that there is still in effect a separate residency requirement that imposes the exact same regulation on their conduct. Because the City ordinance is not the sole cause of Petitioners' alleged harm, the district court erred in enjoining it without also enjoining the state law.

---

[70] *See* Doc. 26 at 30–32.

IV.    **The injunction does not serve the balance of equities or the public interest.**

The balance of equities and the public interest "'merge' when, as here, the Government is the opposing party." *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020). Neither the equities nor the public interest is served by the district court's preliminary injunction. "[T]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018). The district court went far beyond preserving the parties' relative positions pending trial. Its injunction effectively rewrote the City's petition ordinance, leaving it in violation of State law in multiple ways. The district court failed to give due weight to the fact that the City's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the [City]." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018).

The public interest is not served by an injunction that "change[s] the law while the election machinery is already grinding." *VoteAmerica v. Raffensberger*, 609 F. Supp. 3d 1341, 1369 (N.D. Ga. 2022). The *Purcell* principle, discussed above, exists to prevent late-breaking changes to an election process to "avoid … judicially created confusion." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). The district court's injunctions undermine the City's important interests in "conducting an efficient election, maintaining order, quickly certifying election results, and preventing voter fraud." *New Ga. Project v. Raffensperger*, 976

F.3d 1278, 1284 (11th Cir. 2020). Instead, the district court disrupted a process that was well underway, with more than half the 60-day signature collection period gone by the time the court intervened. The Petitioners and the district court also wrongly discount the effect the district court's injunction has had. The City now faces significant uncertainty when it begins signature verification.

The equities and public interest also tip against the Petitioners because of their delay in seeking relief. The Petitioners have "actively participated in" the coalition opposed to the Safety Training Center and were "prepared to canvass" with the petition.[71] The referendum proponents first submitted a draft petition to the municipal clerk on June 7.[72] The Clerk rejected the form of that petition on June 14 because the draft did not include a place for the residency verification attestation. *See id.* at 2. Wingo Smith, who is counsel for Petitioners, got involved that same day to work with the municipal clerk on a petition that met the requirements of state law.[73] On June 20, Mr. Smith submitted the petition that the Clerk ultimately approved.[74]

In short, Petitioners' counsel have known about the residency verification requirement since at least June 14 (if not before), and the Petitioners likely have as

---

[71] Doc. 1 ¶¶ 18–36.

[72] *See* Doc. 24-3 at 5.

[73] Doc. 24-2.

[74] Doc. 24-1.

well, given their active participation in the opposition to the Safety Training Center. Yet they did not sue until July 6, two weeks after signature collection had begun and the Clerk approved the petition that Petitioners' counsel submitted. The district court should have refrained from disrupting the process given this delay.

## V. The district court erred in the broad remedy it granted, which effectively rewrote the City petition ordinance.

Finally, assuming *arguendo* the Petitioners have otherwise met the preliminary injunction standard (and they have not), the district court erred by severing the residency requirement from the petition ordinance and substantially extending the time to submit petition signatures. Not only did the injunction effectively rewrite the ordinance, it resulted in a petition process that is inconsistent with state law.

### A. The residency requirement is not severable from the petition ordinance because state law requires it.

"Severability is of course a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). In Georgia, a court cannot sever the unconstitutional part of a law if severance "would result in a statute that fails to correspond to the main legislative purpose, or give effect to that purpose." *DaimlerChrysler Corp. v. Ferrante*, 637 S.E.2d 659, 662 (Ga. 2006). Rather, if "the objectionable part is so connected with the general scope of the statute that, should it be stricken out, effect cannot be given to the legislative intent, the rest of the statute must fall with it." *Id.* By these

standards, the district court should not have severed the residency requirement from the remainder of the petition ordinance.

The City had no authority to enact the petition ordinance without the residency requirement, and so the district court erred in concluding that it would have. The City "has no inherent power; it may only exercise power to the extent it has been delegated authority by the state. A municipality's allocations of power from the state must be strictly construed." *H.G. Brown Family Ltd. P'ship v. City of Villa Rica*, 607 S.E.2d 883, 885 (Ga. 2005). The residency requirement comes directly from O.C.G.A. § 36-35-3(b), which is "a delegation of the General Assembly's legislative power to municipalities." *Kemp*, 496 S.E.2d at 715. In delegating this power, the General Assembly gave the City no flexibility to adopt different requirements than those the legislature spelled out, or to only adopt some of those requirements.

As noted, the Home Rule Act imposes only two restrictions on signature collection: signatories must be resident electors who were registered to vote in the last municipal election, and a City resident must attest that the signatures were collected inside the City limits. *See* O.C.G.A. § 36-35-3(b)(2)(C). The district court struck down half of the accountability measures the General Assembly mandated in the petition ordinance. If the General Assembly itself declined to give cities the option to skip the residency requirement, then it follows that the residency requirement was material to the delegation of legislative power in the first place.

To make matters worse, the district court enjoined the petition ordinance but left the state-law residency requirement intact.[75] The district court's order now requires the City to count signatures collected out of compliance with state law. This result illustrates the error in severing the residency requirement from the ordinance. The City may not deviate from state law when it comes to petitions and referendums.

Also notably, the petition ordinance does not contain a severability clause. A "severability clause in an act reverses the usual presumption that the legislature intends the act to be an entirety." *City Council of Augusta v. Mangelly*, 254 S.E.2d 315, 320 (Ga. 1979). In the absence of a severability clause, the usual presumption applies.

