No. 23-12469-H

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

————————————

LISA BAKER, et al.

*Plaintiffs/Appellees*,

v.

CITY OF ATLANTA,

*Defendant/Appellant.*

————————————

Appeal From The United States District Court
For The Northern District Of Georgia
1:23-cv-2999-MHC

————————————

**APPELLEES' RESPONSE BRIEF**

————————————

Brian Spears
Georgia Bar No. 670112

Jeff Filipovits
Georgia Bar No. 825553

Wingo Smith
Georgia Bar No. 147896

Spears & Filipovits, LLC
315 W. Ponce de Leon Ave., Ste. 865
Decatur, GA 30030
404-905-2225

Gerald Weber
Georgia Bar No. 744878

Law Offices of Gerry Weber, LLC
Post Office Box 5391
Atlanta, Georgia 31107
404-522-0507

C-1 of 2
*Baker et al. v. City of Atlanta*
23-12469-H

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Pursuant to 11th Cir. R. 26.1, the following is a complete list of the trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of the particular case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and any other identifiable legal entities related to a party:

1. Ashe III, Robert L.

2. Atlanta Police Foundation, Inc.

3. Baker, Lisa

4. Bondurant, Mixson & Elmore, LLP

5. City of Atlanta

6. Cohen, Mark H.

7. Defend the Forest

8. Dougherty, Jacqueline

9. Filipovits, Jeff

10. Law Offices of Gerry Weber, LLC

11. Jones, Keyanna

C-2 of 2
*Baker et al. v. City of Atlanta*
23-12469-H

12. Patel, Alkesh B.

13. Sellers, Matthew R.

14. Smith, Wingo

15. Spears, G. Brian

16. Spears & Filipovits, LLC

17. State of Georgia

18. Stop Cop City Coalition

19. Vincent, Jane D.

20. Weber, Gerald

21. Weltner, Amelia

22. Winkles, Logan B.

Pursuant to Eleventh Circuit Rule 26.1-3(b), the undersigned hereby certifies that no publicly-traded company or corporation has an interest in the outcome of the above-captioned case or appeal.

/s/Jeff Filipovits
Jeff Filipovits
Georgia Bar No. 825553

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

While Plaintiffs believe the First Amendment issue is straightforward and the evidentiary record is limited, Plaintiffs believe oral argument will aid the Court in its decisional process as it considers the referendum process itself and the implications of the injunction entered by the district court in light of the City's changing positions on a number of issues. *See* Doc. 37.

# TABLE OF CONTENTS

Certificate of Interested Persons............................................................C-1

Statement Regarding Oral Argument.........................................................i

Table of Citations.................................................................................iv

Statement Of the Issues..........................................................................1

Statement of the Case............................................................................2

    a. Statement of Facts and Procedural History....................................2

        1. Inception of the Referendum.................................................2

        2. Plaintiffs are unable to collect signatures in support of the referendum.......3

        3. District Court issues a preliminary injunction.............................4

        4. Stop Cop City Coalition's subsequent motion to intervene...........6

Summary of the Argument.......................................................................7

Argument and Citation of Authority.........................................................9

    a. Standard of review...................................................................9

    b. Plaintiffs are entitled to injunctive relief.......................................10

        1. The residency restriction violates the First Amendment.............10

            a. The residency restriction is subject to strict scrutiny...............11

i. Binding Supreme Court precedent
    shows that restrictions on petition
    circulation are subject to strict scrutiny..................................................11

ii. Every circuit court to consider the
    issue has held residency restrictions
    on petition circulation are subject to strict scrutiny............................13

iii. The district court properly applied
    strict scrutiny because the residency
    restriction diminishes core political speech.......................................14

iv. There are no "recent signals" from the
    Supreme Court that indicate it intends
    to depart from *Meyer* and *Buckley*.....................................................19

b. The City has waived any argument that
    the district erred in finding the ordinance
    could not withstand strict scrutiny...........................................................21

c. The residency restriction is unconstitutional
    no matter what level of scrutiny applies...................................................22

i. The ordinance does not guard against fraud.......................................22

ii. The City's interest in self-governance is
    not a basis to limit petition circulation...............................................25

2. The ongoing violation of the First Amendment
    constitutes irreparable harm to Plaintiffs....................................................26

a. Plaintiffs will be irreparably harmed by
    being excluded from an ongoing petition
    drive following the City's official approval of the petition....................27

b. To the extent it is relevant, there is a valid
    legal basis for the referendum ..................................................................30

i. The Georgia Supreme Court's interpretation
of O.C.G.A. § 36-35-3(b) (2) will not survive
a challenge in Georgia Courts..............................................................30

ii. The City's charter provides a separate legal
basis for the referendum........................................................................32

c. The repeal of the City's ordinance would
not violate the Contract Clause ................................................35

3. The balance of equities favors the injunction.............................................38

a. Plaintiffs did not delay filing this lawsuit...............................................39

c. The scope of the injunction is appropriate
to remedy the harm..................................................................................41

1. The City waived any objection to the
scope of the relief sought by Plaintiffs
by failing to raise the issue in the district court.........................................42

2. The City cannot follow an unconstitutional
state law and federal courts are not constrained
by state law when redressing an ongoing
constitutional violation.................................................................................43

3. The district court did not violate *Purcell*
by extending the signature collection deadline
and allowing non-residents to collect signatures.......................................45

4. The residency restriction is severable
from the remainder of the law...................................................................49

Conclusion................................................................................................51

Certificate of Compliance.........................................................................52

iii

# TABLE OF CITATIONS

## Cases

*Angle v. Miller*,
    673 F.3d 1122 (9th Cir. 2012)...............................................................46

*Arizonans for Fair Elections v. Hobbs*,
    454 F. Supp. 3d 910 (D. Ariz. 2020)....................................................47

*Ass'n of Equip. Manufacturers v. Burgum*,
    932 F.3d 727 (8th Cir. 2019) ...............................................................36

*Atlanta v. McKinney*,
    265 Ga. 161 (1995)..............................................................................34

*Ayotte v. Planned Parenthood of N. New England*,
    546 U.S. 320 (2006).............................................................................49

*Bauerband v. Jackson Cnty. Bd. of Comm'rs*,
    278 Ga. 222, 224 (2004)......................................................................37

*Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*,
    781 F.3d 1271 (11th Cir. 2015)............................................................40

*Burns v. Town of Palm Beach*,
    999 F.3d 1317 (11th Cir. 2021).............................................................35

*Camden Cnty. v. Sweatt*,
    315 Ga. 498 (2023)........................................................................30, 33

*Chandler v. City of Arvada, Colorado*,
    292 F.3d 1236 (10th Cir. 2002)................................................14, 17, 24

*City Council of Augusta v. Mangelly*,
    243 Ga. 358 (1979).............................................................................49

*City of Atlanta v. Hotels.com, L.P.*,
    285 Ga. 231 (2009).............................................................................27

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
    661 F.2d 328 (5th Cir. 1981)................................................................26

*Democratic Executive Comm. of Florida v. Lee*,
    915 F.3d 1312 (11th Cir. 2019).........................................................10

*Elrod v. Burns*,
    427 U.S. 347 (1976)............................................................................26

*Cate v. Oldham*,
    707 F.2d 1176 (11th Cir. 1983)........................................................26

*Evans v. Sec'y, Fla. Dep't of Corr.*,
    699 F.3d 1249 (11th Cir. 2012)........................................................19

*Fair Maps Nevada v. Cegavske*,
    463 F. Supp. 3d 1123 (D. Nev. 2020)............................................48

*Firestone v. Let's Help Florida*,
    454 U.S. 1130 (1982)..........................................................................27

*Gebrekidan v. City of Clarkston*,
    298 Ga. 651 (2016).............................................................................33

*Georgia v. President of the United States*,
    46 F.4th 1283 (11th Cir. 2022).........................................................49

*Gibson v. Firestone*,
    741 F.2d 1268 (11th Cir. 1984)........................................................28

*Grace, Inc. v. City of Miami*,
    23-12472, 2023 WL 5286232 (11th Cir. Aug. 4, 2023)...................40

*Holt Civic Club v. City of Tuscaloosa*,
    439 U.S. 60 (1978).......................................................................25, 26

*Horwitz-Matthews, Inc. v. City of Chicago*,
    78 F.3d 1248 (7th Cir. 1996).............................................................37

*Jonesboro Area Athletic Ass'n. v. Dickson*,
    227 Ga. 513 (1971)................................................................37

*Kemp v. City of Claxton*,
    269 Ga. 173 (1998)........................................................29, 30

*Krislov v. Rednour*,
    226 F.3d 851 (2000)..................................................18, 19, 21

*Lamar Advert. Co. v. City of Douglasville*,
    254 F. Supp. 2d 1321 (N.D. Ga. 2003)................................50

*Lerman v. Bd. of Elections in City of New York*,
    232 F.3d 135 (2d Cir. 2000)..............................14, 17, 18, 23

*Let's Help Florida v. Smathers*,
    453 F. Supp. 1003 (N.D. Fla. 1978).....................................27

*Lite-Netics, LLC v. Nu Tsai Capital LLC*,
    8:22CV314, 2022 WL 18106436 (D. Neb. Nov. 10, 2022)...............43

