Case No. 23-12469

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

LISA BAKER, et al.,

*Plaintiffs-Appellees*,

v.

CITY OF ATLANTA,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Northern District of Georgia, Atlanta Division

No. 1:23-cv-2999
Hon. Mark H. Cohen, District Judge

**BRIEF OF AMICUS CURIAE
UNIVERSITY OF GEORGIA SCHOOL OF LAW
FIRST AMENDMENT CLINIC
IN SUPPORT OF PLAINTIFFS-APPELLEES**

Samantha C. Hamilton
Ga. Bar No. 326618
Clare R. Norins
Ga. Bar No. 575364
FIRST AMENDMENT CLINIC*
University of Georgia School of Law
P.O. Box 388
Athens, Georgia 30603

*Counsel for Amicus Curiae*
*co-authored with Ashley Fox

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

1. Ashe III, Robert L.

2. Baker, Lisa

3. Bondurant, Mixon & Elmore, LLP

4. City of Atlanta

5. Cohen, Mark H.

6. Defend Atlanta Forest

7. Dougherty, Jacqueline

8. Filipovits, Jeff

9. Fox, Ashley

10. Hamilton, Samantha C.

11. Law Offices of Gerry Weber, LLC

12. Norins, Clare R.

13. Jones, Keyanna

14. Patel, Alkesh B.

15. Sellers, Matthew R.

16. Smith, Wingo

17. Spears, Brian

18. Spears & Filipovits, LLC

19. State of Georgia

20. Stop Cop City Coalition

21. University of Georgia School of Law's First Amendment Clinic

22. Vincent, Jane D.

23. Weber, Gerald

24. Weltner, Amelia

25. Winkles, Logan B.

/s/ Samantha C. Hamilton
Samantha C. Hamilton

*Counsel for Amicus Curiae*

# **<u>TABLE OF CONTENTS</u>**

Certificate of Interested Persons and Corporate Disclosure Statement........................2

Table of Contents...........................................................................................................4

Table of Authorities.......................................................................................................5

Identity and Interest of Amicus Curiae..........................................................................7

Introduction....................................................................................................................7

Argument......................................................................................................................10

    I. The Residency Restriction Unlawfully Infringes Plaintiffs' Freedom of Speech……………………………………………………………………………..10

    II. The Residency Restriction is Subject to Strict Scrutiny.............................12

    III. Plaintiffs Have a Constitutional Right to Gather Petition Signatures, Regardless of the City's Conjecture About the Legality of the Outcome……………………………………………………………………...16

    IV. Restricting Plaintiffs' Ability to Petition is an Affront to their Liberty Interest in Self-Expression....................................................................20

Conclusion....................................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*303 Creative LLC v. Elenis*,
   143 S. Ct. 2298 (2023)........................................................................10

*Boos v. Barry*,
   485 U.S. 312 (1988)............................................................................8

*Borough of Duryea, Pa. v. Guarnieri*,
   564 U.S. 379 (2011)..........................................................................10

*Brandenburg v. Ohio*,
   395 U.S. 444 (1969)..........................................................................13

*Buckley v. Am. Const. L. Found., Inc.*,
   525 U.S. 182 (1999)............................................................................6

*Buckley v. Valeo*, 424 U.S. 1 (1976) ...................................................6

*California Democratic Party v. Jones*,
   530 U.S. 567 (2000)..........................................................................10

*Camden Cnty. v. Sweatt*,
   315 Ga. 498 (2023) ...........................................................................12

*Chandler v. City of Arvada*,
   292 F.3d 1236 (10th Cir. 2002) ..........................................................7

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010)............................................................................6

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*,
   142 S. Ct. 1464, (2022) ......................................................................8

*Cohen v. California*,
   403 U.S. 15, 24 (1971)...........................................................................15

*Diaz v. Bd. of Cnty. Comm'rs of Dade Cnty.*,
   502 F. Supp. 190 (S.D. Fla. 1980) ........................................................12

*Fusaro v. Cogan*,
   930 F.3d 241 (4th Cir. 2019) ...................................................................5

*Herbert v. Lando*,
   441 U.S. 153, 183 n.1 (1979)................................................................15

*Hustler Mag. v. Falwell*,
   485 U.S. 46 (1988)................................................................................15

*Kemp v. City of Claxton*,
   269 Ga. 173 (1998) ...............................................................................12

*Legal Services Corp. v. Velazquez*,
   531 U.S. 533 (2001)................................................................................8

