NO. 23-12469

IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

City of Atlanta,
*Appellant*,

v.

Lisa Baker, Jacqueline Dougherty, Keyanna Jones, and Amelia Weltner,
*Appellees*.

On Appeal from the United States District Court
for the Northern District of Georgia, Atlanta Division.
No. 1:23-cv-2999—Mark H. Cohen, *Judge*

**BRIEF OF AMICUS CURIAE
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.,
IN SUPPORT OF PLAINTIFF-APPELLEES LISA BAKER, JACQUELINE
DOUGHERTY, KEYANNA JONES, AND AMELIA WELTNER.**

Janai S. Nelson
   *President & Director-Counsel*
Samuel Spital
Anne Oredeko
David Moss
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200

Jin Hee Lee
R. Gary Spencer
Kacey Mordecai
Avatara Smith-Carrington
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005
(202) 682-1300
*Counsel for Amicus Curiae*

No. 23-12469
**City of Atlanta v. Lisa Baker et al.**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Under Federal Rule of Appellate Procedure 26.1 and the Eleventh Circuit Court Rule 26.1-1, undersigned counsel certifies that the following list of interested persons and the corporate disclosure statement is true and correct:

1.  Ashe III, Robert L. – Counsel for Defendant-Appellant

2.  Atlanta Police Foundation, Inc. – Interested Association of Persons

3.  Baker, Lisa – Plaintiff-Appellee

4.  Ballot Initiative Strategy Center Foundation – Interested Association of Persons

5.  Bondurant, Mixson & Elmore, LLP – Counsel for Defendant-Appellant

6.  Carr, Christopher M. – Georgia Attorney General and Counsel for Amicus Curiae

7.  Cepar, Jr., Drago – Counsel for Interested Association of Persons

8.  City of Atlanta – Defendant-Appellant

9.  Cohen, Mark H – United States District Judge

10. Defend Atlanta Forest – Interested Association of Persons

11. Dougherty, Jacqueline – Plaintiff-Appellee

12. Filipovits, Jeffrey – Counsel for Plaintiff-Appellee

ii

13. Hamilton, Samantha Chariz – Counsel for Amicus Curiae

14. Jones, Keyanna – Plaintiff-Appellee

15. Law Offices of Gerry Weber, LLC – Law Firm of Counsel for Appellees

16. Lee, Jin Hee – Counsel for Amicus Curiae

17. Mordecai, Kacey – Counsel for Amicus Curiae

18. Moss, David – Counsel for Amicus Curiae

19. NAACP Legal Defense & Educational Fund – Amicus Curiae

20. Nelson, Janai S. – Counsel for Amicus Curiae

21. Norins, Clare Rivka – Counsel for Amicus Curiae

22. Oredeko, Anne – Counsel for Amicus Curiae

23. Patel, Alkesh B. – Counsel for Amicus Curiae

24. Sellers, Matthew R. – Counsel for Appellant

25. Smith, Wingo – Counsel for Appellees

26. Smith-Carrington, Avatara – Counsel for Amicus Curiae

27. Spears & Filipovits, LLC – Law Firm of Counsel for Plaintiff-Appellee

28. Spears, G. Brian – Counsel of Plaintiff-Appellee

29. Spital, Samuel – Counsel of Amicus Curiae

30. State of Georgia – Interested Association of Persons

31. Stop Cop City Coalition – Interested Association of Persons

32. University of Georgia School of Law First Amendment Clinic – Amicus Curiae

33. Vincent, Jane D. – Counsel of Defendant-Appellant

34. Weber, Gerald – Counsel of Plaintiff-Appellee

35. Weltner, Amelia – Plaintiff-Appellee

36. Winkles, Logan B – Counsel of Amicus Curiae

LDF is a 501(c)(3) non-profit, non-partisan corporation. Amicus has no parent corporation, and no publicly held corporations have any form of ownership interest in Amicus.

