Case No. 23-12469

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

---

CITY OF ATLANTA,
Appellant-Defendant,

v.

LISA BAKER, JACQUELINE DOUGHTERY, KENYANNA JONES, and
AMELIA WELTNER,
Appellee-Plaintiffs.

---

Appeal from the United States District Court
for the Northern District of Georgia

## APPELLANT CITY OF ATLANTA'S REPLY BRIEF

Robert L. Ashe
Jane D. "Danny" Vincent
Matthew R. Sellers

BONDURANT MIXSON & ELMORE LLP
1201 W. Peachtree St. NE, Suite 3900
Atlanta, GA 30309
404-881-4100

*Attorneys for Appellant-Defendant City of Atlanta*

Case No. 23-12469
City of Atlanta v. Baker

## **CERTIFICATE OF INTERESTED PERSONS**
## **AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1 and 11th Cir. R. 26.1-1, 26.1-2, and 26.1-3, the following trial judges, attorneys, persons, associations of persons, firms, partnerships, and corporations are known or believed to have an actual or potential interest in the outcome of this case or appeal:

- Ashe III, Robert L. (Counsel for Appellant)

- Baker, Lisa (Appellee-Plaintiff)

- Bondurant, Mixson & Elmore, LLP (Law Firm Counsel for Appellant)

- City of Atlanta (Appellant-Defendant)

- Cohen, Mark H. (United States District Judge – Northern District of Georgia)

- Defend Atlanta Forest (Interested Association of Persons)

- Dougherty, Jacqueline (Appellee-Plaintiff)

- Filipovits, Jeff (Counsel for Appellees)

- Law Offices of Gerry Weber, LLC (Law Firm Counsel for Appellees)

- Jones, Keyanna (Appellee-Plaintiff)

- Patel, Alkesh B. (Counsel for Former Defendant and Trial Court Amicus State of Georgia)

- Sellers, Matthew R. (Counsel for Appellant)

Case No. 23-12469
City of Atlanta v. Baker

- Smith, Wingo (Counsel for Appellees)

- Spears, Brian (Counsel for Appellees)

- Spears & Filipovits, LLC (Law Firm Counsel for Appellees)

- State of Georgia (Former Defendant and Amicus)

- Stop Cop City Coalition (Interested Association of Persons)

- Vincent, Jane D. (Counsel for Appellant)

- Weber, Gerald (Counsel for Appellees)

- Weltner, Amelia (Appellee-Plaintiff)

- Winkles, Logan. B. (Counsel for Former Defendant and Trial Court Amicus State of Georgia)

The City of Atlanta is a municipality created by the State of Georgia and thus has no parent corporations or publicly traded corporations to disclose.

# TABLE OF CONTENTS

I.    *Kemp* renders the petition invalid and thus precludes Plaintiffs from showing irreparable harm ...................................................................4

    A. The City charter is not an independent source of petition authority separate and apart from the Home Rule Act ..................5

    B. Legislative acquiescence to *Kemp*'s 25-year-old interpretation of the Home Rule Act's language forecloses Petitioners' arguments ..7

    C. Plaintiffs' attacks on *Kemp*'s validity fail .........................................9

II.   O.C.G.A. § 36-35-3 is a statutorily created political process affecting local elections ...........................................................................10

    A. *Purcell* applies to this case .................................................11

    B. *Holt* applies to this case .....................................................14

III.  Strict scrutiny is not automatic: there is no "litmus test" for whether an election law violates the First Amendment ......................................16

    A. The ordinance does not infringe on interactive political speech ...17

        1. Verifying collection of signatures is not the same as soliciting signatures .........................................................................18

        2. If more than one meaning is plausible, the Court should construe the statute in the way that avoids creating constitutional problems ..................................................19

    B. The residency collection attestation does not severely burden Plaintiffs' First Amendment rights ...........................................20

**IV.** **Even if strict scrutiny applies, the resident verification requirement is narrowly tailored to achieve the City's compelling interest in preventing fraud** ......................................................................**22**

**CONCLUSION** ................................................................**25**

# TABLE OF AUTHORITIES

**Cases:**

*Abernathy v. City of Albany*,
    269 Ga. 88 (1998) ............................................................................8

*Andersen v. Celebrezze*,
    460 U.S. 780 (1983)........................................................................20

*Buckley v. Am. Const. Law Found. Inc.*,
    525 U.S. 182 (1999)..................................................................*passim*

*Burdick v. Takushi*,
    504 U.S. 428 (1992).......................................................17, 20, 22

*Fair Maps Nevada v. Cegavske*,
    463 F. Supp. 3d 1123 (D. Nev. 2020) ............................................12

*Franklin Cnty. v. Fieldale Farms Corp.*,
    270 Ga. 272 (1998) ..........................................................................6

*Holt Civic Club v. City of Tuscaloosa*,
    439 U.S. 60 (1978)....................................................................*passim*

*IBP, Inc. v. Alvarez*,
    546 U.S. 21 (2005).............................................................................8

*Initiative & Referendum Inst. v. Jaeger*,
    241 F.3d 614 (8th Cir. 2001).........................................................16

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010)........................................................................10

*Kemp v. City of Claxton*,
    496 S.E.2d 712 (Ga. 1998) .......................................................*passim*