The district court pointed to general severability provisions in the City Code and in the Georgia Code.[76] Reliance on these provisions is misplaced, though for different reasons. With respect to the City Code, the district court's analysis fails to account for the fact that the City cannot deviate from the Home Rule Act. *See H.G. Brown*, 607 S.E.2d at 885. So even if the City Code states a preference for severance in the typical case, that cannot be true of an ordinance that contains requirements mandated by state law. To hold otherwise would be to assume the City Council intended to flout state law, and could do so.

---

[75] *See* Doc. 26 at 30–32.

[76] *See* Doc. 26 at 28–29 (citing Atl. City Code § 1-10 and O.C.G.A. § 1-1-3).

The severability provision of the Georgia Code, O.C.G.A. § 1-1-3, is beside the point because the district court did not enjoin the residency requirement in the Home Rule Act. And what's more, the statutory severability provision is "only an aid to construction," "not an absolute command." *Mangelly*, 254 S.E.2d at 320. So even if the state-law severability provision mattered to the severability of the City's petition ordinance, it could not overcome the fact that the General Assembly that adopted the petition and referendum statute had "a reputation for being stridently opposed to implementing home rule provisions." *Camden County*, 883 S.E.2d at 842 (Bethel, J., concurring dubitante) (citing R. Perry Sentell, Jr., *The Georgia Home Rule System*, 50 Mercer L. Rev. 99, 105–06 (1998)). The General Assembly that passed the Home Rule Act's petition and referendum process did not intend to allow the electorate to "exercise[e] legislative power." *Kemp*, 496 S.E.2d at 716. Still less would it make sense for that same General Assembly to have intended to "delegat[e]" its "legislative power" to anyone, even residents of other states. *Id.* at 715. The Court need not wade into this debate, given that the state-law residency requirement stands. But if it does, it should not accept the district court's reliance on the Georgia Code's severability provision.

## B. The district court had no authority to extend the time limit for collecting signatures.

Besides erroneously severing the residency requirement, the district court erred in significantly extending the 60-day period for collecting signatures. The

Petitioners did not argue that the 60-day period violates the First Amendment, and the district court did not find that it did.[77] "Injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties." *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003); *see also Firestone*, 741 F.2d at 1273 ("Although federal courts have broad equitable powers to remedy proven constitutional violations, injunctive relief must be tailored to fit the nature and extent of the established violation."). The district court had no authority to extend the signature-collection deadline in the absence of a finding that the deadline itself violated the First Amendment.

To be sure, there was a 36-day period during which the Petitioners could not validly attest that signatures were collected inside the City limits. That is a problem of Petitioners' own making, as discussed above. They did not bring this action until the municipal clerk had already issued petitions requiring a residency verification, at Plaintiffs' counsel's own request. And even leaving aside Petitioners' delay, the preliminary injunction extended the signature collection deadline for *everyone*, City resident or not, *and* required the City to count signatures collected prior to the injunction.[78] In effect, the district substituted a 95-day period to collect signatures for the 60-day period specified by the City's ordinance and the Home Rule Act. That

---

[77] *See generally* Doc. 26.

[78] Doc. 26 at 30–31.

relief extended the collection deadline for petition circulators whose First Amendment rights were not even arguably violated. The district court thus erred in granting a remedy that went beyond curing any alleged constitutional violation.

Compounding the error, "[e]xtending the date by which" the Petitioners could collect signatures "for an additional [36] days after the scheduled" deadline "fundamentally alters the nature of the" petition process. *Republican Nat'l Comm.*, 140 S. Ct. at 1207. The result of the unwarranted extension of time is to inject unnecessary confusion and uncertainty into the signature verification process. This confusion was not necessary to remedy any constitutional violation, and this Court should not allow it to stand.

## CONCLUSION

The district court erred by granting a preliminary injunction that disrupted ongoing signature collection and caused confusion and uncertainty in the verification process the City must now undertake. Not only did the district court violate the *Purcell* principle, it also erred in applying strict scrutiny to the City's residency verification requirement and in ignoring other state laws that independently bar the Petitioners from getting a referendum on the ballot. This Court should reverse the preliminary injunction.

Respectfully submitted this 21st day of August, 2023.

*/s/ Robert L. Ashe III*
Robert L. Ashe III

Ga. Bar No. 208077
Jane D. "Danny" Vincent
Ga. Bar No. 350850
Matthew R. Sellers
Ga. Bar No. 691202
BONDURANT, MIXSON &
ELMORE, LLP
1201 W Peachtree St NW
Ste 3900
Atlanta, GA 30309-3417
Tel: 404-881-4100
Fax: 404-881-4111
ashe@bmelaw.com
vincent@bmelaw.com
sellers@bmelaw.com

*Attorneys for the City of Atlanta*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains a total of 9,817 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(i) and 11th Cir. R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

This certification is made on August 21, 2023.

*/s/ Robert L. Ashe III*

## CERTIFICATE OF SERVICE

I certify that, on August 21, 2023, I served a copy of this **APPELLANT CITY OF ATLANTA'S OPENING BRIEF** by filing it with the Court's CM/ECF system, which will automatically serve a copy on counsel of record.

*/s/ Robert L. Ashe III*