*Little v. Reclaim Idaho*,
    140 S. Ct. 2616 (2020)..................................................19, 21

*Lovejoy Realty, LLC v. Clayton Cnty., Georgia*,
    1:08-CV-3750-ODE, 2009 WL 10699711 (N.D. Ga. Nov. 6, 2009)...37

*Moss v. City of Dunwoody*,
    293 Ga. 858 (2013)..............................................................33

*Puerto Rico v. Branstad*,
    483 U.S. 219 (1987).............................................................45

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)...........................................9, 40, 45, 46

*Reeves v. Comm'r, Alabama Dep't of Corr.*,
    23 F.4th 1308 (11th Cir. 2022).........................................44

*Reynolds v. Sims*, 377 U.S. 533 (1964).........................................45

*Ross v. Meese*,
    818 F2d 1132 (4th Cir. 1987)................................................................26

*S&M Brands, Inc. v. Georgia ex rel. Carr*,
    925 F.3d 1198 (11th Cir. 2019)..........................................................36

*Sadler v. Nijem*,
    251 Ga. 375 (1983)................................................................................35

*Smith v. Comm'r AL Dept. of Corr.*,
    2021 WL 4817748 (11th Cir. Oct. 15, 2021))...................................44

*State of Georgia v. Jackson*,
    269 Ga. 308 (1998)................................................................................50

*Taylor v. City of Gadsden*,
    767 F.3d 1124 (11th Cir. 2014)..........................................................38

*Union City Bd. of Zoning Appeals v. Justice Outdoor Displays, Inc.*,
    266 Ga. 393 (1996)................................................................................50

*United States v. Barfield*,
    396 F.3d 1144 (2005)............................................................................39

*Verlo v. Martinez*,
    820 F.3d 1113 (10th Cir. 2016)..........................................................42

*Walker v. City of Calhoun, GA*,
    901 F.3d 1245 (11th Cir. 2018)..........................................................35

*Wooley v. Maynard*,
    430 U.S. 705 (1977)..............................................................................27

*Wreal, LLC v. Amazon.com, Inc.*,
    840 F.3d 1244 (11th Cir. 2016)..........................................................40

Rules

Fed. R. App. P. 32............................................................52

Constitutions

Ga. Const. of 1983, Art. IX, Sec. II, Par. I. ...................................30

Statutes

O.C.G.A. § 21-2-540.........................................................47

O.C.G.A. § 36-30-3..........................................................36

O.C.G.A. § 36-35-3....................................................30–35, 45

## STATEMENT OF THE ISSUES

1.    Whether the district court abuse its discretion when it found that Plaintiffs had a substantial likelihood of success on the merits that the residency restriction violates the First Amendment based upon the finding that it limits core political speech?

2.    Whether the district court abused its discretion when it found that Plaintiffs' inability fully participate in petition drive by witnessing and collecting signatures in support of a time-limited referendum petition drive constitutes an irreparable harm?

3.    Whether the district court abused its discretion when it determined balance of equities favors Plaintiffs given that the City approved a referendum petition and is enforcing an unconstitutional law against individuals who wish to exercise their First Amendment rights by collecting petition signatures?

4.    Whether the district court abused its discretion when it granted the relief sought by Plaintiffs in absence of any argument from the City that it objected to the specific relief requested?

1

## STATEMENT OF THE CASE

**A.    STATEMENT OF FACTS AND PROCEDURAL HISTORY**

### *1.    Inception of the Referendum*

In 2021, the City of Atlanta authorized the lease of 265 acres of City-owned property in unincorporated DeKalb County. Doc. 1 ¶ 8. Since then, there has been widespread controversy over the construction of the training center. *Id.* ¶ 9–16.

Following failed public protest and outreach, a coalition of individuals and organizations filed a referendum petition with the Municipal Clerk of the City of Atlanta on June 7, 2023, seeking to repeal City of Atlanta Ordinance 21-O-0367, which authorized the lease of property to the Atlanta Police Foundation for the purposes of constructing a public safety training center. Doc. 1 ¶¶ 7, 8, 9. Upon collecting sufficient valid signatures, the referendum petition process would require the City to place the issue on the next ballot. *Id.* ¶¶ 39–51.

The petition request was submitted to the City Clerk and ultimately approved by the City on June 21, 2023. *Id.* ¶ 49. That approval started a 60-day clock to collect approximately 70,000 signatures. *Id.* ¶¶ 49–50 Under both the City ordinance and the state statute that separately authorize the referendum, every

2

signature collected in support of the referendum must be collected by a City resident. *Id.* ¶ 41.

### 2. *Plaintiffs are unable to collect signatures in support of the referendum*

Plaintiffs are four residents of DeKalb County who live near the site of the proposed police training center to be constructed by the City of Atlanta. *See* Doc. 1 ¶¶ 18, 25, 34. Each opposes the construction of the training center but cannot collect signatures because they are not residents of the City of Atlanta. The City's enforcement of the residency requirement means that Plaintiffs cannot challenge the construction of a government project that will be built in the county in which they live. *Id.* ¶¶ 18–37.

For example, Ms. Weltner, who lives only feet from the Atlanta border, and could not individually collect signatures from her neighbors who are City residents. *Id.* ¶ 34–36. Ms. Baker's experience was that she signed up to collect signatures as part of a team of canvassers that must include a City resident. The second time she attempted to do so, she could not find a City resident to accompany her and therefore could not collect signatures. *Id.* ¶¶ 23–24. Ms. Jones and Ms. Dougherty similarly want to collect signatures in support of the referendum but cannot do so because, while they live close to the proposed training

center, they are not City residents and must be accompanied by a resident if they wish to aid in collecting signatures. *Id.* ¶¶ 25–31.

### 3.    *District Court issues a preliminary injunction*

On July 6, 2023, Plaintiffs filed this lawsuit seeking an injunction allowing them to participate in signature collection. Plaintiffs sought: (1) an order prohibiting the enforcement of the residency restriction; (2) the issuance of new referendum petitions that remove the language requiring the person collecting signatures to swear they are a City resident; (3) to extend the time to collect signatures (and preserving existing signatures) so that non-residents have the opportunity to fully participate in the referendum free of unconstitutional restrictions. Doc. 2 ¶¶ 16–18. On July 27, 2023, the district court granted Plaintiffs' motion for preliminary injunction and ordered the requested relief. *See* Doc. 26. Specifically, the district court ordered:

> (1) The City of Atlanta Municipal Clerk shall issue official copies of the referendum petition to repeal City of Atlanta Ordinance 21-O-0367 (the "Referendum Petition") that removes the requirement that the person collecting signatures swear that such person is a resident of the City of Atlanta.
>
> (2) The 60-day statutory period for the collection of signatures on the Referendum Petition shall restart on the date the Municipal Clerk provides official copies of the Referendum Petition that do not contain

4

the requirement that the person collecting signatures must be a City of Atlanta resident.

(3) All properly collected and valid signatures that have been obtained since the Municipal Clerk's distribution of the petition to repeal City of Atlanta Ordinance 21-0-0367 on June 21, 2023, shall be counted with the properly collected and valid signatures on the Referendum Petition issued pursuant to this Court's Order to determine whether 15 percent of the registered voters in the City of Atlanta have requested the repeal of City of Atlanta Ordinance 21-0-0367.

(4) Nothing In this Order shall affect the ability of the City of Atlanta to implement all of the remaining portions of City of Atlanta, Code of Ordinances § 66-3 7(b) except for the portion which states, "to swear that such person is a resident of the city[.]" More specifically, nothing in this Order prevents the Municipal Clerk from "providing a place on each form for the person collecting signatures to provide such person's name, street address, city, county, state, ZIP code and telephone number" or for that person to swear "that the signatures were collected inside the boundaries of the city."

See Doc. 26 at 31–32. The next day, the City issued new referendum petitions. *See* Doc. 33-1. The City then appealed, *see* Doc. 28. After the district court denied the City's motion to stay, *see* Doc. 34, the City sought relief from this Court. *See* App. Doc. 14. This Court stayed the injunction and ordered an expedited briefing schedule. *See* App. Doc. 36, 37.

### 4.    *Stop Cop City Coalition's subsequent motion to intervene*

Following this Court's stay, on September 11, 2023, the Cop City Vote Coalition filed an emergency motion to intervene and for injunctive relief in the

district court. *See* Doc. 36. The basis of the motion was that the Coalition turned in 116,00 signed petition copies to the City of Atlanta (approximately twice the required amount). According to the motion, when the Coalition arrived at the Clerk's Office:

> Atlanta surprised the Coalition by handing it a piece of paper explaining that Atlanta would accept the petitions for safekeeping but had no intention of beginning the verification process until the conclusion of the Eleventh Circuit appeal. Atlanta has purported to claim that the Georgia code prohibits it from processing the signatures because the petitions were not handed in by the original deadline of August 21.

*See* Doc. 36 at 3–4. The Coalition's request for injunctive relief was based on "the City of Atlanta's determination that it is obligated to reject the petitions solely because they were submitted after August 21 but before September 25 would completely eliminate the ability of 116,000 voters to place an initiative they favor on the ballot, and it restricts the Coalition's right to petition the government on the voters' behalf." *Id*. at 7. The Coalition sought an injunction "instructing the City of Atlanta not to refuse to process the petitions submitted on September 11, 2023 on the sole basis that they have been submitted after August 21, 2023." *Id.* at 10.