*Libertarian Party of Va. v. Judd*,
   718 F.3d 308 (4th Cir. 2013) .............................................................7, 10

*McIntyre v. Ohio Elections Comm'n*,
   514 U.S. 334 (1995)................................................................................5

*Meyer v. Grant*,
   486 U.S. 414 (1988).......................................................................4, 5, 6

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964)................................................................................4

*Procunier v. Martinez*,
   416 U.S. 396 (1974)..............................................................................15

*Reed v. Town of Gilbert, Ariz.*,
 576 U.S. 155 (2015).........................................................................8, 10

*Roth v. United States*,
 354 U.S. 476, 484 (1957)......................................................................4

*Thornburgh v. Abbott*,
 490 U.S. 401 (1989)............................................................................15

*United States v. Playboy Entertainment Group, Inc.*,
 529 U.S. 803 (2000)............................................................................10

**Other Authorities**

*'Stop Cop City' petition campaign in limbo as Atlanta officials refuse to process*

 *signatures*, PBS News Hour (Sep. 11, 2023) ......................................14

*Atlanta lawmakers approve funds for police training center despite fierce*

 *opposition*, NBC News (June 6, 2023) ..................................................2

*Atlanta's Black community raises voice against 'Cop City' police base*, The

 Guardian (March 12, 2023) ..................................................................3

*In Atlanta, Proposed 'Cop City' Stirs Environmental Justice Concerns*, Inside

 Climate News (March 8, 2023)..............................................................3

*Neighbors of planned 'Cop City' weigh in on controversial development*, Georgia

 Public Broadcasting ............................................................................2

*New York activists join national day of outcry over Atlanta's 'Cop City,'* The

 Villager (March 10, 2023) ....................................................................3

iv

*Officers will continue to stand guard at Atlanta Public Safety Training Center, chief says*, Fox 5 Atlanta (Apr. 25, 2023)...................................................2

Ordinance 21-O-0367 ...................................................1

Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 1:21 (2023).........17

*The Movement to Stop "Cop City" Sparks International Solidarity*, Sierra Club (Feb. 5, 2023)...................................................3

Thomas Emerson, *The System of Freedom of Expression* 6 (1970).......................17

*What is Atlanta's 'Cop City' and why are people protesting it?* ABC News (Mar. 6, 2023) ...................................................2

## Statutes and Municipal Codes

Atlanta Municipal Code § 66-36...................................................7

Atlanta Municipal Code § 66-37(a) ...................................................7

Atlanta Municipal Code § 66-37(b)...................................................3, 7

O.C.G.A. § 36-35-3(b) ...................................................12

## IDENTITY AND INTEREST OF AMICUS CURIAE

The University of Georgia School of Law's First Amendment Clinic ("UGA First Amendment Clinic" or "the Clinic") defends and advances expressive freedoms, including freedom of speech and the right to petition. The Clinic accomplishes these goals through direct representation and advocacy on behalf of journalists, students, government employees, and public citizens as well as through community education that promotes free expression, open access to government, and the creation of a more informed citizenry. The Clinic has a vested interest in protecting core political speech from government regulation that does not comply with First Amendment standards. The Clinic served as amici curiae on behalf of referendum petition circulators in *Camden Cnty. v. Sweatt*, 315 Ga. 498 (2023). This decision by the Georgia Supreme Court calls into question whether *Kemp v. City of Claxton*, 269 Ga. 173 (1998), on which Defendant City of Atlanta heavily relies, still remains good law. *See* 315 Ga. at 512-13.

## STATEMENT REGARDING CONSENT TO FILE, AUTHORSHIP AND CONTRIBUTIONS PURUSANT TO FED. R. APP. P. 29(a)(4)(E)

All parties have consented to the filing of this brief.

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), amicus curiae UGA First Amendment Clinic certifies that no party or party's counsel authored this brief in whole or in part, that no party or party's counsel provided any money that was intended to fund the preparation or submission of this brief, and that no

party or person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund the preparation or submission of this brief.

## **INTRODUCTION**

In 2021, the City of Atlanta (the "City") passed Ordinance 21-O-0367 ("Ordinance") to authorize leasing 381 acres of city property located in unincorporated DeKalb County to the Atlanta Police Foundation ("APF"), a private entity, for the construction of the Atlanta Public Safety Training Center ("Training Center"). The Training Center's proposed site covers 85 acres in the South River Forest.