# TABLE OF CONTENTS

Page

Table of Authorities ..................................................................................... vi

Interest of Amicus Curiae ............................................................................ 1

Statement of the Issues ................................................................................ 2

Summary of the Argument ........................................................................... 2

Argument ...................................................................................................... 3

    I.    Section 66-37(b)'s Atlanta Residency Requirement Severely Burdens the Political Expression of Non-Resident Petition Circulators ............. 3

    II.    Appellees, Residents of Neighboring DeKalb County, Have a Clear First Amendment Interest in Circulating Petitions in Atlanta ............. 8

        A. Environmental and Health Concerns ............................................. 10

        B. Quality-of-Life and Nuisance Issues ............................................. 13

        C. Racial Justice and Policing Concerns ............................................ 13

Conclusion .................................................................................................... 15

Certificate of Compliance ............................................................................ 17

Certificate of Service ................................................................................... 18

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Buckley v. Am. Const. L. Found., Inc.*,

　525 U.S. 182, 192-195 (1999) ..................................................................4, 5, 7, 8

*Brown v. Board of Education*,

　347 U.S. 483 (1954).........................................................................................1

*Diaz v. Board of County Comm'rs*,

　502 F. Supp. 190, 193 (S.D. Fla. 1980) ..................................................4

*Holt Civic Club v. City of Tuscaloosa*,

　439 U.S. 60 (1978).........................................................................................7

*Initiative & Referendum Inst. v. Jaeger*,

　241 F.3d 614, 618 (8th Cir. 2001)..........................................................5

*Lerman v. Bd. of Elections in City of New York*,

　232 F.3d 135, 149-153 (2d Cir. 2000)...................................................6

*Libertarian Party of Virginia v. Judd*,

　718 F.3d 308, 319 (4th Cir. 2013).........................................................6

*McCleskey v. Kemp*,

　481 U.S. 279 (1987).........................................................................................1

vi

*Meyer v. Grant*,

486 U.S. 414, 414 (1988)...............................................................4-6, 8

*Nader v. Blackwell*,

545 F.3d 459, 475 (6th Cir. 2008).........................................................6

*Nader v. Brewer*,

531 F.3d 1028, 1038 (9th Cir. 2008)......................................................6

*Shelby County v. Holder*,

133 S. Ct. 2612 (2013)...........................................................................1

*Smith v. Allwright*,

321 U.S. 649 (1944)...............................................................................1

*We the People PAC v. Bellows*,

40 F.4th 1, 13 (1st Cir. 2022) ................................................................5

*Wilmoth v. Sec'y of New Jersey*,

731 F. App'x 97, 103 (3d Cir. 2018)......................................................6

*Yes On Term Limits, Inc. v. Savage*,

550 F.3d 1023, 1030 (10th Cir. 2008)....................................................6

**Statutes and Municipal Codes**

Atlanta Municipal Code § 2-501.............................................................4

Atlanta Municipal Code § 66-37........................................................2-4, 7

O.C.G.A. § 36-35-3................................................................................4

## Other Authorities

Ga. Const. art. I, § 1, ¶ V ............................................................3

Ga. Const. art. I, § 1, ¶ IX ..........................................................3

U.S. Const. amend. I ..................................................................3

## INTEREST OF AMICUS CURIAE

Founded in 1940 by Justice Thurgood Marshall, the NAACP Legal Defense & Educational Fund, Inc. ("LDF") is the nation's first and foremost civil rights law organization. Through litigation, advocacy, public education, and outreach, LDF strives to secure equal justice under the law for all Americans, and to eliminate barriers that prevent Black Americans from realizing their basic civil and human rights. For more than eight decades, LDF has litigated some of the most significant and pressing legal issues pertaining to discrimination against Black people in our country. *See, e.g., Brown v. Board of Education*, 347 U.S. 483 (1954) (racial segregation of public schools); *McCleskey v. Kemp*, 481 U.S. 279 (1987) (challenge to discriminatory application of death penalty). Among its core areas of practice, LDF has long sought to protect the political participation of Black people. *See, e.g.*, *Smith v. Allwright*, 321 U.S. 649 (1944) (exclusion of Black voters from primary election); *Shelby County v. Holder*, 133 S. Ct. 2612 (2013) (defending the constitutionality of Section 5 of the Voting Rights Act).