*Krislov v. Rednour*,
    226 F.3d 851 (7th Cir. 2000).................................................12, 23

*Lerman v. Bd. of Elections in New York City*,
    232 F.3d 135 (2d Cir. 2000) ............................................................ 21

*Libertarian Party of Va. v. Judd*,
    718 F.3d 308 (4th Cir. 2013) ............................................................ 21

*Little v. Reclaim Idaho*,
    140 S.Ct. 2616 (2020) ...................................................................... 11

*Merrell v. Milligan*,
    142 S.Ct. 879 (2022) ................................................................... 2, 11

*Meyer v. Grant*,
    486 U.S. 414 (1988) .......................................................... 16, 17, 19

*Pierce v. Jacobsen*,
    44 F.4th 853 (9th Cir. 2022) ................................................... *passim*

*Pine v. City of West Palm Beach*,
    762 F.3d 1262 (11th Cir. 2014) ....................................................... 19

*Purcell v. Gonzales*,
    549 U.S. 1 (2006) ................................................................... *passim*

*RadioShack Corp. v. Cascade Crossing II, LLC*,
    282 Ga. 841 (2007) ...................................................................... 8, 9

*Rowe v. City of Cocoa*,
    358 F.3d 800 (11th Cir. 2004) ........................................................ 15

*Thompson v. Dewine*,
    959 F.3d 804 (6th Cir. 2020) .......................................................... 13

*We the People PAC v. Bellows*,
    40 F.4th 1 (1st Cir. 2022) ................................................... 14, 19, 21

*Yes on Term Limits, Inc. v Savage*,
    550 F.3d 1023 (10th Cir. 2008) ...................................................... 14

**Statutes:**

O.C.G.A. § 21-2-540 .......................................................................... 1

O.C.G.A. § 36-35-1 ............................................................................ 4

O.C.G.A. § 36-35-3 .................................................................... *passim*

Atl. Code § 66-37(b) ................................................................... *passim*

The only issue in this appeal is whether the district court should have—halfway through the petition circulation process and only three months and eleven days before the next election—entered a preliminary injunction that (a) changed the City's statutory petition requirements and (b) significantly extended the statutory collection deadline.

Contrary to the Plaintiffs' repeated accusations, the City has never "misrepresented" the relevant election timing.[1] Although the next election date is now, as a practical matter, March 2024, that was not true *before* the district court entered its injunction, nor was it true when the City filed its opening brief in this appeal. The official petition was issued by the municipal clerk on June 22, 2023, so the statutory petition submission deadline was originally August 21.[2] This left 49 days for the City to review the petition and call for a special election on the November 7 ballot.[3] Because the *maximum* amount of time the City can take to validate a petition is 50 days, it was feasible for a valid referendum to be placed on

---

[1] App. Doc. 41 at 50. "App. Doc." shall refer to documents filed in this Court and "Doc." Shall refer to the District Court docket number. All page numbers refer to the number affixed by the Court's electronic filing system.

[2] The petition sponsors initially arranged with the City to submit what they claimed were more than 100,000 signatures on August 21, but they did not show up and ultimately informed the City they were holding the petition and collecting additional signatures until a later date.

[3] The call for a special election must be made at least 29 days before such election is held. O.C.G.A. § 21-2-540(c)(2). Twenty-nine days before November 7 is October 9. August 21 to October 9 is 49 days.

the November 7 ballot under the original, statutory timeline. It was the district court's injunction, extending the collection deadline to September 25, that disrupted this process and created confusion about the election timing. And this confusion is exactly the situation *Purcell v. Gonzales,* 549 U.S. 1 (2006), instructs federal courts to avoid—there is little that is more disruptive to a state election process than a federal court effectively canceling an election three months away. *See Merrell v. Milligan*, 142 S.Ct. 879, 880–81 (2022) ("Late judicial tinkering…can lead to disruption and to unanticipated and unfair consequences.") (J. Cavanaugh, concurring).

Also contrary to the Plaintiffs' accusations, the City's position has always been that the municipal clerk could only approve the petition as to form, Atl. Code §66-37(b); O.C.G.A. § 36-35-3(b)(2)(C) ("The [municipal] clerk … shall approve all petitions as to form."), and that any validity determination—both as to signatures and constitutionality—must be made by the City Council after the petition is submitted. Atl. Code § 66-37(a) ("The council shall determine the validity of such petition within 50 days of its filing."); O.C.G.A. § 36-35-3(b)(2)(A). This litigation is the first instance in which the City could (and did) raise its concerns about the

petition's lawfulness, and Plaintiffs' insinuations about what "City officials" should or should not have done ignore the clear text of the statute and ordinance.[4]

The district court stated, the "validity of the proposed referendum [under *Kemp* and the Impairments Clause] is not ripe" unless and until the required number of signatures are collected.[5] The City agrees with the district court that the *ultimate* validity of the petition is not at issue in this case. However, as the City has explained, the petition is indisputably invalid under the binding Georgia Supreme Court precedent in *Kemp v. City of Claxton*, 496 S.E.2d 712 (Ga. 1998), and that legal fact (and the petition's similar constitutional flaws) should absolutely be considered in the test for a preliminary injunction.