The district court denied the motion to intervene because it found that it did not have jurisdiction over the issue while the appeal was pending. While the

district court recognized that "the order issued by the United States Court of Appeals for the Eleventh Circuit staying this Court's Preliminary Injunction leaves both Plaintiffs, the Coalition, and the City in a quandary with respect to whether the signatures previously obtained in reliance on the Preliminary Injunction should still be counted[,]" it found that it could not resolve the matter while the appeal remained pending in the Eleventh Circuit.[1]

## SUMMARY OF THE ARGUMENT

Two Supreme Court opinions and every circuit to consider the issue has applied strict scrutiny to strike down residency restrictions on petition circulation like those contained in the City's referendum ordinance. Indeed, other Circuits have extended the First Amendment right to engage in petition circulation to residents of other states. The district court correctly found that the ban on non-municipality-resident signature collectors substantially burdened core political speech. The City failed to advance any argument that its ordinance can survive strict scrutiny, and its newfound fraud argument has been rejected repeatedly by other circuits.

---

[1] The district court also found that the Coalition had not met its burden in showing an interest in the transaction that is subject to the litigation or that its interests were not adequately represented by the existing parties. *See* Doc. 37 at 3 n.1.

The district court properly rejected the City's argument that Plaintiffs will suffer no harm if they are prohibited from collecting and verifying signatures in support of the referendum. The City argues that the referendum will ultimately be declared invalid under state law, but it failed to raise that issue before it approved the referendum and issued petition forms and never filed an action to address the state law issue. Now, with the referendum effort underway, the City cannot meaningfully argue that there is no First Amendment right for non-residents to participate in petition circulation.[2] Questions about the referendum's ultimate legality are not before the Court and, to whatever extent they are, the City ignores that there are two separate legal bases for the referendum and that the Georgia Supreme Court has effectively overruled only case that supports its argument.

While the City attempts to shield itself by invoking *Purcell*, the fact is that there is no looming election and the change in the referendum process was slight and non-disruptive, and there is no change at all anticipated in either ballot language or voting procedures. The City projects blame onto the district court for "injecting unnecessary confusion" into the referendum process, but as the district

---

[2] The City shifts this argument at its convenience. For example, in its motion to stay in this Court, it argued that it would have to review the signatures collected and could be required to hold an election in November 2023.

8

court recently noted, the City has only itself to blame for any self-created confusion arising from its constantly changing and factually suspect legal positions in this litigation. *See* Doc. 37.

The district court did not abuse its discretion in issuing the injunction, the scope of the relief was narrowly tailored to the harm caused, and necessary to ensure non-municipality residents' rights to participate in a constitutional process for the circulation and collection of signatures on the petition referendum. This Court should affirm the district court's preliminary injunction.

## ARGUMENT AND CITATION OF AUTHORITY

### A.    STANDARD OF REVIEW

This Court reviews "the district court's decision [for] a clear abuse of discretion." *Carillon Importers, Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997); *see also Melendez v. Sec'y, Florida Dep't of Corr.*, 21-13455, 2022 WL 1124753, at *7 (11th Cir. Apr. 15, 2022) ("Our review of an order granting a preliminary injunction 'is extremely narrow in scope.'"). While issues of law are reviewed *de novo*, the district court's factual findings are not disturbed unless there is a clear error. *Democratic Executive Comm. of Florida v. Lee*, 915

9

F.3d 1312, 1317 (11th Cir. 2019). The "review, therefore, must be highly deferential." *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000).

## B.   PLAINTIFFS ARE ENTITLED TO INJUNCTIVE RELIEF

### 1.   *The residency restriction violates the First Amendment*

The district court's found that Plaintiffs have established a substantial likelihood of success on the merits of their First Amendment claim that the residency restriction violates the First Amendment. That finding was based on binding Supreme Court precedent and the overwhelming weight of authority from other circuits that the restriction on non-resident petition circulation limits core political speech, unduly burdens the referendum process, and cannot survive strict scrutiny.

#### a.   *The residency restriction is subject to strict scrutiny*

##### i.   Binding Supreme Court precedent shows that restrictions on petition circulation are subject to strict scrutiny

*Meyer v. Grant*, 486 U.S. 414 (1988) and *Buckley v. Am. Const. Law Found.*, 525 U.S. 182 (1999), establish that the residency restriction is subject to strict scrutiny because it diminishes the number of people who can circulate referendum

petition by requiring non-residents to have an accompanying resident for any signature collection.

In *Meyer*, the Court struck down a law that made it a felony to pay initiative petition circulators. The Court found that the law burdened core political speech because it limited the number of voices who could convey the petitioners' message and therefore made it less likely the petitions could garner the number of signatures necessary to place the matter on the ballot. *Id.* at 422. The Court agreed that this restriction was "a limitation on political expression subject to exacting scrutiny." *Id. at* 420.

In *Buckley*, the Court held that a requirement that petition circulators be registered voters was subject to strict scrutiny because the requirement "produced a speech diminution." The Court found that it was "scarcely debatable" that the restriction decreased "the pool of potential circulators." *Id.* at 195.[3] In reaching that holding, the Court examined and reaffirmed *Meyer.*

---

[3] The City argues that for strict scrutiny to apply, a law must impose a "severe burden" on Plaintiffs. Both *Meyer* and *Buckley* show that a law is subject to strict scrutiny if it either (a) imposes a "severe burden," or (b) limits "core political speech." *See Buckley*, 525 U.S. at 206 ("When considering the constitutionality of a state election regulation that restricts core political speech or imposes 'severe burdens' on speech or association, we have generally required that the law be narrowly tailored to serve a compelling state interest.").

11

The City asks this Court to ignore *Buckley*'s holding by arguing that the law in *Buckley* prohibited all forms of "interactive communication" about a referendum. *See* App. Doc. 16 at 30. That is not true. The statute in *Buckley* did not regulate speech and did not prohibit non-circulators from urging others to sign a petition. Instead, it required that each petition be accompanied, inter alia, by a sworn statement that circulator was a registered voter and "that each signature thereon was affixed in the circulator's presence; that each signature thereon is the signature of the person whose name it purports to be; that to the best of the circulator's knowledge and belief each of the persons signing the petition section was, at the time of signing, a registered elector . . . ." *Buckley*, 525 U.S. at 189 n.7. Nothing in the statute restricted "interactive communication" or prevented a person who was not a registered voter from urging others to sign referendum petitions in the same way the City describes. Justice Thomas' concurring opinion reinforced this point by reiterating that the law did not "directly regulate speech." *Buckley*, 525 U.S. at 211 & n.3 (Thomas, J., concurring).

12

> ii.  Every circuit court to consider the issue has held residency restrictions on petition circulation are subject to strict scrutiny

Since *Meyer* and *Buckley*, "a consensus has emerged that petitioning restrictions . . . are subject to strict scrutiny analysis." *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013) (holding that a Virginia residency requirement for circulators of petitions for an individual to be placed on the presidential ballot was unconstitutional). *See also We The People PAC v. Bellows*, 40 F.4th 1, 14 (1st Cir. 2022) (holding that Maine's requirement that petition circulators be state residents is a severe burden on political speech subject to strict scrutiny); *Pierce v. Johnson*, 44 F.4th 853, 861 (9th Cir. 2022) (holding that Montana's requirement that initiative petition signature gatherers be state residents "imposes a severe burden on the First Amendment rights of both out-of-state residents and in-state proponents and is therefore subject to strict scrutiny"); *Chandler v. City of Arvada, Colorado*, 292 F.3d 1236 (10th Cir. 2002) (applying strict scrutiny to home rule ordinance prohibiting nonresidents from circulating referendums); *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1028 (10th Cir.

2008) ("[S]trict scrutiny is the correct legal standard under which to analyze Oklahoma's ban on non-resident circulators.").[4]

> iii.   The district court properly applied strict scrutiny because the residency restriction diminishes core political speech

In light of this wall of authority, the district court found that the City's residency restriction burdens the petition circulation process by restricting the number of people who can circulate a referendum petition. The district court then applied strict scrutiny because barring non-residents from individually collecting signatures "clearly limits the potential number of the City's residents who can receive the political message and making it less likely that the proponents of the

---

[4] Circuits have reached the same result when analyzing rules concerning residency restrictions for circulating local and statewide candidate petitions. *See Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 146 (2d Cir. 2000) (requirement that a witness circulating a local candidate's petition reside in the political subdivision of the candidate seeking nomination); *Krislov v. Rednour*, 226 F.3d 851, 860-61 (7th Cir. 2000) (finding Illinois' law that restricted circulators who live out-of-district or out-of-state was not narrowly for three proposed governmental interests); *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008) (finding statute that required nominating petition circulators to be registered voters and residents of Ohio was subject to exacting scrutiny); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013) (holding witness residency requirement for circulating nominating petitions required non-resident circulators to "work in tandem" with residents was "patently burdensome" and failed strict scrutiny); *Wilmoth v. Sec'y of New Jersey*, 731 F. App'x 97 (3d Cir. 2018) (holding where "residency is the sine qua non for determining whether [one] may lawfully circulate nomination petitions" strict scrutiny applies).

petition can gather sufficient signatures to place the initiative on the ballot." Doc. 26 at 12. Based upon the diminution of core political speech, and the attendant burden on the referendum process, the court followed *Meyer*, *Buckley*, and every other circuit court opinion and applied strict scrutiny.