Proponents of the Training Center argue that it is necessary to replace existing training facilities that do not currently meet the needs of an urban law enforcement agency.[1] Former Atlanta Mayor Keisha Lance Bottoms and police officials have stated that the Training Center will help increase morale, retention,

---

[1] *Neighbors of planned 'Cop City' weigh in on controversial development*, Georgia Public Broadcasting (Feb. 2, 2023), https://www.gpb.org/news/2023/02/02/neighbors-of-planned-cop-city-weigh-in-on-controversial-development (last accessed Sept. 20, 2023); *Atlanta lawmakers approve funds for police training center despite fierce opposition*, NBC News (June 6, 2023), https://www.nbcnews.com/news/us-news/atlanta-lawmakers-approve-funds-controversial-cop-city-police-training-rcna87894 (last accessed Sept. 18, 2023).

and recruitment of police officers.[2] Meanwhile, opponents of the Training Center, who refer to it as "Cop City," have criticized the environmental destruction required to build the facility, raised safety concerns associated with building a firing range so close to residential neighborhoods, and rebuked the fact that the facility is being built in a majority-Black area that opponents report has historically been disenfranchised by local government.[3] Protests against the Training Center have garnered national and international attention.[4]

Another point of criticism by the Training Center's opponents is the manner in which the City decided to lease the land to APF without meaningful public

---

[2] *What is Atlanta's 'Cop City' and why are people protesting it?* ABC News (Mar. 6, 2023), https://abcnews.go.com/US/atlantas-cop-city-people-protesting/story?id=96716095 (last accessed Sept. 18, 2023); *Officers will continue to stand guard at Atlanta Public Safety Training Center, chief says*, Fox 5 Atlanta (Apr. 25, 2023), https://www.fox5atlanta.com/news/atlanta-public-safety-training-center-security-will-continue (last accessed Sept. 18, 2023).

[3] *Atlanta's Black community raises voice against 'Cop City' police base*, The Guardian (March 12, 2023), https://www.theguardian.com/us-news/2023/mar/12/atlanta-cop-city-black-community-protest (last accessed Sep. 14, 2023); *In Atlanta, Proposed 'Cop City' Stirs Environmental Justice Concerns*, Inside Climate News (March 8, 2023), https://insideclimatenews.org/news/08032023/atlanta-cop-city-forest-justice-trees/ (last accessed Sep. 14, 2023).

[4] *New York activists join national day of outcry over Atlanta's 'Cop City*,' The Villager (March 10, 2023), https://www.amny.com/news/new-york-activists-national-day-outcry-atlantas-cop-city/ (last accessed Sept. 14, 2023); *The Movement to Stop "Cop City" Sparks International Solidarity*, Sierra Club (Feb. 5, 2023), https://www.sierraclub.org/sierra/movement-stop-cop-city-sparks-international-solidarity (last accessed Sep. 14, 2023).

input. In June 2023, activists began collecting petition signatures for a referendum election pursuant to Atlanta Municipal Code § 66-37 ("Petition"), whereby if a sufficient number of valid signatures are collected, the issue of whether to repeal the Ordinance authorizing lease of the land for the Training Center construction will be put to a City-wide vote. It is undisputed that only Atlanta residents may validly sign the Petition and vote in any resulting referendum election. At issue here is the City's restriction that only Atlanta residents may *collect Petition signatures*. Atlanta Municipal Code § 66-37(b) (the "Residency Restriction") provides, in relevant part, that "the person collecting signatures" must "swear that such person *is a resident of the city* and that the signatures were collected inside the boundaries of the city" (emphasis added). Accordingly, the Residency Restriction prohibits Plaintiffs, who live in DeKalb County, as well as others who live outside the City, from collecting Petition signatures from Atlanta residents.

The City has not met its burden to show that it has a compelling government interest in preventing non-Atlanta residents from collecting Petition signatures. Most of the Plaintiffs live less than four miles from the proposed Training Center site, and yet they have no say in the process of whether this facility is built in their community; they may not sign the Petition and they may not vote in any future referendum election related to the Training Center. They do, however, have a clearly-established First Amendment right to gather signatures from City residents

4

to help get the issue on the ballot. This right, which also implicates Plaintiffs' liberty interest in free speech, is not dependent on whether any future referendum election is successful in lawfully repealing the Ordinance. The decision below should therefore be affirmed.