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), Amicus states that neither party's counsel authored the brief in any capacity; in addition, neither party, nor their counsel, nor any person other than the Amicus Curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

1

## STATEMENT OF THE ISSUES

**I.**    Whether the district court's grant of the preliminary injunction should be affirmed, because the requirement that only Atlanta residents may circulate and attest to petitions in Atlanta severely burdens the political expression of DeKalb County residents in violation of their First Amendment rights.

## SUMMARY OF THE ARGUMENT

Amicus Curiae LDF urges the Court to affirm the district court's preliminary injunction, which provided appropriate relief to remedy the harm caused by an unconstitutional provision in Atlanta Municipal Code § 66-37(b) ("Section 66-37(b)"). Section 66-37(b) restricts the political expression of residents in unincorporated DeKalb County—a predominantly Black, low-income community— who seek to prevent the construction of the Atlanta Public Safety Training Center (the "Facility"), which would negatively impact their health, quality of life and public safety. Section 66-37(b) limits the First Amendment rights of these DeKalb County residents by allowing only Atlanta residents to collect and attest to signatures for a referendum petition against the Facility.

The district court's ruling was crucial to allow Appellees to exercise their First Amendment rights to communicate with their Atlanta neighbors and express their support for the referendum effort by collecting and attesting to petition signatures,

even though they themselves, as non-residents of Atlanta, cannot sign the petition or vote for the referendum. Accordingly, we respectfully ask this Court to affirm the district court's preliminary injunction.

## ARGUMENT

### I.   Section 66-37(b)'s Atlanta Residency Requirement Severely Burdens the Political Expression of Non-Resident Petition Circulators.

Individuals outside of Atlanta have a First Amendment right to express their political support for a referendum about the Facility. Yet, Section 66-37(b)'s Atlanta residency requirement severely burdens their political expression by prohibiting them from collecting and attesting to petition signatures. Atlanta Municipal Code § 66-37(b) ("The municipal clerk shall provide a place on each form for the person collecting signatures . . . to swear that such person is a resident of the city and that the signatures were collected inside the boundaries of the city."). This infringement of constitutionally protected activity fails under strict scrutiny.

The right to political expression is a cornerstone of a functional democracy. Both the First Amendment of the United States Constitution and Georgia's State Constitution grant the right to freedom of expression and to petition the government. U.S. Const. amend. I. ("Congress shall make no law . . . abridging the freedom of speech . . . and to petition the Government for a redress of grievances."); Ga. Const. art. I, § 1, ¶ V ("No law shall be passed to curtail or restrain the freedom of speech"); Ga. Const. art. I, § 1, ¶ IX ("The people have the right . . . to apply by petition or

3

remonstrance to those vested with the powers of government for redress of grievances.").

"Citizens have the unquestioned right to petition their governments for redress of what they believe are grievances . . . through the procedures of initiative, referendum and recall." *Diaz v. Board of County Comm'rs*, 502 F. Supp. 190, 193 (S.D. Fla. 1980). Indeed, Georgia's Home Rule for Municipalities, the City Charter of Atlanta, and the Atlanta Code of Ordinances all provide residents with a right and process to hold referenda via petition. *See* O.C.G.A. § 36-35-3; Atlanta Municipal Code § 2-501; Atlanta Municipal Code § 66-37(b). Likewise, the *circulation* of petitions is "core political speech, for which First Amendment protection is at its zenith." *Meyer v. Grant*, 486 U.S. 414, 414 (1988) (holding that Colorado's prohibition against paid petition circulators violated the First Amendment); *see also*, *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 192-195 (1999) (holding that Colorado's statute requiring petition circulators be registered voters violated the First Amendment). The First Amendment protects the circulation of petitions not only because it "involves both the expression of a desire for political change and a discussion of the merits of the proposed change" but also because it protects the rights of petition circulators to "select what they believe to be the most effective means for so doing." *Meyer*, 486 U.S. at 421, 425.