Plaintiffs argue these two positions by the City are "gamesmanship."[6] That is not true: both positions are factually and legally correct, and each provides an independent reason why the preliminary injunction was improper. If the petition is invalid under *Kemp*—which it clearly is—then there is no irreparable harm to Plaintiffs because the petition they wish to circulate is futile. Alternatively, if *Kemp's* validity is not ripe for determination unless and until the signatures are collected and

---

[4] The municipal clerk's approval as to form is akin to this Court's clerk accepting an appeal as properly formatted and filed—that acceptance is not an endorsement that the appeal is substantively or procedurally valid.

[5] Doc. 26 at 23–24.

[6] App. Doc. 41 at 51.

3

the referendum passes (as the district court concluded), then the injunction—entered three months and eleven days before the next election—was improper under *Purcell*. Either way, the district court should not have entered the preliminary injunction.

## I. *Kemp* renders the petition invalid and thus precludes Plaintiffs from showing irreparable harm.

As discussed in the City's opening brief, Plaintiffs successfully, but incorrectly, persuaded the trial court that *Kemp* and the Home Rule Act[7] could be ignored. According to the Plaintiffs (and the district court), the City has allegedly been given independent authority to have a petition and referendum by virtue of the 1996 local act adopting the City's current charter. But the City may not exercise delegated legislative authority except in strict conformity with the conditions placed on the delegation, and the decades of legislative silence following *Kemp* confirms that its construction of the Home Rule Act controls both O.C.G.A.§36-35-3 and the relevant portion of City's own code, § 66-37.

---

[7] O.C.G.A. § 36-35-1 *et seq.*  The specific portion of the Home Rule Act applicable in this matter is O.C.G.A. §36-35-3.

### A. The City charter is not an independent source of petition authority separate and apart from the Home Rule Act.

Plaintiffs argue that the statute at issue in *Kemp*, O.C.G.A. § 36-35-3, does not apply to this petition and referendum. They say instead that § 2-501 of the City charter authorizes it.[8] Section 2-501 reads:

> The council shall by ordinance prescribe procedures to govern the initiation, adoption, and repeal of ordinances by the electorate, and the council shall authorize an initiative or referendum election on petition of at least 15 percent of the registered voters qualified to vote in the preceding general municipal election.[9]

However, properly read, § 2-501 only authorizes the City to adopt *procedures* for a petition and referendum, pursuant to the constraints of general state law—it is not an authorization for *any* type of petition and referendum. It is an acceptance of the authority delegated by the statewide general law, not an unlimited grant of additional power.  Plaintiffs cannot identify any authority suggesting § 2-501 may or does authorize referenda beyond those allowed by O.C.G.A. § 36-35-3, or in a manner different than that set out in O.C.G.A. § 36-35-3. Indeed, the relevant City code section setting out the petition process, § 66-37, expressly acknowledges that its state

---

[8] Doc. 21 at 12. The City charter was adopted by local act of the Georgia General Assembly in 1996. *See* Act No. 1019, Ga L. p. 4469. Petitioners tacitly concede that that Act was a local law applying only to the City, not a general act with statewide application.

[9] Doc. 21-1.

legislative authority is O.C.G.A. § 36-35-3. *See* See Atl. Code § 66-37, State Law reference—Charter amendments. And that conformity is necessary, not optional.

The Georgia Constitution's Uniformity Clause requires "uniform operation" of general state laws, and it forbids "local or special law[s]…for which provision has been made by an existing general law." Ga. Const. art. 3, § 6, ¶ IV(a). Since its adoption in 1983, Georgia courts have consistently held that when the General Assembly grants a "narrow power to local governments," the Uniformity Clause preempts local governments "from exercising broader powers." *Franklin Cnty. v. Fieldale Farms Corp.*, 270 Ga. 272, 277 (1998). The Home Rule Act authorizes only one, specific referendum process. Deviation from its express terms would conflict with the general law and thus be invalid.[10] Accordingly, the City cannot deviate from the strictures of O.C.G.A. § 36-35-3 and so must follow *Kemp*'s binding interpretation of that statute.

This rule also answers Plaintiffs' unusual argument that *Kemp* somehow "judicially erased" language from the Home Rule Act.[11] As best the City understands it, Plaintiffs' argument here is that there is no express conflict between the charter's "repeal of ordinances" language and the state statute because *Kemp* held the state

---

[10] Relatedly, as explained in the City's opening brief, no local act could give the City permission to ignore a general law. App. Doc. 16 at 41–43.

[11] App. Doc. 41 at n. 20.

6

statute does not apply to ordinances. But far from eliminating any conflict between the state statute and the City charter, *Kemp*'s interpretation emphasizes the conflict between the general law and how Plaintiffs and the district court construed the 1996 Act and the City's charter and code. The charter's provision (§ 2-501) and the city code that implements it (§ 66-37) are derivative of the power granted by the Home Rule Act, not independent of it—the City does not have the power to invent its own petition and referendum process but must instead use the one provided in the Home Rule Act, as construed in *Kemp*.

### B. Legislative acquiescence to *Kemp*'s 25-year-old interpretation of the Home Rule Act's language forecloses Petitioners' arguments.