The City argues this finding is a "drastic misreading of the petition ordinance's actual requirement." App. Doc. 16 at 31. It argues that the referendum ordinance does not restrict who may circulate the petitions and solicit signatures because a resident can make the attestation "without ever soliciting passersby to sign the petition, or speaking to anyone at all." *Id.* at 22. The City even implies that a person can sign the attestation *without actually witnessing the signature*. *See id.* at 35 (arguing the ordinance "requires only that a resident attest that the signatures 'were collected' within the City limits").

But the actual text of the ordinance requires "the person collecting the signatures" to "swear that such person is a resident of the city and that the signatures were collected inside the boundaries of the city." The City's petition forms likewise require the affiant to swear "I have collected" the signatures within the City of Atlanta. Doc. 33-1 at 2. A person cannot swear under oath that a

15

signature was collected at a specific location without actually witnessing the signature.

So while it is theoretically possible for a non-resident and resident to collect signatures together as a team (so long as the resident witnesses the signature), the City does not dispute that a non-resident cannot individually take a petition circulation form, approach a city resident, secure a signature, and then sign the attestation as a signature collector. Instead, the non-resident circulator must find a resident partner, arrange a mutually agreeable location and time, and then hope that the resident partner will appear on time and be ready to participate in the full circulation schedule. This mirrors Plaintiff Lisa Baker's experience on the first day the referendum was available. *See* Compl., Doc. 1 at 5–6 ¶¶ 22-24.

The district court correctly found that this requirement reduces the number of potential petition circulators and makes it less likely that the referendum effort will succeed. And this, again, is the basis the Supreme Court relied upon in both *Meyer* and *Buckley* when it held that restrictions on petition circulation burden core political speech, burden the petition circulation process. Contrary to the City's argument, this burden "is not relieved by the fact that other avenues of expression remain open to" Plaintiffs. *Meyer*, 486 U.S. at 414.

The City cannot cite a single circuit court opinion whose holding supports its argument that strict scrutiny should not apply, and many have specifically rejected it.[5] *See Chandler*, 292 F.3d at 1244 (rejecting an argument that less than strict scrutiny should apply because the defendants claimed it did not "completely shut [non-residents] out of the initiative process" because they could "coordinate, organize, train and even accompany the circulators."); *Judd*, 718 F.3d at 311 (applying strict scrutiny to a law that would have required out-of-state circulators to "work in tandem with a resident of Virginia, whose sole purpose is to function as a witness."); *Lerman*, 232 F.3d at 152 (finding law failed strict scrutiny where NYC argued its in-district residency requirement did not affect a would-be circulator's "absolute right to enter the . . . district . . . [to] express, as vigorously as she desired, her views and opinions about the issues facing the voters in that district and the candidates for the City Council"). The City ignores these cases.

---

[5] The only case that even approaches that the City's theory is *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614, 616 (8th Cir. 2001), where the Eighth Circuit applied strict scrutiny but nevertheless found a statewide residency restriction survived because it furthered the state's interest in combating fraud due to limitations on interstate subpoena power. But since the City here did not introduce any evidence or argument concerning fraud, it is impossible to overcome strict scrutiny. And even if that evidence did exist, every other court has still struck down the law.

17

Instead, the City attempts to distinguish *Pierce*, *Bellows*, and *Savage* by arguing that each dealt with a law that "categorically excluded [non-residents] from the petition process." *See* App. Doc. 16 at 36. But that too is wrong. *Pierce*, *Bellows*, and *Savage* addressed laws that specifically addressed signature collection and did not impose any limitation on speech surrounding the petition process.[6]

The City also attempts to distinguish *Wilmoth*, *Judd*, *Lerman*, and *Krislov* on the basis that those cases dealt with nomination petitions rather than referendum petitions. It does not explain why that distinction matters.[7] But both nomination petitions and referendum petitions are subject to strict scrutiny because they

_____

[6] *See Pierce*, 44 F.4th at 858 (analyzing a law that required that signature gatherers be Montana residents and prohibited paying gatherers on a per-signature basis ); *Bellows* 40 F.4th at 4 (applying strict scrutiny to a statute that required that anyone who "solicits signatures for the petition by presenting the petition to the voter, asking the voter to sign the petition and personally witnessing the voter affixing the voter's signature to the petition"); *Savage*, 550 F.3d at 1026 (applying strict scrutiny to a law that referendum petition signatures collected by non-residents would not count toward the total number of signatures whereas those collected by residents would).

[7] The only meaningful distinction is that the interest in preventing fraud is more justifiable when dealing with a statewide residency requirement rather than one that is based on municipality, but that interest cuts in Appellee's favor here. Also, each of these cases still found statewide residency restrictions could not be justified under strict scrutiny by slim concerns of fraud due to limitations on interstate subpoena power.

18

diminish core political speech and unduly burden the nomination petition process. *See, e.g.*, *Krislov* 226 F.3d at 861 (finding the distinction between "ballot access petitions for initiatives and . . . candidates" was "not a particularly relevant distinction").

        iv.    <u>There are no "recent signals" from the Supreme Court that indicate it intends to depart from *Meyer* and *Buckley*</u>

Finally, the City urges this Court to ignore the holdings of *Meyer*, *Buckley*, and the circuits cited above because of a so-called "recent signal" from a per curium shadow docket opinion in *Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020).

It is, of course, inappropriate to interpret signals from the Supreme Court when there is binding precedent that controls the resolution. *See Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1263 (11th Cir. 2012). And even if *Little* could bear on the court's analysis, it does not say what the City claims. *Little* did not address a restriction on petition circulation. Instead, it addressed a novel challenge to a procedural aspect of a referendum law.

The City's argument hinges on its quote of sentence fragment from the plurality opinion writing that "Chief Justice Roberts . . . wrote that 'the Circuits diverge in fundamental respects when presented with challenges to' citizen

19

initiative laws." App. Doc. 16 at 34 (quoting *Little*, 140 S.Ct. at 2616) . The City expands this half-sentence to make it appear that the Chief Justice was calling into question the wall of authority that petition circulation residency restrictions are subject to strict scrutiny.

In reality, Chief Justice Roberts examined the divergence between the circuits concerning procedural aspects of referenda. He observed that the Sixth and Ninth circuits applied strict scrutiny to *any* inhibition on a person's ability to place an initiative on the ballot. He then contrasted the Seventh, Eighth, and Tenth Circuits that "have held that regulations that make the initiative process more challenging do not implicate the First Amendment." But he noted that was only the case "so long as the State does not restrict political discussion or petition circulation." *Id.* at 2617 (emphasis added). The reason the Chief Justice added that caveat "so long as the State does not restrict . . . petition circulation" is that the Seventh, Eighth, and Tenth Circuits—although more conservative on the

20

application of the First Amendment to other aspects of referenda[8]—still apply strict

scrutiny to residency restrictions on petition circulation.[9]

*Little* is not a signal to depart from *Meyer* and *Buckley*.

> b.     *The City has waived any argument that the district erred in finding the ordinance could not withstand strict scrutiny*

The district court found that the City failed to argue that its ordinance could

survive strict scrutiny, nor did it frame an argument about fraud or any other

compelling interest. *See* Doc. 26 at 13 & n.13 (finding the City made "no argument

that the residency restriction on signature gatherers somehow protects against

petition fraud" and offered no explanation for why an in-state residency restriction

---

[8] The opinions cited in *Little* from the Seventh, Eighth, and Tenth Circuits concern dissimilar procedural restrictions on referenda—not core political speech of circulators. *See Jones v. Markiewicz-Qualkinbush*, 892 F.3d 935, 938 (7th Cir. 2018) (analyzing a statute that allowed a maximum of three referenda on any election ballot); *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082, 1099–1100 (10th Cir. 2006) (challenging a statute that required a supermajority for passing wildlife-related initiatives); *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997) (analyzing a statute that required a certain percentage of registered voters' signatures to place an initiative measure on a ballot).

[9] *See Krislov v. Rednour*, 226 F.3d 851, 860-61 (7th Cir. 2000); *Initiative & Referendum Institute v. Jaeger*, 241 F.3d 614, 616 (8th Cir. 2001); *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1028 (10th Cir. 2008).

21

would reduce fraud).[10] The City does not appear to advance these arguments on appeal. Therefore, if strict scrutiny applies, the City has forfeited any other argument that the ordinance is constitutional.

> c.    *The residency restriction is unconstitutional no matter what level of scrutiny applies*

Although the City abandons any argument that the ordinance survives strict scrutiny, it does argue that its ordinance survives rational basis review. Even if the Court departed from the Supreme Court and sister Circuits, the residency restriction would fail because the ordinance does not guard against fraud and the City's interest in self-governance cannot justify the restriction on speech.