## **<u>ARGUMENT</u>**

### I.    **The Residency Restriction Unlawfully Infringes Plaintiffs' Freedom of Speech.**

The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)). As such, "public discussion is a political duty," and the Court must consider Plaintiffs' free speech rights "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open[.]" *Id.* at 270. By forbidding non-Atlanta residents from gathering petition signatures, the Residency Restriction thwarts Plaintiffs' ability to fulfill their public duty to participate in robust political debate on a deeply divisive issue—the construction of the Training Center. Further, the Residency Restriction unconstitutionally prevents Plaintiffs' political speech on a matter affecting their own community.

In *Meyer v. Grant*, the Supreme Court explained that collecting petition signatures "involves both the expression of a desire for political change and a

5

discussion of the merits of the proposed change." 486 U.S. 414, 421 (1988) (holding that a "statute prohibiting the payment of petition circulators imposes a burden on political expression that the State has failed to justify"). Thus, Plaintiffs' ability to gather Petition signatures implicates "core political speech." *Id.* at 422. This is not least because Plaintiffs must convince potential signatories that the construction of the Training Center is worthy of consideration by the electorate as a whole. *See id.* As a result, every interaction between a petition circulator and a potential signatory "involve[s] an explanation of the nature of the proposal and why its advocates support it." *Id.* Plaintiffs' circulation of the Petition therefore receives "the broadest protection afforded by the First Amendment" as it involves political advocacy. *Fusaro v. Cogan*, 930 F.3d 241, 251 (4th Cir. 2019) (citing *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995)) (internal quotation marks omitted).

Additionally, prohibiting Plaintiffs from gathering signatures unconstitutionally restricts their "access to the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." *Meyer*, 486 U.S. at 424. By severely curtailing who can circulate the Petition, the Residency Restriction "limits the number of voices who will convey [the Petition advocates'] message . . . and, therefore, limits the size of the audience they can reach." *Id.* at 422-23. The Residency Restriction also renders it

6

less likely that petitioners will collect enough signatures deemed certifiable by the City to place the matter on the ballot.[5] *Id.* at 423. The Residency Restriction's impeding political advocacy in this manner is "wholly at odds with the guarantees of the First Amendment." *Id.* at 428 (quoting *Buckley v. Valeo*, 424 U.S. 1, 50 (1976)). In sum, the City cannot avoid the fact that the Residency Restriction burdens core political speech. As a result, the Court must apply strict scrutiny.

## II.    The Residency Restriction is Subject to Strict Scrutiny.

Strict scrutiny applies because the Residency Restriction burdens core political speech. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."). It is uncontested that the Plaintiffs' circulation of the Petition is core political speech. "[P]etition circulation is 'core political speech' for which First Amendment protection is 'at its zenith.'" *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 183 (1999) (quoting *Meyer*, 486 U.S. at 422). The Residency Restriction impermissibly burdens Plaintiffs' speech because it limits the number of Petition signatures they can collect. It

---

[5] The Cop City Vote Coalition has already submitted 116,000 signed Petition copies to the City, which would be more than enough to force a referendum vote. However, the City has refused to begin certifying the signatures pending this Court's ruling on the instant appeal. *See* ECF 41 at 17-18.

requires any Petition circulator who does not live in Atlanta, but who may nonetheless be impacted by the Training Center, to coordinate scheduling and work jointly with a Petition circulator who does live in Atlanta, since only City residents may collect signatures if the signatures are to be counted toward the referendum election. *See Libertarian Party of Va. v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013) (finding "patently burdensome" a residency requirement for petition circulation that required non-resident circulators to "work in tandem" with residents). The City's Residency Requirement effectively forces Plaintiffs to be chaperoned by an Atlanta resident in order to circulate the Petition. This erects an unnecessary logistical hurdle to gathering signatures, the practical effect of which "is to reduce the pool of eligible circulators and limit political conversation and association." *Chandler v. City of Arvada*, 292 F.3d 1236, 1239 (10th Cir. 2002).