While states have "considerable leeway to protect the integrity and reliability of the initiative process," the First Amendment nevertheless requires courts to be "vigilant in making those judgments, to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley*, 525 U.S. at 192 (citation omitted). In *Buckley* and *Meyer*, the Supreme Court recognized that laws limiting core protected speech are subject to exacting scrutiny. *See Meyer*, 486 U.S. at 420 ("We fully agree . . . that this case involves a limitation on political expression subject to exacting scrutiny."); *Buckley*, 525 U.S. at 197. Moreover, when analyzing restrictions on petition circulators, the Supreme Court also considers whether the restriction will make it less likely that circulators "will garner the number of signatures necessary to place the matter on the ballot." *Meyer*, 486 U.S. at 423. Therefore, restrictions of core speech that can affect the ultimate goal of placing a measure onto the ballot do not "survive the demanding form of scrutiny [that should be] applied." *We the People PAC v. Bellows*, 40 F.4th 1, 13 (1st Cir. 2022).

Following Supreme Court guidance, Circuit Courts have overwhelmingly overturned residency restrictions because they severely burden petition circulators' political expression and contribute to speech diminution.[1] *See We the People PAC v.*

---

[1] The Eighth Circuit, in *Initiative & Referendum Institute v. Jaeger*, upheld a state-residency requirement for circulators of initiative petitions. *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 618 (8th Cir. 2001). When conducting its analysis, the court stated that the residency requirement was not subject to strict scrutiny because

*Bellows*, 40 F.4th 1, 22 (1st Cir. 2022) (holding that constitutional and statutory provisions requiring petition circulators be Maine residents was not narrowly tailored); *Lerman v. Bd. of Elections in City of New York*, 232 F.3d 135, 149-153 (2d Cir. 2000) (holding that New York's residency requirement violates the First Amendment); *Wilmoth v. Sec'y of New Jersey*, 731 F. App'x 97, 103 (3d Cir. 2018) (determining that because New Jersey's "residency requirement for circulators restricts 'core political speech,' strict scrutiny review is warranted"); *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 319 (4th Cir. 2013) (declaring Virginia's witness residency requirement unconstitutional because it fails strict scrutiny); *Nader v. Blackwell*, 545 F.3d 459, 475 (6th Cir. 2008) (holding that Ohio violated First Amendment rights when the state enforced its registration and residency requirements against petition circulators); *Nader v. Brewer*, 531 F.3d 1028, 1038 (9th Cir. 2008) (finding that Arizona did not meet its burden of showing that its residency requirement is narrowly tailored); *Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1030 (10th Cir. 2008) (applying strict scrutiny in declaring Oklahoma's residency restriction unconstitutional). Accordingly, to satisfy strict scrutiny, a law limiting

---

it did not impose a severe burden on core political speech given the high success rate of signature campaigns. Notably, this reasoning is out of step with the Supreme Court's thorough analysis in *Meyer*, in which the court applied exacting scrutiny and noted that the prohibition on paid circulators still has the "inevitable effect of reducing the total quantum of speech on a public issue." *Meyer*, 486 U.S. at 423.

petition circulation would need to serve both a compelling government interest and be narrowly tailored to serve that interest.

Appellant City of Atlanta ("Appellant," "City," or "Atlanta"), however, makes no effort to satisfy strict scrutiny, instead merely contending that Section 66-37(b)'s residency requirement is a "reasonable restriction." Def.-Appellant's Br. at 12, ECF No. 16. Indeed, the City fails to demonstrate any compelling interest, let alone legitimate interest that is grounded in "a real, rather than a conjectural, problem." *Buckley*, 525 U.S. at 210 (Thomas, J., concurring).[2] Nor can the City demonstrate that the residency requirement is narrowly tailored. Rather, this restriction unduly burdens the core political expression of those who do not reside in Atlanta.[3]

Section 66-37(b) also "increase[d] the burden on collecting signatures" by reducing the number of people who could circulate petitions, Compl. ¶ 53, ECF No.