Plaintiffs' latest explanation of why *Kemp*'s interpretation of O.C.G.A. § 36-35-3 is not binding condemns their position rather than saving it. Plaintiffs now argue that because the City's 1996 charter used the same language *Kemp* later construed, the charter section is "a clearer picture of the Legislature's understanding of the meaning of the Home Rule Act than *Kemp*'s divination."[12] Thus, according to Plaintiffs, the petition referendum language in the city ordinance should be read differently than how the Georgia Supreme Court construed that same language in the Home Rule Act in *Kemp*. But that gets a basic rule of statutory construction 180 degrees wrong.

-----

[12] App. Doc. 41 at 43, n. 15.

It has long been the law in Georgia that when a court construes a statute, the validity of that construction is confirmed by subsequent legislative inaction. *See, e.g., Abernathy v. City of Albany*, 269 Ga. 88, 89–90 (1998) (legislative silence/inaction in the face of long-settled statutory interpretation is acquiescence to the interpretation which thus "has become an integral part of the statute"); *RadioShack Corp. v. Cascade Crossing II, LLC*, 282 Ga. 841, 843 (2007) ("[T]he result is to establish the legislative intent of the General Assembly which binds this Court, as well as all others, in construing the statutory provision in issue."). Federal courts apply the same rule, particularly when, as here, the longstanding precedent was unanimous and was greeted by decades of legislative inaction. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 32 (2005) ("Considerations of *stare decisis* are particularly forceful in the area of statutory construction, especially when a unanimous interpretation of a statute has been accepted as settled law for several decades.").

Here, not one, but two legislative bodies have acquiesced for decades to *Kemp*'s interpretation of the Home Rule Act—both the Georgia General Assembly and the Atlanta City Council have had 25 years to seek alterations in the statutory authorization for petitions and referenda if they were dissatisfied with *Kemp*, but neither did so. Applying that rule of statutory construction here, the fact that the City ordinance includes language materially identical to what the Georgia Supreme Court interpreted in *Kemp* means that the ordinance's language should continue to be

8

construed how *Kemp* construed it in the Home Rule Act, *i.e.,* as not permitting petition referendums to repeal ordinances unrelated to the City charter. *See RadioShack Corp.*, 282 Ga. at 843 ("A reinterpretation of a statute after the General Assembly's implicit acceptance of the original interpretation would constitute a judicial usurpation of the legislative function.").

### C.  Plaintiffs' attacks on *Kemp*'s validity fail.

Plaintiffs argue that this Court should disregard *Kemp*, because, according to them, "[*Kemp*]'s interpretation of O.C.G.A. § 36-35-3(b)(2) will not survive a challenge in Georgia Courts."[13] First, as this Court knows, it cannot disregard binding state law because "it appears" a case will be overturned.[14] Second, this is a bold prediction as there are good reasons to believe that, to paraphrase Mark Twain, the rumors of *Kemp*'s imminent demise are greatly exaggerated. As discussed above, there is a strong stare decisis interest in *Kemp*'s decades-old, unanimous statutory interpretation. In addition, although *Camden County* interpreted similar language, it was an interpretation of a constitutional (rather than statutory) delegation of legislative authority to counties. Because counties' home rule powers are constitutional, the scope of legislative delegation may be broader for counties than for municipalities. Thus, *Kemp*'s interpretation of the scope of the statutorily

---

[13] App. Doc. 41 at 42.
[14] App. Doc. 41 at 43.

delegated legislative power to municipalities in Home Rule Act likely avoids constitutional concerns regarding improper delegation that were not present in *Camden County*.

Ultimately, unless and until the Georgia Supreme Court holds otherwise, *Kemp* is good law and binding in this Court.[15]

## II. O.C.G.A. § 36-35-3 is a statutorily created political process affecting local elections.

Ballot referendums are political processes that allow citizens "to make laws directly through initiatives placed on election ballots." *Buckley v. Am. Const. Law Found. Inc*., 525 U.S. 182, 186 (1999); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 195 (2010) ("Petition signing…has legal effect in the electoral process."). Nonetheless, Plaintiffs argue that the referendum here is (a) not a political process and (b) that the district court's order did not affect an election.[16] But Plaintiffs offer no good reason to treat the referendum process any differently than other election processes.

---

[15] Plaintiffs argue the City should have sought certification of *Kemp*'s ongoing validity, but it is Plaintiffs who seek to have the case law changed, rather than follow its clear command. If they want the Georgia Supreme Court to overturn *Kemp*, then they may ask for certification. That said, the City has no objection to the Court certifying that question to Georgia's Supreme Court should it deem it necessary.

[16] App. Doc. 41 at 57.

### A. *Purcell* applies to this case.

Plaintiffs do not argue that they meet their heightened burden under *Purcell*, only that *Purcell* does not apply.[17] Specifically, they contend *Purcell* does not apply (1) because it only applies to "elections" and (2) because there is "no impending election."[18] Neither of these are true.