> i.    <u>The ordinance does not guard against fraud</u>

Beyond applying the wrong standard, the City's argument that the district court failed to consider whether the ordinance furthered its interest in preventing fraud, *see* App. Doc. at 37, fails because the City introduced no evidence and never argued "that its interest in obtaining valid signatures is greatly assisted by the residency restriction, or even that it is necessary to achieve this goal." *Krislov*, 226 F.3d at 865. The City "must show that the recited harms are real, not merely

---

[10] While the City does not argue the ordinance survives strict scrutiny, it does attempt to reinvigorate its fraud argument in its argument that the ordinance survives rational basis review. That argument is addressed in the following section.

conjectural and that the regulation will in fact materially alleviate the anticipated harm." *Id*. It has not done so here.

The City argues that its "interest in preventing fraud suffices" to survive intermediate scrutiny. However, "the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting." *Meyer*, 486 U.S. at 427. Moreover, the Second Circuit found that requiring a circulator to live within the district where the candidate was running did "not bear even a rational relationship" to the City of New York's interest in "ensuring integrity and preventing fraud in the electoral process." *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 149 (2d Cir. 2000).

The guard against fraud is even weaker than is typical in cases where the non-state-residents seek to circulate petitions.[11] The City's ordinance is not an interstate ban on canvassing. Even Georgia residents who live outside the City

_____

[11] In *Pierce* and *Savage*, both states submitted evidence of alleged fraud from past petition cycles but their laws restricting out-of-state residents from circulating petitions still did not survive strict scrutiny. *Compare Pierce*, 44 F.4th at 858 (Montana found that "signature gathering process for three initiatives was permeated by a pervasive and general pattern and practice of fraud.") (internal quotations and citation omitted) *with Savage*, 550 F.3d at 1027 (describing the evidence Oklahoma presented that "non-resident circulators unlawfully participated in signature gathering" and officials "could not question many of the non-resident circulators within the ten-day protest period.").

23

cannot participate.[12] Unlike a claim that a state could not issue a subpoena or engage in other enforcement activity outside of its borders, the concern is not even present here as Plaintiffs and other residents of the State of Georgia are fully subject to subpoena power. *See, e.g.*, *Chandler v. City of Arvada, Colorado*, 292 F.3d 1236, 1244 (10th Cir. 2002) (holding a city could not ban non-city residents from circulating referendum petitions and observing that the residency requirement did not protect against fraud because "an Arvada resident who circulates a petition in Arvada, subsequently moves outside the City, but is later called upon by the City Clerk for a protest hearing, is beyond the reach of the City Clerk's subpoena power").

The City does not, and cannot, argue its subpoena power will be unable to not reach non-residents; instead, it argues that it will be *easier* (in some undefined way) to subpoena city residents than non-residents. App. Doc. at 33. First, the City did not raise this argument in the district court, and it never put the city code sections on which it relies into the record below. Second, the City's argument is belied by the fact that it subpoenas and prosecutes thousands of non-residents each

_____

[12] Plaintiffs specifically limited the scope of the relief they requested to in-state residents. *See* Doc. 2-1 at 6 n.6, and the City did not make any argument concerning in that regard.

24

month in its municipal court. Third, as the City has argued, the City Council only "verif[ies] that signers are qualified municipal voters," and does not verify where the petitions are signed. App. Doc. 16 at 17–18. If the City does not enforce whether petitions are signed inside its boundaries, then it is unclear how subpoenaing Georgia residents who live outside the City is something the City would ever need to do.[13]

      ii.    <u>The City's interest in self-governance is not a basis to limit petition circulation</u>

In its argument to the district court, the City relied on *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60 (1978), the proposition that it has a legitimate governmental interest in restricting people from its "political process." But *Holt* is about the right of non-residents to vote, not the role of non-residents in circulating petitions.

Similar arguments were made to three different circuit courts, and each time the courts rejected it. *See Bellows*, 40 F.4th at 22 (rejecting Maine's argument and

---

[13] The City faults the district court for failing to include a requirement that a person collecting signatures should have to "submit to legal process" before collecting signatures. However, the City never raised any argument or introduced any evidence about preventing fraud, nor did it request such language be part of an injunction. Moreover, there is no indication that a person "submitting to legal process" would guard against fraud.

explaining "*Holt* concerned participation in the political process through voting rather than through the circulation of a petition."); *Pierce,* 44 F.4th at 863 (finding out-of-state ban was not narrowly tailored when the interest in self-governance may be served by who can be "official proponents, petition signers, and voters on initiatives"); and *Savage,* 550 F.3d at 1029 n.2 (declining to accept the state's restriction of out-of-state speech "simply because the speech may indirectly affect the political process through the solicitation of resident participation"). The City's sole authority comes from an unreported district court case in Maine, which the First Circuit in *Bellows* declined to follow. *Bellows*, 40 F.4th at 18.

### 2. *The ongoing violation of the First Amendment constitutes irreparable harm to Plaintiffs*

It is long established that "[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). "The denial of a Constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v. Meese*, 818 F2d 1132, 1135 (4th Cir. 1987). The First Amendment occupies a unique place in our pantheon of freedoms, and as such is entitled to particular protection. *See Let's*

26

*Help Florida v. Smathers*, 453 F. Supp. 1003, 1009 (N.D. Fla. 1978), *aff'd sub nom. Firestone v. Let's Help Florida*, 454 U.S. 1130 (1982). *See also Wooley v. Maynard*, 430 U.S. 705 (1977) (injunctive relief appropriate to prevent injury to Plaintiffs First Amendment rights).

> a.   *Plaintiffs will be irreparably harmed by being excluded from an ongoing petition drive following the City's official approval of the petition*

The City of Atlanta approved a referendum petition seeking to repeal the ordinance that authorized the construction of a police training center. It issued copies of petitions for circulation and signature collection. By issuing the petitions, it created an ongoing drive to collect signatures.

As the district court observed, "the City could have taken the position that it later espoused in this lawsuit and disapproved the petition as unauthorized under Georgia law." Doc. 37 at 5. It could have filed for declaratory relief before issuing official petitions. *See City of Atlanta v. Hotels.com, L.P.*, 285 Ga. 231, 234 (2009) ("Cities, like other litigants, are entitled to avail themselves of declaratory relief under OCGA § 9-4-2."). Although the City recognizes that a municipal clerk has no obligation to issue a petition that is unauthorized by state law, *see* App. Doc. 16 at 39, it chose to issue the petition. *See* Doc. 1 at 48.

27

Once the City approved the referendum petition, volunteers and paid canvassers began circulating petitions across Atlanta, and Plaintiffs filed their lawsuit so they could participate on equal terms as Atlanta residents.

Because the City chose to defer any litigation surrounding the validity of the referendum, the next step is to see if the proponents of the referendum collect enough signatures assuming the City follows through on its representation in the district court that it will not approve the referendum under any circumstances. That, however, contradicts the position it took in this Court when seeking a stay of the injunction when it argued that it would be required to place the referendum on the November 2023 or March 2024 ballots. *See* App Doc. 14 at 10, 13, 14, 22.[14]

If there are enough valid signatures, and the City refuses to approve the referendum, then the issue will be litigated in state court about state law issues. If there are not enough valid signatures, then the issue is moot.

The City's reliance on *Gibson v. Firestone*, 741 F.2d 1268 (11th Cir. 1984), is misplaced. In *Firestone*, the Florida Supreme Court that decided a referendum

---

[14] This shift of positions compelled the district court to comment that the City's "vacillating positions . . . have directly contributed to the uncertainty of the validity of the signatures previously collected in accordance with this Court's previous injunction" and to remind the City of a "proverb dating back over four centuries ago once again applies here: Honest is the Best Policy." Doc. 39 at 3,6

28

violated the Florida constitution and ordered that it be removed from an election ballot. After that decision, the plaintiffs filed a lawsuit in federal court asking the district court to enjoin the secretary of state from complying with the Florida Supreme Court's mandate. The district court declined to do so and this court affirmed, writing that "[w]e cannot ignore the practical effect of an order" which "would be tantamount to a decision by this court that the Florida Supreme Court has misread, or misapplied the single-subject requirement . . . of the Florida Constitution." *Id.* at 1273. That is nothing like what is happening here. While City argues that this case stands for the proposition that the State and City alone have the power to determine the scope referendum law, that interpretation flies in the face of the Supreme Court and circuit precedent invalidating residency restrictions.

Neither Plaintiffs' standing nor their irreparable harm is conditioned on the referendum's success. *See, e.g.*, *Judd*, 718 F.3d at 313 (finding that plaintiff had standing even though "the [plaintiff] has yet to fail in its quadrennial quest to gather sufficient signatures in Virginia on behalf of its party's presidential candidate").

      *b.*    *To the extent it is relevant, there is a valid legal basis for the referendum*

          i.    <u>The Georgia Supreme Court's interpretation of O.C.G.A. § 36-35-3(b) (2) will not survive a challenge in Georgia Courts</u>

The City relies on the Supreme Court's decision in *Kemp v. City of Claxton*, 269 Ga. 173, 175–6 (1998), to argue that the referendum at issue here will ultimately be declared invalid if it is challenged in court. *Kemp* held the "procedure of OCGA § 36–35–3(b)(2) applie[d] only to amendments to municipal charters." While *Kemp* has not been overruled, the Supreme Court of Georgia recently called the validity of *Kemp* into question in *Camden Cnty. v. Sweatt*, 315 Ga. 498, 499 (2023).