The Residency Restriction found in Atlanta Municipal Code § 66-37(b) is further subject to strict scrutiny for the additional reason that it is a content- or viewpoint-based regulation. Specifically, it burdens the speech rights of only those who wish to hold a special election to make "amendments to the [City] Charter or amendments to or repeals of ordinances or resolutions which may have already been adopted by the [City] council." Atlanta Municipal Code §§ 66-37(a). There is no such residency restriction for petitions that seek to initiate a City ordinance or resolution. *See* Municipal Code § 66-36 ("Initiative"). In other words, the

8

Residency Restriction at issue in this case only applies to petitions seeking to change a piece of City legislation that has already been enacted or adopted. *See, Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 162 (2015) (content-based regulations are subject to strict scrutiny); *id*. at 182-83 (same regarding viewpoint-based regulations) (Kagan, J. concurring). That the Residency Restriction would apply to referendum petitions on other topics besides repeal of the Training Center lease Ordinance at issue here does not render the Residency Restriction content- or viewpoint-neutral. In *Legal Services Corp. v. Velazquez*, the Court affirmed that a regulation preventing attorneys from engaging in advocacy to change welfare laws was viewpoint-based. 531 U.S. 533, 539, 549 (2001). The decision did not turn on the specific law the attorneys sought to change; but rather, turned on the fact that the restriction "clearly [sought] to discourage challenges to the status quo." *Id*. at 539. The Court noted that "[w]here private speech is involved, [government regulation] cannot be aimed at the suppression of ideas thought inimical to the Government's own interest." *Id*. at 548-49 (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 548 (1983)).

So too here, the Residency Restriction serves to suppress ideas that go against the City's interest, by seeking to challenge the City's legislative decisions. Thus, the Residency Restriction is content- or viewpoint-based because it restrains the ability of individuals who disagree with an existing legislative act of the City

9

from garnering support to amend or repeal the act via a referendum election. The same individuals would not be so-hampered in gathering signatures for a petition advocating for an initiative—i.e., a new City ordinance or resolution not already in existence. Accordingly, the Residency Restriction is subject to strict scrutiny because it is triggered by a petition's content (referendum vs. initiative) or a petition's viewpoint (desire to repeal or amend an existing law vs. desire to affirmatively enact a new law). *See City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (noting that a speech regulation is content-based if it "applies to particular speech because of the . . . idea or message expressed"); *Reed*, 576 U.S. at 182 (strict scrutiny applies to "facially content-based regulations of speech," and "regulation [that] facially differentiates on the basis of viewpoint") (Kagan, J., concurring); *Boos v. Barry*, 485 U.S. 312, 319-21 (1988) (holding that a law regulating signs and displays "critical" of foreign governments was content-based and subject to strict scrutiny).

The City argues that the Residency Restriction does not hamper the ability of non-Atlanta residents to participate in the Petition circulation process because they may still "circulate the referendum petition, collect signatures, and advocate for the ordinance's repeal," so long as a City resident (who may or may not speak) is present to attest that the signatures were collected inside the City. ECF 16 at 29. This ignores the burden placed on a non-resident's speech by requiring that they

work in tandem with a City resident. *See Judd*, 718 F.3d at 317. Regarding a non-resident's ability to advocate for repeal of the Ordinance by means other than collecting Petition signatures, the Supreme Court has "consistently refused to overlook an unconstitutional restriction upon some First Amendment activity simply because it leaves other First Amendment activity unimpaired." *California Democratic Party v. Jones*, 530 U.S. 567, 581 (2000). Moreover, "it is of no moment that the statute does not impose a complete prohibition" on non-residents' speech in support of repealing the Ordinance in the context of collecting signatures (i.e., they can do so as long as a City resident is also present); the "distinction between laws *burdening* speech and laws *banning* speech is but a matter of degree." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 812 (2000) (emphasis added).

### III. Plaintiffs Have a Constitutional Right to Gather Petition Signatures, Regardless of the City's Conjecture About the Legality of the Outcome.

The First Amendment protects speech and petition activity regardless of whether the petitioned-for change will become a reality. "The right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 388 (2011). Exercising the right to petition often involves communicating with elected officials who are indifferent or unsympathetic to one's "ideas, hopes, and concerns," and may be skeptical or even oppositional to a course of action that

11

people advocate for. *Id*. But the First Amendment's sphere of protection reaches wide; it protects speech that government officials disagree with, do not believe in, and may find to be of little value. *303 Creative LLC v. Elenis*, 143 S. Ct. 2298, 2303 (2023) ("[T]he First Amendment protects an individual's right to speak his mind regardless of whether the government considers his speech sensible and well intentioned or deeply misguided and likely to cause anguish or incalculable grief." (citations omitted)).