---

[2] The legitimate interest offered by the City at the district court was in "restricting the right to participate in the political process only to its own residents." D. Ct. Op. at 13, ECF No. 26 (citing *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60 (1978)). But as the district court recognized, "*Holt* had nothing to do with a challenge under the First Amendment or a review of a restriction on the residency of petition circulators or signature gatherers." D. Ct. Op. at 14, ECF No. 26.

[3] For example, some DeKalb residents were forced to completely forgo opportunities to participate in the petition circulation effort if they did not have an Atlanta resident to accompany them. Compl. ¶¶ 22-24, ECF No. 41 ("Ms. Baker was among the first to volunteer to canvass signatures for the referendum petition. Because [of the residency requirement,] she had fewer teams of volunteers who could canvass than the total number of volunteers. She also wanted to volunteer for a second shift that day but did not have a City of Atlanta resident to accompany her, so she could not go out.").

41, a fact recognized by the Supreme Court as an important consideration in its analysis. *See Meyer*, 486 U.S. at 423; *Buckley*, 525 U.S. at 197. In fact, when issuing its injunction, the district court specifically noted that "the residency requirement clearly limits the number of persons who can promote the petition's message, thereby limiting the potential number of the City's residents who can receive the political message and making it less likely that the proponents of the petition can gather sufficient signatures to place the initiative on the ballot." D. Ct. Op. at 12, ECF 26.

## II.  Appellees, Residents of Neighboring DeKalb County, Have a Clear First Amendment Interest in Circulating Petitions in Atlanta.

Atlanta spans parts of Fulton and DeKalb Counties, creating the backbone for the metro-Atlanta region.[4] Although distinct boundaries distinguish the Atlanta city limits from other parts of DeKalb County, decisions made by Atlanta officials have a significant impact on neighboring communities, as evident in this matter. Appellees live within four miles of Atlanta in parts of unincorporated DeKalb County, in a predominately Black and economically disinvested community.[5] The metropolitan area is interconnected; the largest concentration of DeKalb County residents work

---

[4]  Atlanta Reg'l Comm'n, *About the Atlanta Region*, https://www.atlantaregional.org/atlanta-region/about-the-atlanta-region.
[5] Council on Env't Quality, Executive Off. Of the President, Map of DeKalb and Fulton County, Climate and Justice Economic Screening Tool, https://www.screeningtool.geoplatform.gov/en/#12.06/33.70999/-84.30574.

in Atlanta,[6] with U.S. Census Bureau data from 2009 – 2013 showing that over 112,000 people commuted into Fulton County from DeKalb County on a typical work day.[7] Unsurprisingly, many DeKalb County residents spend significant time in Atlanta and have friends and family who live there.

DeKalb County residents, like Appellees, have significant environmental, quality-of-life, and public safety concerns associated with the Facility. Although the site of the proposed Facility sits in the South River Forest ("Forest") in DeKalb County, Atlanta owns the land on which the Facility would be built. As a result, DeKalb County residents have few opportunities to express their political will with regards to the Facility, even though they will be directly impacted by its construction and operation.[8]

---

[6] DeKalb Cty., The DeKalb 2050 Unified Plan Existing Conditions and Needs Assessment – Part 3 at 77, https://www.dekalbcountyga.gov/planning-and-sustainability/2021-comprehensive-plan-5-year-update (defining Atlanta as Midtown, Downtown, and Buckhead).

[7] U.S. Dep't Com., U.S. Census Bureau, U.S. Census Bureau Roundtable Discussion on Atlanta Commuting Data at 7 (Apr. 27, 2016), https://www.census.gov/content/dam/Census/newsroom/press-kits/2016/20160427_atlanta_round_table_slides.pdf.

[8] Zoe Seiler, *Residents Urge DeKalb County to Issue Stop-Work Order For Public Safety Training Center*, Decaturish (Feb. 16, 2023), https://www.decaturish.com/2023/02/residents-urge-dekalb-county-to-issue-stop-work-order-for-public-safety-training-center/ (quoting DeKalb Commissioner Ted Terry, "My community has no voice or decision-making power in this matter other than my representation on the community stakeholder's advisory committee.").