First, Plaintiffs try to avoid *Purcell* with an incongruous argument that ballot access does not implicate "election rules."[19] Plaintiffs contend that regulations "govern[ing] access to the ballot" are not "election rules" under *Purcell*.[20] But the ballot initiative process outlined in O.C.G.A. § 36-35-3 is "a state[] election law"— the whole process culminates with a "call for an election for the purpose of submitting such amendment or repeal to the registered electors." *Merrell*, 142 S.Ct. at 880; O.C.G.A. § 36-35-3(b)(2)(A). Indeed, federal courts at all levels treat ballot access cases generally, and petition circulation specifically, as challenges to election laws. *See, e.g., Buckley*, 525 U.S. at 191 (a state's right to regulate its elections extends to "protect[ing] the integrity and reliability of the initiative process"); *Little v. Reclaim Idaho*, 140 S.Ct. 2616, 2617 (mem) (2020) ("[T]he initiative process is

---

[17] *See generally id*. at 57–61. Nor could they, as the City laid out in its Motion to Stay. *See* App. Doc. 14 at 15–21.

[18] App. Doc. 41 at 57–59.

[19] *Id*. at 58.

[20] App. Doc. 41 at 58.

just one aspect of a primary and general election system….); *Pierce v. Jacobsen*, 44 F.4th 853, 859 (9th Cir. 2022) (challenge to restriction on petition circulation was a challenge to an election law); *Krislov v. Rednour*, 226 F.3d 851, 859 (7th Cir. 2000) (registration and residency requirement for nomination petition circulation was a "State election law"); *Fair Maps Nevada v. Cegavske*, 463 F. Supp. 3d 1123, 1148 (D. Nev. 2020) ("signature collection and verification" regulations were election rules subject to the *Purcell* principle).

Plaintiffs' argument that the "signature, petition circulation, and the City's validation process" do not implicate "election rules," also conveniently ignores the "call for an election" language in the very same section of the statute.[21] To find in Plaintiffs' favor on this point, this Court would have to conclude that the signature collection and validation provisions in O.C.G.A. § 36-35-3(b)(2)(A) are somehow distinct from the election provision, also in O.C.G.A. § 36-35-3(b)(2)(A). That does not make any sense and contravenes statutory rules of construction.

Second, Plaintiffs argue that *Purcell* does not apply because there was no impending election: "Because the call of the election must be 29 days before the election date…and the Coalition turned in its petitions to the City on September 11, 2023, the referendum will not be on the ballot until, at the earliest, March 2024."[22]

---

[21] App. Doc. 41 at 58.

[22] App. Doc. 41 at 59.

As discussed above, this is revisionist history. On the date the clerk provided the official petition, on the date the Plaintiffs filed this lawsuit, and on the date the district court issued the injunction, November 7 was the next potential election date. Only after the district court's injunction did the next potential election date get pushed out to 2024.

Indeed, as demonstrated by the facts here, "rewriting a state's election procedures or moving deadlines rarely ends with one court order. Moving one piece on the game board invariably leads to additional moves [which is] why [courts] must heed the Supreme Court's warning that federal courts are not supposed to change state election rules as elections approach." *Thompson v. Dewine*, 959 F.3d 804, 813 (6th Cir. 2020) (refusing to enjoin a ballot initiative regulation even though election was months away because there were "important, interim deadlines" and "moving or changing a deadline or procedure now will have inevitable, other consequences"). A court should not be able to avoid the rule in *Purcell* by issuing an order that changes the election date, and then say *Purcell* does not apply because the election is not imminent.

Because O.C.G.A. § 36-35-3 and Ordinance § 66-37 are election laws and the next election was just three months away, the district court injunction violated the *Purcell* principle that federal courts should avoid "late judicial tinkering with election laws." *Merrill*, 142 S.Ct. at 880–81.

**B.   *Holt* applies to this case.**

Having statutorily created a political process that is, by definition, a delegation of the state's legislative power to its residents, a state may reasonably restrict participation in that process to its residents. *See Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 68–69 (1978) ("[O]ur cases have uniformly recognized that a government unit may legitimately restrict the right to participate in its political processes to those who reside within its borders.").

Plaintiffs' only response to *Holt* is a single sentence pointing out that *Holt* was a voting access case, not a ballot access case, and a string cite to three circuit court cases.[23] First, two of the cases Plaintiffs cite do not discuss *Holt* at all. *See Pierce v. Jacobsen,* 44 F.4th 853, and *Yes on Term Limits, Inc. v Savage,* 550 F.3d 1023 (10th Cir. 2008). Second, the one case that does mention *Holt*, *We the People PAC v. Bellows*, dismissed the application of *Holt* because it "concerned participation in the political process through voting rather than through the circulation of a petition." 40 F.4th 1, 22 (1st Cir. 2022). But, just like Plaintiffs, *Bellows* summarily dispensed with *Holt* in a single sentence. And neither Plaintiffs nor the First Circuit in *Bellows* provide any analysis of *Holt* or explain why its directive that governments "may legitimately restrict the right to participate in its political process**es**" to its residents

---

[23] App. Doc. 41 at 37–38.

applies only to voting access and not to ballot access. *Holt*, 439 U.S. at 68–69 (emphasis added).

They can't explain it because there is no logical reason to make such a distinction. Indeed, *Holt*'s approval of residency restrictions on voting can be bookended with cases like *Rowe v. City of Cocoa*,[24] which approved residency restrictions for speaking at city council meetings—thus placing petition referendum residency restrictions squarely in the middle of the political process. Furthermore, if anything, restrictions on voting access (like those in *Holt*) are more suspect than petition referendum restrictions. Unlike statutorily created petition referendums, the right to vote "is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Thus, if a government unit can restrict participation in a fundamental constitutional right to its residents, and if a city can limit speech at its council meetings to residents, surely a state or city can restrict participation in its optional, statutory petition process to its residents.