In *Sweatt*, a county passed a resolution to buy property as part of its plan to build a spaceport on Georgia's coast. County residents responded with a referendum to repeal that ordinance. Prior to issuing the referendum petitions, the county sought a declaration that the referendum was invalid based on *Kemp*'s interpretation of the Home Rule Act, O.C.G.A. § 36-35-3. The language of the Home Rule Act mirrors the Home Rule provision for counties found in Ga. Const. of 1983, Art. IX, Sec. II, Par. I.

In analyzing that nearly identical language, the court found that *Kemp* "dismissed some of the canons of construction" and allowed "the spirit and intent of the legislation [to] prevail[] over a literal reading of the language." *Sweatt*, 315 Ga. at 512–13.[15] This is the very error that leads courts into "dangerously undemocratic, unfair, and impractical territory." *DeKalb Cnty. Bd. of Tax Assessors v. Barrett*, 361 Ga. App. 598, 606–07, n.34 (2021). The court in *Sweatt* went on to reach a different result and while it did not explicitly overrule *Kemp* (because the case dealt with a different law), it appears inevitable that *Kemp* will be overruled when the court is presented with a case dealing with O.C.G.A. § 36-35-3(b)(2).[16]

If enough signatures are collected, the City and the sponsors of the referendum will have to litigate whether *Kemp* should be overturned. If *Kemp* is

_____

[15] In 1996, the Legislature passed the City's charter allowing repeals of ordinances, which is a clearer picture of the Legislature's understanding of the meaning of the Home Rule Act than *Kemp*'s divination of the Act's spirit or Legislature's intent, because the Legislature "had full knowledge of the existing state of the law and enacted the [Charter] with reference to it." *Patton v. Vanterpool*, 302 Ga. 253, 257 (2017) (internal quotations and citations omitted).

[16] The Supreme Court of Georgia has recognized *stare decisis* "should not be used to sanctify and perpetuate error." *Harper v. State*, 286 Ga. 216, 218 (2009) (quotation and citation omitted). Moreover, it has "consistently said that the soundness of the reasoning of the relevant precedent is the most important factor in the stare decisis analysis." *Cook v. State*, 313 Ga. 471, 486 (2022). Because *Kemp* eliminated an entire phrase in the statute based on its interpretation of the law's "spirit," *Kemp* is likely no longer good law.

overturned, it means that the referendum at issue where would be authorized under

O.C.G.A. § 36-35-3(b)(2).[17]

ii.    The City's charter provides a separate legal basis
for the referendum

Even if *Kemp* is not overturned, the general legislative authority in O.C.G.A.

§36-35-3(a) and the City's Charter provides a separate referendum procedure that

authorizes the referendum. *See* Doc. 1-1.[18] *Kemp* did not preempt referendums

under a city's legislative power; it only decided that the power to amend charters

did not include referendums that repeal ordinances unrelated to a city's charter.

---

[17] It is notable that the City has not requested certification of this question to the Supreme Court of Georgia. That is likely because it has asserted that the issue is not actually before the Court while simultaneously placing the issue before the Court. *See* Doc. 37 at 4–5 (detailing the City's shifting position as to whether the Court should actually decide whether the referendum is valid). Intruding upon the Georgia Supreme Court's prerogative to determine state law is unnecessary here, as this Court need not decide the viability of *Kemp* both because there is an alternative avenue for the City to assert its rights in state court, and because the validation process has not yet begun.

[18] The City's charter also permits citizens to initiate legislation through a referendum process it calls an initiative and the City Council to submit any ordinances or resolutions directly to qualified voters in a special election. Alt. Charter §2-501; *see also* Atl. Mun. Code §§ 66-36 and 37(c). The legislature authorized the City's charter, and it is presumed to have "had full knowledge of the existing state of the law and enacted the [City's charter] with reference to it." *Patton v. Vanterpool*, 302 Ga. 253, 257 (2017). Thus, the City's expansive view of *Kemp*'s holding that it restricted all delegations of "legislative authority" to citizens is unreasonable.

*Kemp*'s holding is limited to "an interpretation of OCGA § 36–35–3(b)(2)." *Kemp*, 269 Ga. at 176. In *Sweatt*, Camden County seized the same language as the City and argued that the electorate could not directly exercise legislative power, and the court rejected the argument.

Neither the City nor its amicus go through the steps to analyze whether the ordinance is preempted. "[T]he General Assembly may preempt local ordinances on the same subject as a general law either expressly or by implication." *Gebrekidan v. City of Clarkston*, 298 Ga. 651, 653 (2016). "In considering the constitutionality of a particular ordinance, [Georgia's Supreme] Court looks beyond the ordinance's stated purpose and inquires instead as to its operative effect." *Moss v. City of Dunwoody*, 293 Ga. 858, 860 (2013).

Both the City and State of Georgia argue the Charter cannot authorize the referendum because it is in direct conflict with O.C.G.A. § 36-35-3(b)(2).[19] But that express conflict does not exist if *Kemp*'s interpretation of O.C.G.A. § 36-35-

---

[19] It states "(a) The council shall by ordinance prescribe procedures to govern the initiation, adoption, and repeal of ordinances by the electorate, and the council shall authorize an initiative or referendum election on petition of at least 15 percent of the registered voters qualified to vote in the preceding general municipal election." This section of the City's charter was enacted by the Georgia legislature. *See*, 1996 Ga. Laws p. 4493, found online at http://dlg.galileo.usg.edu/do:dlg_zlgl_575898203.

3(b) is good law.[20] Moreover, the charter does not empower the city council to enact an ordinance that would amend the City's charter, putting the grant of authority in the charter wholly outside *Kemp*'s interpretation of O.C.G.A. § 36-35-3(b).

Nor is preemption implied from the Act. Implied preemption preempts local legislation "on the same subject as the general law." *Gebrekidan* at 654. The City and State of Georgia suggest referendums are the subject of O.C.G.A. § 36-35-3(b)(2), not amendments to municipal charters. However, a referendum is only one method by which the City may amend its charter under the Home Rule Act; it is not the subject of the Home Rule Act. Both the City and the State's arguments ignore the broad authority over *how* cities exercise their legislative power under O.C.G.A. § 36-35-3(a). *See City of Atlanta v. McKinney*, 265 Ga. 161, 165 (1995) (holding legislative grant of power does not dictate how that power is exercised); *Sadler v. Nijem*, 251 Ga. 375 (1983) (same); *see also Walker v. City of Calhoun,*

_____

[20] Again, Plaintiffs disagree that *Kemp* is good law, but taking *Kemp* at face value, it judicially erased the phrase "repeals of ordinances, resolutions, or regulations adopted pursuant to subsection (a) of this Code" from the statute. *Kemp v. City of Claxton*, 269 Ga. 173, 175–6 (1998) ("The legislative intent will be effectuated even if some language must be eliminated"). The City and its amicus would have it both ways – that the language is eliminated yet still expressly preempts the City's charter and ordinance.

*GA*, 901 F.3d 1245, 1256 (11th Cir. 2018) (upholding city's regulation of bail under the broad authority in O.C.G.A. § 36-35-3(a) and the city's charter).

The Home Rule Act permits the City to legislate on subjects where there is no preemption. *Kemp* did not foreclose the City's power to decide how it exercises its general legislative authority under O.C.G.A. § 36-35-3(a), and thus does not preempt the referendum.

> c.    *The repeal of the City's ordinance would not violate the Contract Clause*

The City also invites this Court to issue an advisory opinion on whether the referendum, once approved and voted upon, would violate the Contracts Clause. This is the exact speculation that its amicus says this Court should not on in. As it noted, "[c]ourts 'don't answer constitutional questions that don't need to be answered.'" App. Doc. 21 at 17 (quoting *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1348 (11th Cir. 2021)).

To whatever extent this is argument is relevant, if the referendum is placed on the ballot and it succeeds by garnering a majority vote, its repeal of the ordinance, and thus the contract, would not violate the Contracts Clause because that Clause only "protects contracting parties' reasonable contractual expectations

against unreasonable abrogation by the states." *S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1202-3 (11th Cir. 2019).

Georgia law disfavors contracts that bind future city councils from making important policy decisions. O.C.G.A. § 36-30-3(a) ("One council may not, by an ordinance, bind itself or its successors so as to prevent free legislation in matters of municipal government."). Hence, the City required a unilateral termination clause in its contract, which allows it, "at its sole option, [to] terminate this Lease with or without cause, upon providing at least 180 days written notice to Lessee." *See* ¶ 4.3 of DEAM Lease, attached to Ordinance 21-O-0367[21]. The universal termination clause ensures future councils are not bound, and, in fact, could "excuse the City from performing under the lease agreement." App. Doc. 16 at 44. It also severely undermines any "expectation" by the parties to the contract. *See, e.g.*, *Ass'n of Equip. Manufacturers v. Burgum*, 932 F.3d 727, 730 (8th Cir. 2019) ("[I]f the party to the contract who is complaining could have seen it coming, it cannot claim that its expectations were disappointed.").