This rule is essential for the First Amendment to mean anything at all. If the First Amendment only protected speech and petition activity advocating for measures which those in power determined were likely to succeed, all attempts to influence government action or otherwise challenge the status quo would fall outside the ambit of the First Amendment, meaning that the government could prohibit constituents from asking elected officials for rights they did not already have or services that did not already exist. If that were the case, such a rule would encourage willful blindness by lawmakers—whose ideas of what legislation is likely or desirable to pass are necessarily limited by their own worldviews and life experiences—incentivizing them to ignore the voices of the people they are elected to represent.

All ideas must start somewhere, and of course, what seems legislatively possible or desirable changes over time, even when there are laws or institutional

mechanisms in place that seem to pose barriers. From universal suffrage and desegregation, to the five-day work week and environmental protection laws, American history is full of examples of policies that began as propositions by a vocal minority, and that only through years of First Amendment-protected advocacy became the law of the land. Indeed, this is what democracy looks like.

The City's and the amicus curiae State's assertion that the Petition is futile confuses the issues in this case. They claim that the Petition effort is a nullity because repealing Ordinance 21-O-0367 via a referendum election would, they allege, violate O.C.G.A. § 36-35-3(b) ("Home Rule Act"). As Plaintiffs-Appellees have explained, *Kemp v. City of Claxton*, 269 Ga. 173, 175-76 (1998) is the single case on which the City relies to make this argument. The Georgia Supreme Court recently indicated that *Kemp* is vulnerable to being overruled should the issue again reach the Court. *See Camden Cnty. v. Sweatt*, 315 Ga. 498, 512-13 (2023) ("[W]e need not consider at this time whether *Kemp* should be overruled in light of today's ruling. Nevertheless, we note that in reaching the holding in *Kemp*, this Court dismissed some of the canons of construction we apply in this case[.]"). ECF 41 at 42-43.

But in any event, it is too early at this juncture to assess the legal validity of any future referendum election that may repeal the Training Center lease Ordinance because this question is not yet ripe for review. First, a sufficient

number of Petition signatures would have to be certified by the City to require the referendum election (which the City is currently refusing to start doing).[6] Then the election would have to be held. And only if the majority of votes in that election supported a repeal of the Training Center lease Ordinance, would *Kemp*'s purported applicability to that referendum election outcome be ripe for consideration and decision. *See, e.g., Diaz v. Bd. of Cnty. Comm'rs of Dade Cnty.*, 502 F. Supp. 190, 193 (S.D. Fla. 1980) (denying petition to enjoin placing a proposed ordinance, alleged to be unconstitutional, on the ballot because the issue of the proposal's constitutionality was not yet ripe for decision; it was possible that the voters would not approve the proposal). Thus, the question of whether a referendum election that repeals a City ordinance would be invalid under *Kemp* is not properly before this Court, nor does it have any bearing on the straightforward question of whether a residency requirement for gathering City referendum petition signatures violates the First Amendment.

Even if, *arguendo*, all of the City's contingencies were to come true—that is, if a referendum election were to be held, if the election were to repeal the lease Ordinance, and if the Georgia Supreme Court were to rule the outcome of the

---

[6] *'Stop Cop City' petition campaign in limbo as Atlanta officials refuse to process signatures*, PBS News Hour (Sep. 11, 2023), https://www.pbs.org/newshour/politics/stop-cop-city-petition-campaign-in-limbo-as-atlanta-officials-refuse-to-process-signatures (last accessed Sep. 14, 2023).

election to be invalid under *Kemp*—the Plaintiffs still have a constitutional right to circulate the Petition without restriction because the First Amendment protects speech advocating for potentially unlawful acts, so long as there is no incitement to imminent lawless action. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of . . . law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."). Plaintiffs' speech in this case is a far cry from even advocating for any violation of the law, let alone inciting imminent lawless action. Here, the City's Municipal Code authorizes the Petition that Plaintiffs seek to circulate as a valid means of requesting a referendum election. Moreover, the City itself approved this very Petition to begin circulating on June 21, 2023. ECF 41 at 2. Thus, there is nothing currently the least bit unlawful about the speech in which the Plaintiffs seek to engage by collecting signatures for the City-authorized and City-approved Petition. Should it later come to pass that circulating the lawful Petition results in a lawful referendum election that turns out to have an unlawful result, the remedy would be to invalidate the unlawful result—not to suppress the

speech of Plaintiffs who are peacefully advocating within the bounds of what is currently lawful for reversing a City ordinance they believe to be misguided.[7]

In sum, the City's, and the amicus State's, argument that the Plaintiffs should be precluded from collecting signatures because their petition effort will ultimately prove futile or result in a legally-invalid election result is not only highly speculative, but also entirely irrelevant to whether Plaintiffs have a First Amendment right—just like their City-resident counterparts—to collect signatures in support of a currently lawful and City-approved referendum Petition.