## A. Environmental and Health Concerns

Often called the "Lungs of Atlanta," the Forest provides immense health and environmental benefits for DeKalb County residents. Atlanta's Department of City Planning has acknowledged these benefits, particularly for its closest neighbors:

> "Urban forests . . . help to provide clean drinking water, reduce flooding, cool neighborhoods, provide oxygen, and clean pollutants from the air that city residents breathe. Physical activity in Atlanta's parks . . . reduces obesity and cardiac disease and improves overall physical fitness . . . lower stress levels and symptoms of anxiety and depression."[9]

Given the environmental and health conditions in DeKalb County, residents there have a particular interest in this referendum effort. The South River Forest has been indispensable to protecting the area from heavy flooding,[10] and rainfall in the region has increased by 75% over the past 70 years.[11] Extreme heat in the region is expected to worsen in the coming decades,[12] risking disproportionate mortality

---

[9] Dept. City Planning, City of Atlanta Ga., Atlanta City Design: Nature, at 4 (Fall 2020), http://www.atlantaga.gov/home/showpublisheddocument/49083/637426021309200000.

[10] Adam Mohoney & Adjoa Danso, *To Residents, Razing Atlanta Forest for 'Cop City' Project Is 'An Act of Disinvestment'*, Capital B Atlanta (June 6, 2022, 10:20 AM), https://atlanta.capitalbnews.org/atlanta-cop-city-climate-change/.

[11] *Across U.S., Heaviest Downpours on the Rise*, Climate Central (May 27, 2015) https://www.climatecentral.org/news/across-us-heaviest-downpours-on-the-rise-18989.

[12] Meris Lutz, *In Metro Atlanta, Days Over 100 Degrees to Double by 2053, Report Says*, Atlanta Journal-Constitution (Aug. 17, 2022), https://www.ajc.com/news/in-metro-atlanta-days-over-100-degrees-to-double-by-2053-report-says/W5REPIFDTFAANBWWMI4WWA4QY4/.

rates[13] and unsustainable energy costs to working-class Black residents like those in DeKalb County.[14] Preserving the South River Forest may help protect against these outcomes,[15] while razing 85 acres of forest may exacerbate them.[16]

As a matter of public health, the communities surrounding the Facility are in the 94th percentile for asthma prevalence and the 80th percentile for diabetes prevalence.[17] Access to green space and waterways carry widespread health

---

[13] Angel Hsu et al., *Disproportionate Exposure to Urban Heat Island Intensity Across Major US Cities*, 12 Nature Commc'ns, 7-8 (May 2021), https://www.nature.com/articles/s41467-021-22799-5#Abs1 (noting that "evidence suggests that extreme heat-related morbidity and mortality in cities disproportionately affect marginalized groups,").

[14] U.S. Env't Prot. Agency, *Heat Islands and Equity*, https://www.epa.gov/heatislands/heat-islands-and-equity ("Excessive heat is a financial burden for many people, especially low-income households . . . The inability to afford household energy needs . . . makes it harder to stay cool, comfortable, and healthy during periods of extreme heat.").

[15] David J. Nowak & Eric J Greenfield, *U.S. Urban Forest Statistics, Values, and Projections*, 116 J. Forestry at 164, https://www.fs.usda.gov/research/treesearch/55818 (finding that the benefits of urban forests "include moderating climate, reducing building energy use and atmospheric [CO2], improving air and water quality, mitigating rainfall runoff and flooding, enhancing human health and social well-being, and lowering noise impacts"); David J. Nowak, *Urban Trees Save Billions of Dollars Through Reduced Energy Costs*, U.S. Dept. of Agriculture, https://www.fs.usda.gov/research/news/highlights/urban-trees-save-billions-dollars-through-reduced-energy-costs (noting that urban trees and forests alter building energy use "by shading buildings, cooling air temperatures, and altering wind speeds around buildings," reducing residential energy use by 7.2 percent.").