---

[24] 358 F.3d 800 (11th Cir. 2004). Although *Rowe* was analyzed under the limited public fora doctrine, it was a First Amendment challenge that considered many of the same factors in this case: the government's interest in orderly and efficient proceedings and limiting discussion to those "who have a direct stake in the business of the city." *Id*. at 803.

### III. Strict scrutiny is not automatic: there is no "litmus test" for whether an election law violates the First Amendment.

If this Court decides that neither *Purcell*, nor *Holt*, nor *Kemp* apply to this case, the preliminary injunction was still improper because Plaintiffs are unlikely to succeed on the merits of their First Amendment challenge. As an initial matter, Plaintiffs' representation that "Two Supreme Court opinions and every circuit to consider this issue has applied strict scrutiny to strike down residency restrictions on petition circulation" is facially false.[25] Neither Supreme Court case on petition circulation (*Meyer* and *Buckley*) struck down a residency requirement. Indeed, to the extent the Court considered residency in *Buckley*, the majority assumed a residency requirement would be valid[26]—a narrowly tailored restriction to protect the state's "compelling interest in ensuring that all circulators are residents," per Justice Thomas[27]—and the dissenting justices would have upheld a residency limitation.[28] Nor has "every" circuit court struck residency requirements down: the Eighth Circuit in *Initiative & Referendum Inst. v. Jaeger* did not apply strict scrutiny and upheld the residency requirement. 241 F.3d 614, 616–17 (8th Cir. 2001).

---

[25] App. Doc. 41 at 19; *see also id*. at 17 ("The City cannot cite a single circuit court opinion…that strict scrutiny should not apply.").

[26] 525 U.S. at 197.

[27] *Id*. at 211.

[28] *See id.* at 215–220 (JJ. O'Connor and Breyer, dissenting in part) and 226 (J. Rehnquist, dissenting).

Furthermore, the Supreme Court has expressly rejected Plaintiffs' argument that strict scrutiny is automatic. Because "[e]lection laws will invariably impose some burden" on "the individual's right to vote and his right to associate with others for political ends," "subject[ing] every voting regulation to strict scrutiny…as the petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Burdick*, 504 U.S. at 433. Thus, there is "no litmus test [that] will separate valid ballot-access provisions from invalid interactive speech restrictions." *Buckley* 525 U.S. at 187, 192.

### A.  The ordinance does not infringe on interactive political speech.

As relevant here, the "core political speech" protected by the First Amendment is the "interactive communication concerning political change." *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). In particular, the Supreme Court in *Meyer* reasoned that because circulators must "persuade potential signatories" that their cause should prevail, or at least is a cause deserving of public consideration, petition circulation "will, in almost every case involve an explanation of the nature of the proposal and why its advocates support it." *Id*. at 421. Thus, the Court concluded that "the *solicitation* of signatures for a petition involves protected speech." *Id*. at 422, n.5 (emphasis added).

### 1.   Verifying collection of signatures is not the same as soliciting signatures.

The ordinance and statute here do not impinge on non-residents' right to solicit signatures. The only limitation on participation in the petition circulation process is that a resident must attest that the signatures "were collected" within the city limits. Plaintiffs state in their brief that "the City does not dispute that a non-resident cannot individually take a petition circulation form, approach a city resident, secure a signature, and then sign the attestation."[29] But that is wrong—the City has consistently explained that non-residents *can* do the first three things; it is only the last item that non-residents may not do under the ordinance and state statute.

The City's interpretation of the "were collected" language is entirely consistent with the common understanding of the terms solicit and collect. The Oxford English Dictionary defines "collect" as "[t]o gather together into one place or group; to gather, get together."[30] By contrast, it defines "solicit" as "[t]o entreat or petition (a person) for, or to do, something; to urge, importune; to ask earnestly or persistently."[31] Using the plain meaning of these words, soliciting implicates the

[29] App. Doc. 41 at 28.

[30] *Collect*, Oxford English Dictionary, https://www.oed.com/search/dictionary/?scope=Entries&q=collect, (last visited Oct. 4, 2023).

[31] *Solicit*, Oxford English Dictionary, https://www.oed.com/search/dictionary/?scope=Entries&q=solicit, (last visited Oct. 4, 2023).

First Amendment, but collecting does not. *See, e.g., Meyer*, 486 U.S. at 422, n.5 ("[T]he solicitation of signatures for a petition involves protected speech"); *Buckley*, 525 U.S. at 189, n.7 ("[E]ach signature [must be] affixed in the circulator's presence…."); *Bellows*, 40 F.4th at 4 (a "circulator" is the person who "present[s] the petition to the voter, ask[s] the voter to sign the petition and personally witness[es] the voter affixing [their] signature"); *Pierce*, 44 F.4th at 859 ("The solicitation of signatures on an initiative petition is 'core political speech' involving 'interactive communication'…."). Thus, because the ordinance does not limit non-residents' right to solicit signatures, it does not burden their First Amendment rights.