---

[21] The ordinance and lease are not in the record but can be found on the City's website, located at
https://atlantacityga.iqm2.com/Citizens/Detail_LegiFile.aspx?Frame=SplitView&MeetingID=3468&MediaPosition=0.000&ID=24221&CssClass=

Likewise, the no-cause termination distinguishes this matter from the *Jonseboro* case cited by the City where the contract at issue "contain[ed] no provision for unilateral cancellation." *Jonesboro Area Athletic Ass'n. v. Dickson*, 227 Ga. 513, 519 (1971). Just because it "would be difficult" or a "hard choice" for the City to terminate a multi-year contract, "do[es] not render meaningless the power of termination," nor allow the City to bind future city councils to the lease. *Bauerband v. Jackson Cnty. Bd. of Comm'rs*, 278 Ga. 222, 224 (2004). Both parties entered into this agreement clear-eyed and with full knowledge of the unilateral termination provision; neither can assert a constitutional claim if the contract is terminated.

Even if the repeal of the ordinance were to violate the City's termination clause, the "mere repudiation of a contract with a private party, even when that repudiation takes the form of legislative action, constitutes a breach of contract but does not raise a constitutional issue." *Lovejoy Realty, LLC v. Clayton Cnty., Georgia*, 1:08-CV-3750-ODE, 2009 WL 10699711, at *4 (N.D. Ga. Nov. 6, 2009); *see also Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1251 (7th Cir. 1996) (finding no violation of the Constitution where "[t]he repealing ordinance, the target of the constitutional claim, purports to do no more than repeal the

37

approving ordinance" and is thus only a breach); *and see Taylor v. City of Gadsden*, 767 F.3d 1124, 1133 (11th Cir. 2014) (holding there no Contract Clause violation because the city was doing nothing different from what a private party does) (internal quotation marks and citation omitted).

### 3.    *The balance of equities favors the injunction*

As an initial matter, the record shows that the City has: (a) it approved a referendum petition that it now contends is illegal , and—according to the City—will refuse to recognize its citizens' time and money expended collecting 116,0000 signatures the City has no intention of honoring; (b) misrepresented to this Court that there will be an impending November 2023 election if enough signatures are acquired when it has no intention of holding such election;; (c) issued new referendum petitions pursuant to the district court's order before seeking a stay of the injunction creating more confusion; (d) blamed the district court for "injecting unnecessary confusion and uncertainty" when it failed raise issues it to the district court; and most recently, (f) refusing to state whether it will consider petitions containing signatures collected by City residents within the original petition deadline, with the implication being that the petition sponsors relying on the district court's extension of the original deadline have now forfeited the submission

38

of *any* signatures (even those collected within the original deadline) unless the district court's order is affirmed in full. *See* Doc. 36 at 1–4. This gamesmanship from a party invoking the principles of equity should not be rewarded, and led the district court to flag each shape-shifting change of position by the City. *See* Doc. 37.

### a.    *Plaintiffs did not delay filing this lawsuit*

Although the City fails to employ the term or its test, it appears to suggest laches even though Plaintiffs—who are not sponsors of the referendum effort—filed this lawsuit within two weeks of the City approving the referendum petition and issuing petition forms. To demonstrate laches, the City "must demonstrate that Plaintiffs inexcusably delayed bringing their claim and that the delay caused it undue prejudice." *Democratic Executive Comm. of Florida v. Lee*, 915 F.3d 1312, 1326 (11th Cir. 2019) (rejecting the argument that waiting one year after passage of signature match law equitably barred plaintiffs' claim that the law violated the First Amendment) (*citing United States v. Barfield*, 396 F.3d 1144, 1150 (2005)).

The earliest date Plaintiffs could have filed this lawsuit was the date the referendum was approved, and Plaintiffs filed their lawsuit two weeks later. This Circuit has never found that two weeks is an undue delay. *See Grace, Inc. v. City of*

*Miami*, 23-12472, 2023 WL 5286232, at *2 (11th Cir. Aug. 4, 2023) (deciding eleven-month delay was too long under *Purcell*); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (finding district court did not abuse its discretion in deciding that five-month delay was fatal to finding of imminent irreparable harm). Moreover, "there is a strong presumption that a plaintiff's suit is timely if it is filed before the statute of limitations has run." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1286 (11th Cir. 2015) (finding that a delay of "a scant few months" did not bar a Clean Water Act claim brought within the statute of limitations).

Moreover, the delay was not inexcusable. That one of Plaintiffs' attorneys had a role assisting the referendum organizers[22] has no bearing on when Plaintiffs (or their counsel) realized there was a cognizable First Amendment claim based on the residency restriction.[23] Speculation aside, Plaintiffs had no way of knowing if

---

[22] The City does not address that this evidence was not properly submitted to the district court or why it should be considered by this Court. There is no indication that the district court allowed the surreply and the evidence attached to it. *See* Doc. 26 at 6 n.4 (noting that the City's surreply was not authorized by the Federal Rules or the local rules, and only citing the surreply to address an argument unrelated argument in its order).

[23] The City implies that one of Plaintiffs' counsel is responsible for the First Amendment violation at issue in this case. *See* Doc. 24 at 4. That is false. Numerous players were involved in submitting different language, but the City

or when the City would approve the referendum petition. If the City had refused to do so on the basis that it believed that the referendum is invalid, Plaintiffs could not have filed a lawsuit.

Finally, the City suffered no harm. It has not alleged any hardship from the two weeks between its decision to issue the referendum petitions and Plaintiffs lawsuit.

### C.    THE SCOPE OF THE INJUNCTION IS APPROPRIATE TO REMEDY THE HARM

The scope of the district court's "remedies should be limited to the inadequacy that produced the injury in fact that the plaintiff has established, and no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) (internal quotations and citation omitted). But the "the district court's broad discretion in shaping an injunction" means that ultimately its injunction need not be "perfect" but "within the realm of reasonableness." *Democratic Executive Comm. of Florida v. Lee*, 915 F.3d 1312, 1323 n.13 (11th Cir. 2019).

itself arrived at the language contained on the form, and the Clerk's final email states the decision that the form "sufficiently reflects the applicable legal requirements." *See* Doc. 24-1 at 2, 4. The residency requirement comes from the City's ordinance, not the language proffered by the referendum sponsors at the Municipal Clerk's insistence.

41

### 1. The City waived any objection to the scope of the relief sought by Plaintiffs by failing to raise the issue in the district court

As a preliminary matter, the City makes the audacious claim that the district court "inject[ed] unnecessary confusion and uncertainty into the signature verification process." App. Doc. 16 at 53.[24] The district court did not inject any confusion, and it could not consider arguments the City failed to timely raise.

Plaintiffs' complaint and preliminary injunction motion precisely stated the relief they sought from the Court. *See* Doc. 2 ¶¶ 16–18. The City responded to that motion by arguing that its ordinance did not violate the First Amendment, that there was no irreparable injury, and that the residency requirement was not severable. It ignored the scope of relief requested, and did not make any argument concerning the requested extension of the signature collection deadline to correct for an unconstitutional process. It is too late to object to that relief now. *See, e.g.*, *Verlo v. Martinez*, 820 F.3d 1113, 1128–29 (10th Cir. 2016) ("Because the Judicial District either made a strategic decision to forgo any argument that the Restricted Areas are nonpublic fora, or inadequately presented that argument to the district court, we conclude the argument is waived."); *Lite-Netics, LLC v. Nu Tsai Capital*

---

[24] The district court addressed this in a recent order where it recounted in detail some of the City's changing positions in this litigation and own lack of candor with the district court. *See* Doc. 37 at 5–6.

42

*LLC*, 8:22CV314, 2022 WL 18106436 (D. Neb. Nov. 10, 2022) (argument concerning the bond required in a preliminary injunction order waived when raised for the first time in a motion to stay).

> ### 2. *The City cannot follow an unconstitutional state law and federal courts are not constrained by state law when redressing an ongoing constitutional violation*

The City argues that the injunction requires it to depart from state law by counting signatures collected by non-residents and signatures submitted more than 60 days after it gave the official petition to the referendum sponsors. App. Doc. 16 at 50. Although it never raised the argument below, the City also faults the district court for not "enjoining a state law containing an identical residency requirement."

First, as explained above, the City's ordinance provides an independent basis for the referendum. There was no need to expand the requested injunction to enjoin the City from enforcing a statute with identical language.

Second, to whatever extent the referendum does depend on state law, the City is solely responsible for administering that law and its obligation to honor the Constitution over any unconstitutional state law. The City, not the state, is responsible for overseeing a municipal referendum. In an abundance of caution, Plaintiffs sued the State of Georgia, but the State of Georgia responded by arguing

43

it was not a proper party rather than defend its own law if needed. Plaintiffs thereafter dismissed the State as a party. *See* Doc. 23.

The City cannot rely on the existence of an unconstitutional statute to justify its ongoing violation of the First Amendment.[25] "It is hornbook federal law that the authority of a 'federal court to fashion effective relief for a violation of federal law is not limited by what state law permits.'" *Reeves v. Comm'r, Alabama Dep't of Corr.*, 23 F.4th 1308, 1319 (11th Cir.) (quoting *Smith v. Comm'r AL Dept. of Corr.*, 2021 WL 4817748, at *4 (11th Cir. Oct. 15, 2021)).