## IV.    Restricting Plaintiffs' Ability to Petition is an Affront to their Liberty Interest in Self-Expression.

Restricting Plaintiffs' ability to circulate the Petition not only unconstitutionally regulates their political speech—it is also an affront to their liberty interest in self-expression on a matter of significant controversy in their community. *See Cohen v. California*, 403 U.S. 15, 24 (1971) (explaining that the right of free expression respects "the premise of individual dignity and choice upon which our political system rests"); *Hustler Mag. v. Falwell*, 485 U.S. 46, 50-51

---

[7] In making its "futility" argument, the City never takes the position that Atlanta City residents should have been stopped from circulating the Petition—even though, by the City's logic, City residents' signature-collection efforts are equally as futile and as likely to lead to an "unlawful" result as Plaintiffs' would be. That the City has never questioned its own residents' right to collect Petition signatures highlights the truly non-sensical nature of the City's "futility" argument as applied to the Plaintiffs.

16

(1988) (recognizing that "freedom to speak one's mind" is "an aspect of liberty-and thus a good unto itself") (citations omitted);1 Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 1:21 (2023) (noting that the "freedom to speak without restraint provides the speaker with an inner satisfaction and realization of self-identity," regardless of whether the listener is persuaded).[8]

Thus, reversing the lower court's ruling striking down the Residency Restriction would not only fly in the face of a wealth of First Amendment jurisprudence holding such restrictions to be unconstitutional, but would deprive the Plaintiffs of the "freedom of speech [that] is therefore intrinsic to [their] individual dignity." *Herbert v. Lando*, 441 U.S. 153, 183 n.1 (1979) (Brennan, J., dissenting); *see Procunier v. Martinez*, 416 U.S. 396, 427-28 (1974) (Marshall, J., concurring) ("To suppress [Plaintiffs'] expression is to reject the basic human desire for recognition and affront the individual's worth and dignity."), *overruled by Thornburgh v. Abbott*, 490 U.S. 401 (1989).

## CONCLUSION

The Plaintiffs in this case have a clearly-established First Amendment right to engage in petition circulation, which the Supreme Court, joined by myriad lower courts, has repeatedly held constitutes core political speech that cannot be

---

[8] *See also* Thomas Emerson, *The System of Freedom of Expression* 6 (1970) (describing free speech as a means to "the achievement of self-realization").

restricted based on residency requirements. Strict scrutiny is the proper standard to apply to the Residency Restriction at issue here, not only because it seeks to directly regulate First Amendment-protected speech of the highest value, but also because, per the statutory scheme of the City's municipal code, the Residency Requirement constitutes a content- or viewpoint-based regulation of only referendum petitions.

Finally, it matters not whether the Petition succeeds in securing a referendum election, or whether the outcome of that election is ultimately upheld by the Georgia Supreme Court as lawful. Those are future contingencies that need not be considered in order to for this Court to affirm that the Plaintiffs have a present-day First Amendment right to express themselves and advocate for their position on a matter of substantial public concern by collecting signatures for a currently lawful Petition, that the City itself approved for circulation. Amicus curiae therefore strongly urge this Court to uphold the judgment below.

Respectfully submitted this 20th day of September, 2023.

*/s/ Samantha C. Hamilton*
Samantha C. Hamilton
Ga. Bar No. 326618
samantha.hamilton@uga.edu
Clare R. Norins
Ga. Bar No. 575364
cnorins@uga.edu
FIRST AMENDMENT CLINIC*
University of Georgia School of Law

18

P.O. Box 388
Athens, Georgia 30603
Tel: (706) 227-5421

*Counsel for Amicus Curiae*

*co-authored with First Amendment
Clinic Fellow Ashley Fox

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)</u>

I hereby certify that the foregoing complies with the length limitation of Fed.

R. App. P. 32(a)(7)(B) because the Brief was prepared using 14-point Times New

Roman font and contains 4,199 words using the Word Count function of Microsoft

Word, not including the items excluded by Fed. R. App. P. 32(f).


*/s/ Samantha C. Hamilton*
Samantha C. Hamilton

*Counsel for Amicus Curiae*