[16] Cahyadi Ramadhan et al., *Spatial and Temporal Based Deforestation Proclivity Analysis on Flood Events with Applying Watershed Scale*, 93 Int'l J. of Disaster Risk Reduction at 1 (2023), https://doi.org/10.1016/j.ijdrr.2023.103745 ("Flood events are often associated with deforestation or forest degradation").

[17] *Climate and Justice Economic Screening Tool, supra* note 1.

benefits[18] and correlate to better asthma[19] and diabetes[20] outcomes. The Facility would diminish access to these valuable outdoor resources. It also may further endanger Intrenchment Creek,[21] an outdoor recreational resource that is already considered one of the most endangered waterways in the United States.[22] DeKalb County residents, therefore, have a vested interest in protecting these resources, particularly in light of societal trends showing that communities of color are almost three times more likely than white communities to lack access to parks, paths, and green spaces.[23]

---

[18] Jo Barton & Mike Rogerson, *The Importance of Greenspace for Mental Health*, 14 BJPsych Int'l at 8 (Nov. 2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5663018/pdf/BJPI-14-79a.pdf (noting the "positive relationship between levels of neighborhood greenspace and mental health and well-being…").

[19] David J. Nowak et al., *Tree and forest effects on air quality and human health in the United States*, 193 Env't Pollution at 124 (Oct. 2014), https://www.fs.usda.gov/nrs/pubs/jrnl/2014/nrs_2014_nowak_001.pdf.

[20] Felipe De la Fuente et al., Green Space Exposure Association with Type 2 Diabetes Mellitus, Physical Activity, and Obesity: A Systematic Review, 21 Intl. J. of Env't Rsch. and Pub. Health (Dec. 25, 2020) https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7796153/ (noting a study that "highlighted that environmental characteristics such as neighborhood green spaces were associated with lower rates of [Type 2 Diabetes].").

[21] Victoria St. Martin, *In Atlanta, Proposed 'Cop City' Stirs Environmental Justice Concerns*, Inside Climate News (March 8, 2023), https://insideclimatenews.org/news/08032023/atlanta-cop-city-forest-justice-trees/.

[22] American Rivers, *America's Most Endangered* (April 2021), https://www.americanrivers.org/wp-content/uploads/2021/04/MER2021_FINAL_Report_ReducedSize-1-1-1.pdf.

[23] Alejandra Borunda, *How 'nature deprived' neighborhoods impact the health of people of color*, Nat'l Geographic (July 29, 2020),

## B. Quality-of-Life and Nuisance Issues

The proposed Facility will also likely contribute to significant and detrimental quality-of-life issues for DeKalb County residents. The proposed Facility would include, among other things, a firing range, a mock city for tactical training, and a "burn building" where fires will be set for training exercises.[24] Currently, a firing range that the Atlanta Police Department ("APD") already uses on the site causes serious noise and safety concerns for residents.[25] Shooting ranges can also expose surrounding soil to lead exposure.[26]

## C. Racial Justice and Policing Concerns

As a majority-Black community, DeKalb County residents are directly impacted by racial justice and policing issues that are central to the political debate surrounding the Facility. The Atlanta metropolitan area, which includes parts of DeKalb County, is one of the most surveilled cities by some measures, and has long

---

https://www.nationalgeographic.com/science/article/how-nature-deprived-neighborhoods-impact-health-people-of-color.

[24] The Atlanta Public Safety Training Center, https://www.atltrainingcenter.com/the-training-center.

[25] As local resident Albrica Batts described, "You'll hear like 20, 30, 40, 50 rounds go off[.] . . . It is very, very stressful. You want to feel safe in your neighborhood, but it's hard to feel that way if you're just hearing gunshots going off in the middle of the night." Adam Mahoney & Adjoa Danso, *To Residents, Razing Atlanta Forest for 'Cop City' Project is 'an Act of Disinvestment'*, Capital B (June 6, 2022), https://www.atlanta.capitalbnews.org/atlanta-cop-city-climate-change/.