> **2.  If more than one meaning is plausible, the Court should construe the statute in the way that avoids creating constitutional problems.**

Further, both Plaintiffs and the Amici ignore the work the canon of constitutional avoidance must do here. Under that canon, "[w]hen faced with more than one plausible interpretation of a law," courts "apply the reasonable presumption that the legislature did not intend the alternative which raises serious constitutional doubts." *Pine v. City of West Palm Beach*, 762 F.3d 1262, 1270–71 (11th Cir. 2014) (cleaned up). Here, the ordinance can plausibly be interpreted to not bar Plaintiffs from soliciting signatures, the interactive communication, but only from attesting that "signatures *were collected* inside the boundaries of the city." Atl. Code § 66-

37(b) (emphasis added). And because this interpretation would avoid the constitutional problem that Plaintiffs identify, the Court must adopt it.

### B. The residency collection attestation does not severely burden Plaintiffs' First Amendment rights.

Because "subject[ing] every voting regulation to strict scrutiny…would tie the hands of States seeking to assure that elections are operated equitably and efficiently…a more flexible standard applies." *Burdick,* 504 U.S. at 433–34. Under this flexible standard, the "rigorousness" of the review "depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* at 434. When that burden is "severe," the regulation must be "narrowly drawn" to serve a "compelling" state interest. *Id.* But when a state election law "imposes only reasonable, non-discriminatory restrictions" on First and Fourteenth Amendment rights, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id*. Thus, the application of strict scrutiny is only appropriate *after* a court determines the regulation imposes a severe burden on First Amendment rights. *See., e.g., Buckley*, 525 U.S. at 192, n.12 ("[S]tate regulations imposing severe burdens on speech must be narrowly tailored to serve a compelling state interest.") (cleaned up); *Andersen v. Celebrezze*, 460 U.S. 780, 789 (1983) (courts "must first consider the character and magnitude of the asserted injury"); *Burdick*,

504 U.S. at 439 ("Because we have already concluded that the burden is slight, the State need not establish a compelling interest….").[32]

As "[t]he party challenging the law," Plaintiffs "bear[] the initial burden of [showing] the specific burden caused by the law." *Pierce*, 44 F.4th at 860. But because Plaintiffs continue to insist that the resident attestation is a solicitation restriction—*i.e.*, that it requires a 1:1 resident/non-resident ratio—they never explain how or why the collection attestation imposes a severe burden on core political speech or "drastically reduces" the "number of voices" who may carry the message. *Cf., e.g.*, *Buckley*, 525 U.S. at 193 (Colorado's voter registration requirement imposed a severe burden because it "drastically reduce[d]" the number of people available to circulate the petition); *Lerman v. Bd. of Elections in New York City*, 232 F.3d 135 (2d Cir. 2000) (finding a witness resident requirement imposed a severe burden because it rendered almost 99.5% of party members ineligible the circulate the petition).

---

[32] Plaintiffs' own cases similarly recognize that the burden dictates the level of scrutiny. *See Bellows*, 40 F.4th at 14 (if the regulation "impose[s] a severe burden on core political speech…it may survive…only if it is narrowly tailored to serve a compelling state interest"); *Lerman v. Bd. of Elections in New York City*, 232 F.3d 135, 145 (2d Cir. 2000) ("In determining the level of scrutiny to be applied to the section 6–132(2) witness residence requirement, we first must assess the extent to which that requirement burdens First and Fourteenth Amendment rights."); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 317 (4th Cir. 2013) ("[A]n election regulation that imposes a severe burden is subject to strict scrutiny…."); *Pierce*, 44 F.4th at 861 ("[W]e must weigh all the effects of the regulation to determine whether, on the whole, it severely burdens core political speech.").

The collection attestation here does not impose a severe burden because it is materially different from the solicitation restrictions in every other federal case. Instead of restricting solicitation, the collection attestation functions like a supervisory role—allowing one resident to oversee multiple solicitors. Thus, it does not severely "cut[] down on the number of message carriers." *Buckley,* 525 U.S. at 197. The ordinance does not require that each signature must be witnessed by a resident and the City does not contend that the circulators must go out in 1:1 pairs. To the extent this 1:1 pairing was Plaintiff Baker's experience,[33] that was a restriction imposed by the petition organizers, not a direction from the City, and it has no effect on the actual legal meaning of the ordinance.

Because the residency collection attestation here does not impose a severe burden" on First Amendment rights, "the State's important regulatory interests are…sufficient to justify the restrictions." *Burdick,* 504 U.S. at 434.

## IV. Even if strict scrutiny applies, the resident verification requirement is narrowly tailored to achieve the City's compelling interest in preventing fraud.

It is axiomatic that a "State's interest in preserving the integrity of the electoral process is undoubtedly important." *Reed*, 561 U.S. at 197. This interest is "particularly strong with respect to efforts to root out fraud, which not only may produce fraudulent outcomes, but has a systemic effect as well: It 'drives honest

---

[33] App. Doc. 41 at 28.

citizens out of the democratic process and breeds distrust of our government.'" *Id.* at 197 (quoting *Purcell*, 549 U.S. at 4, and upholding regulation that petition signatures must be publicly disclosed).