Nor can the City allow a state statute supersede a federal court's order redressing an ongoing violation of the First Amendment. *See Puerto Rico v. Branstad*, 483 U.S. 219, 228 (1987) (rejecting the premise that states and the federal government should always be viewed as coequal sovereigns and explaining

---

[25] This Circuit has also recognized that local governments can be held liable for money damages arising from enforcing an unconstitutional statute. *See Barnett v. MacArthur*, 956 F.3d 1291, 1298 (11th Cir. 2020) (holding that a sheriff could be held liable for enforcing an unconstitutional policy even if that policy was consistent with, or mandated by, a state statute). *See also Cooper v. Dillon*, 403 F.3d 1208, 1222–23 (11th Cir. 2005) (holding that a city could be liable for enforcing an unconstitutional policy, even though the policy was consistent with a Florida statute, because the statute itself was unconstitutional). Similarly, the fact that the City may be acting pursuant to a state statute does not justify its violation fo the First Amendment.

that "[i]t has long been a settled principle that federal courts may enjoin unconstitutional action by state officials."). *See also Reynolds v. Sims*, 377 U.S. 533, 584 (1964) ("When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls.")

Finally, if the district court should have also enjoined enforcement of the residency restriction in O.C.G.A. § 36-35-3, then the remedy is to remand the case for the district court to do that. The remedy is not to allow the City to continue to violate the First Amendment because of a technical defect in a district court order that the City failed to call to the district court's attention.

### 3. *The district court did not violate* Purcell *by extending the signature collection deadline and allowing non-residents to collect signatures*

*Purcell* applies to elections. Its concerns are rooted in voter confusion and creating an incentive for voters to stay away from the polls:

> Court orders affecting *elections*, especially conflicting orders, can themselves result in *voter confusion* and consequent incentive to remain away from the *polls*. As an *election* draws closer, that risk will increase.

*Purcell v. Gonzalez*, 549 U.S. 1, 4–5, (2006) (emphasis added). This case presents none of those concerns. The City's argument that *Purcell* extends to all the undefined "political process" more generally expands *Purcell* beyond its limit.

45

The purposes of ballot initiatives and elections differ and have different stakes. *See Angle v. Miller*, 673 F.3d 1122, 1130 (9th Cir. 2012) ("A ballot access requirement determines whether there is a minimum level of grassroots support for an initiative to warrant its inclusion on the ballot. An election, by contrast, measures the collective, aggregate will of the electorate.") Thus, petition signatures, petition circulation, and the City's validation process do not raise the same concerns as "election rules" because they govern access to the ballot, not the vote itself near the time to vote.

The injunction does not change who qualifies to sign the petition, much less who can vote on an eventual referendum, or the logistics, such as the appropriate identification needed to vote or whether someone can absentee vote. The words on the future ballot itself are unchanged by the district court's order.

Moreover, there is no impending election. Because of this Court's stay of the injunction, the referendum sponsors turned in signed petitions on September 11, 2023. Under the City's ordinance, "the council shall determine the validity of such petition within 50 days of its filing." Atl. Mun. Code § 66-37(a).[26] That means that

---

[26] The City now argues it could complete the signature review without using the entire fifty days. Facts supporting that assertion are not in the record, and the guidelines the City created in August and updated in September, call for "a manual process, a line-by-line review, which will also include double-checking of each line

46

the City has until October 31, 2023, to determine whether the petition is valid.[27]

Because the call of the election must be 29 days before the election date, O.C.G.A.

§ 21-2-540(c)(2), and the Coalition turned in its petitions to the City on September

11, 2023, the referendum will not be on the ballot until, at the earliest, March 2024.

*Id*. at (c)(2)(B).

Both district court cases cited by the City involve dissimilar facts: requests

on the part of referendum sponsors to enjoin in-person signature requirements

during the COVID-19 pandemic and implement new electronic signature collection

and verification requirements to permit electronic signatures. *Compare Arizonans*

*for Fair Elections v. Hobbs*, 454 F. Supp. 3d 910 (D. Ariz. 2020) (requesting "an

injunction requiring the Secretary of State 'to allow the electronic submission of

signatures through E-Qual . . . during the state of emergency in Arizona caused by

the COVID-19 pandemic'") *with Fair Maps Nevada v. Cegavske*, 463 F. Supp. 3d

1123, 1148 (D. Nev. 2020) ("Plaintiffs ask the Court to order the Secretary to set

_____

and other quality control measures." https://citycouncil.atlantaga.gov/home/
showpublisheddocument/13100. A manual signature match would easily fill the
entire 50-day review period.

[27] That is assuming the City is willing to consider those petitions. *See* Doc.
36 at 1–5 (describing the process of submitting petition forms to the City and
counsel's refusal to state whether it would consider those forms timely submitted).

up a system for collecting and verifying signatures offered to support an initiative petition electronically, for the first time, immediately."). Much like the concurrence in *Little*, the district courts did not find in-person restrictions to violate the First Amendment. *Hobbs*, 454 F. Supp. 3d at 923 (finding that the "in-person signature requirements of Title 19 affirmatively promote speech") and *Cegavske*, 463 F. Supp. 3d at 1148 (holding "the In-Person Requirements are narrowly tailored to serve the compelling government interest of preventing fraud"). Moreover, one court found the adoption of a new technology to permit electronic signatures was a "large-scale [change] to the election process" that would "more difficult for [election officials] to prepare for the November 2020 general election." *Fair Maps Nevada v. Cegavske*, 463 F. Supp. 3d 1123, 1148 (D. Nev. 2020).

By comparison, the district court's order required the City to issue a new petition, which it did within hours of the order, and then proceed with its normal validation, ballot and voting processes. The City does not argue that the injunction affects what information the city validates or that it requires it to adopt a new technology. Because the injunction extends the time in which to collect signatures by 35 days, the City complains that the injunction could require it to validate more

48

signatures,[28] but it has introduced no evidence on what additional burden that actually entails. Moreover, the City failed to raise this objection to the district court, and there is no evidence about the claimed additional burden. The petitions contain all the relevant information to do this expeditiously because they provide the address of the circulator and the date of each signature.

### 4.    The residency restriction is severable from the remainder of the law

"When confronting a constitutional flaw in a statute," a court should "try to limit the solution to the problem." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006). Under Georgia law, which governs the severability question, to hold one part of a statute unconstitutional and uphold another part as separable, they must not be "mutually dependent upon each other." *City Council of Augusta v. Mangelly*, 243 Ga. 358, 363 (1979) (citations and quotations omitted). The question is whether the severance would "result in a statute that fails to correspond to the main legislative purpose, or give effect to that purpose." *State of Georgia v. Jackson*, 269 Ga. 308, 312 (1998).

––––––––––––––––––

[28] Arguing that the injunction would cause the City to "incur the expense of counting and verifying signatures that will be invalid if this Court vacates the injunction or if the district court declines to give permanent relief." App. Doc. at 25.

49

While the City spends much of its brief minimizing the effect of the nonresident ban, it paradoxically argues that the restriction is so vital that the legislature would not have enacted the law without the phrase "he or she is a resident of the municipality affected by the petition" included in it. As the district court found, both the City ordinance and Georgia law contain broad severability clauses in keeping with the entry of appropriately narrow injunctions. *See* O.C.G.A. § 1-1-3; City of Atlanta, Code of Ordinances § 1-10, Doc. 21-4. Several cases, relied upon by the district court, demonstrate that the language is severable. *See, e.g.*, *Covenant Christian Ministries*, 854 F3d at 1240 (concluding that the district court did not err by severing the City's ordinance by striking only those portions which offended federal law); *Lamar Advert. Co. v. City of Douglasville*, 254 F. Supp. 2d 1321, 1338 (N.D. Ga. 2003) (severing five unconstitutional parts of the Douglasville sign ordinance from other provisions that were not mutually dependent on them); *Union City Bd. of Zoning Appeals v. Justice Outdoor Displays, Inc.*, 266 Ga. 393, 396-99 (1996) (concluding that the stated purpose of the act was still served after the unconstitutional portions of the ordinance were severed).

50

## **CONCLUSION**

For the foregoing reasons, Plaintiffs request this Court affirm the

district preliminary injunction order and remand the case for further proceedings.


Respectfully submitted, this 13th day of September, 2023.

/s/Brian Spears                                    /s/Gerald Weber
Brian Spears                                       Gerald Weber
Georgia Bar No. 670112                             Georgia Bar No. 744878

/s/Jeff Filipovits                                 Law Offices of Gerry Weber, LLC
Jeff Filipovits                                    Post Office Box 5391
Georgia Bar No. 825553                             Atlanta, Georgia 31107
                                                   (404) 522-0507 (phone)
/s/Wingo Smith                                     wgerryweber@gmail.com
Wingo Smith
Georgia Bar No. 147896

SPEARS & FILIPOVITS, LLC
315 W. Ponce de Leon Ave.
Suite 865
Decatur, GA 30030
404-905-2225
bspears@civil-rights.law
jeff@civil-rights.law
wingo@civil-rights.law

## **CERTIFICATE OF COMPLIANCE**

Undersigned counsel certifies that this document complies with the 13,000 word limitation of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,549 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface in 14-point Times New Roman font. The brief was prepared using LibreOffice 7.4.5.1 and GNU Emacs 28.3

This 13th day of September, 2023.

/s/Jeff Filipovits
Jeff Filipovits
Georgia Bar No. 825553

Spears & Filipovits, LLC
315 W. Ponce de Leon Ave.
Suite 865
Decatur, Georgia 30306
404-905-2225
jeff@civil-rights.law

52