[26] A.O. Fayiga & U.K. Saha, *Soil pollution at outdoor shooting ranges: Health effects, bioavailability and best management practices*, 216 Env't Pollution at 135, (Sept. 2016), https://doi.org/10.1016/j.envpol.2016.05.062.

suffered from racially discriminatory policing that inflicts harm on Black individuals.[27] In Atlanta, Black residents account for 90% of arrests, they are nearly 15 times more likely than white residents to be arrested for minor offenses, and Black men constitute nearly 75% of people subjected to police use of force.[28] Over a six-year period, DeKalb County police officers shot 25 Black people and one white person, representing the highest racial disparity among the 50 largest police departments in the United States.[29]

For Black residents in DeKalb County, collecting petition signatures in Atlanta is an important way to engage neighbors about racially biased policing that may be exacerbated by the Facility. Their lived experiences may shape and color the valuable perspective that they can provide as petition circulators. Not only did the district court issue a sound decision based on the law; it also ensured their valuable viewpoint would not be unjustly excluded by the City.

---

[27] Jurgita Lapienytė, This is the most heavily surveilled city in the US: 50 CCTV cameras per 1,000 citizens, Cyber News (Sept. 28, 2021), https://cybernews.com/editorial/this-is-the-most-heavily-surveilled-city-in-the-us-50-cctv-cameras-per-1000-citizens/.

[28] Tyler Gay, Six Takeaways from Phase One of SCHR's Community Safety & Police Violence Town Hall Series, S. Ctr. for Hum. Rights (Apr. 18, 2023), https://www.schr.org/six-takeaways-from-phase-one-of-schrs-community-safety-police-violence-town-hall-series/.

[29] Joshua Sharpe, DeKalb police shot 25 times more black people than whites, Atlanta J. Const. (Dec. 13, 2017), https://www.ajc.com/news/local/dekalb-police-shot-times-more-black-people-than-whites/s4zAffeohsBuU1gOpPBiYI/.

## <u>Conclusion</u>

For the foregoing reasons, *Amicus Curiae* NAACP Legal Defense & Educational Fund, Inc. respectfully urges the Court to affirm the preliminary injunction issued by the district court.

Date: Sept. 20, 2023

Respectfully submitted,

*/s/ R. Gary Spencer*

Janai S. Nelson
   *President and Director-Counsel*
Samuel Spital
Anne Oredeko
David Moss
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector St, 5th Floor
New York, NY 10006

Jin Hee Lee
R. Gary Spencer
Kacey Mordecai
Avatara Smith-Carrington
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005

**CERTIFICATE OF COMPLIANCE WITH FRAP 32(g)(1)**

The undersigned certifies that this brief complies with the applicable typeface and volume limitations of Federal Rules of Appellate Procedure 29(a)(5). This brief contains 4,536 words, exclusive of the components that are excluded from the word count limitation in Rule 32(f). This certificate was prepared in reliance upon the word-count function of the word processing system used to prepare this brief (Microsoft Word 2010). This brief complies with the typeface and type style requirements of Rule 32(a)(5) because it has been prepared in a proportionally spaced typeface using Times New Roman, font size 14.

Date: Sept. 20, 2023

Respectfully submitted,

*/s/ R. Gary Spencer*
R. Gary Spencer
Georgia State Bar No. 671905
11th Circuit Bar No. 2950265
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005
gspencer@naacpldf.org
(202) 216-5578

## CERTIFICATE OF SERVICE

In accordance with Rule 25(d) of the Federal Rules of Appellate Procedure, I hereby certify that on this 20th day of September, 2023, I electronically filed the foregoing Brief of Amicus Curiae with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Date: Sept. 20, 2023

Respectfully submitted,

*/s/ R. Gary Spencer*
R. Gary Spencer
Georgia State Bar No. 671905
11th Circuit Bar No. 2950265
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Ste. 600
Washington, DC 20005
gspencer@naacpldf.org
(202) 216-5578

18