But, citing to a summary judgment case, Plaintiffs contend that the City's interest in preventing fraud "fails" because "the City introduced no evidence" that "obtaining valid signatures is greatly assisted by the residency restrictions."[34] This argument misrepresents the procedural posture of this case—here, the City has had minimal opportunity to prevent any evidence as there was no hearing or discovery before the preliminary injunction. On remand however, the City will present such evidence and it will show that, while there is vanishingly little evidence of fraud in connection with voting, including absentee ballots, there is widespread evidence of fraud in connection with petition collection efforts.[35]

That risk of fraud is particularly evident when, as has happened here, hundreds of thousands of dollars (or more) are spent by out of state interests to influence the process.[36] This was highlighted in 2022 when five Republican gubernatorial

---

[34] App. Doc. 41 at 34 (quoting *Krislov*, 226 F.3d at 865).

[35] *See Reed*, 561 U.S. at 197–98 ("The threat of fraud in this context is not merely hypothetical; respondents and their amici cite a number of cases of petition-related fraud across the country.").

[36] *See* John Ruch, *Cox Scion's Defection Over "Cop City" Shines a Light on Media Conflicts, Old-Money Power*, Saporta Report (July 17, 2023). *See also* Tweet by Fergie Chambers, [July 18, 2023], Fergie Chambers #StopCopCity on X: "The

candidates—half of the field, including the two front runners—were officially disqualified from appearing on the Michigan ballot because they submitted thousands of fraudulent signatures. Indeed, one of the disqualified campaigns was a QAnon affiliated petition effort, which was determined to have included thousands of fraudulent signatures and other chicanery.[37]

A 2023 effort to get a GOP candidate onto a primary ballot in Colorado was similarly found to involve thousands of fraudulent signatures.[38] In Florida, in 2022, petition circulators turned in thousands of illegally gathered, fraudulent petition pages.[39] Similar stories can be found in New Jersey, Pennsylvania, and New York.[40]

---

battle to #StopCopCity & move forward the United Front of organizing for the people of ATL has only just begun. Having just detached from my family's company, our cadre is now making our first major strategic "give," with $600k split between @CommunityMvt & @ATLSolFund" / X (twitter.com).

[37] *See* Mitchell Armentrout, *Q-Anot? Far-right Conspiracy Theorists Knocked Off Illinois GOP Primary Ballot – But They Insist "We Are Not Done,"* Chicago Sun-Times (Apr. 22, 2022).

[38] Janet Oravetz & Marshall Zelinger, *Six People Accused of Forging Signatures on Petition to Get Candidate on Primary Ballot*, 9News (June 20, 2023).

[39] Jake Stofan, *Florida Secretary of State Weighs in on Petition Fraud Arrests*, ActionNewsJax.com (May 27, 2022).

[40] Press Release, New Jersey Office of the Attorney General, *AG Platkin Announces Campaign Manager Faces Election Fraud Charges in Connection with False Voter Certifications Supporting Gubernatorial Candidate in 2021* (May 2, 2023); Press release, Pennsylvania Attorney General, *AG Shapiro Announces Charges Against Philadelphia Man for Orchestrating the Forgery of Signatures on Election Nomination Petitions in Municipal Primary Races* (Nov. 16, 2022); Press Release, Suffolk County District Attorney's Office, *Four Charged in Connection with Petition Fraud* (Dec. 4, 2018); Martin Wilbur, *Mt. Kisco Democratic Chair, Son Indicted for Forging Names on Petition*, The Examiner-News (Sept. 13, 2023).

Indeed, petition fraud is a nationwide issue, cutting across demographic, racial, and partisan lines, particularly when paid circulators from outside the area are being employed.

Finally, the resident attestation requirement is narrowly tailored. As noted above, it does not require a 1:1 ratio for soliciting signatures. Instead, the ordinance merely requires that a resident supervise the process—ultimately attesting that all the signatures were collected in compliance with the state statute. Again, Plaintiffs are making this process harder than it needs to be by choosing the most restrictive interpretation. If, as discussed above, a residency restriction might be a narrowly tailored restriction to protect the state's "compelling interest in ensuring that all circulators are residents," then surely the residency collection attestation would survive strict scrutiny. *See Buckley*, 525 U.S. at 211.

## CONCLUSION

For these reasons, the Court should reverse the entry of the preliminary injunction.

[*Signatures follow on next page*.]

Respectfully submitted this 4th day of October, 2023.

*/s/Jane D. Vincent*
Robert L. Ashe III
Georgia Bar No. 208077

25

ashe@bmelaw.com
Jane D. "Danny" Vincent
Georgia Bar. No. 380850
vincent@bmelaw.com
Matthew R. Sellers
Georgia Bar No. 691202
sellers@bmelaw.com
Bondurant, Mixson & Elmore, LLP
1201 W. Peachtree Street, NW
Atlanta, GA 30309
(404) 881-4100 – Telephone

*Attorneys for the City of Atlanta*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because this brief contains 5,875 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

This certification is made on October 4, 2023.

*/s/ Jane D. Vincent*
Jane D. Vincent
Georgia Bar No. 380850

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on October 4, 2023, I served a copy of this **APPELLANT CITY OF ATLANTA'S REPLY BRIEF** by filing a copy with the Court's CM/ECF system, which will automatically serve a copy on counsel of record by email.

<u>*/s/ Jane D. Vincent*    </u>
Jane D. Vincent
Georgia Bar No. 380850